# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN LIBRARY ASSOCIATION,<br>225 N. Michigan Ave.<br>Suite 1300<br>Chicago, Illinois 60601,<br><br>AMERICAN FEDERATION OF STATE,<br>COUNTY AND MUNICIPAL<br>EMPLOYEES, AFL-CIO,<br>1625 L Street NW<br>Washington, DC 20036,<br><br>             *Plaintiffs*,<br><br>       v.<br><br>KEITH SONDERLING, in his capacity as<br>Acting Director of the Institute of Museum<br>and Library Services,<br>955 L'Enfant Plaza North, SW,<br>Suite 4000<br>Washington, DC 20024,<br><br>INSTITUTE OF MUSEUM AND<br>LIBRARY SERVICES,<br>955 L'Enfant Plaza North, SW,<br>Washington, DC 20024,<br><br>DONALD TRUMP, in his capacity as<br>President of the United States of America,<br>1600 Pennsylvania Avenue NW,<br>Washington, DC 20050,<br><br>AMY GLEASON, in her capacity as<br>Acting Administrator of the U.S. DOGE<br>Service and U.S. DOGE Service<br>Temporary Organization,<br>736 Jackson Place NW<br>Washington, DC 20503,<br><br>U.S. DOGE SERVICE,<br>736 Jackson Place NW<br>Washington, DC 20503, | **COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF**<br><br><br><br>Case No. _____ |

U.S. DOGE SERVICE TEMPORARY
ORGANIZATION,
   736 Jackson Place NW
   Washington, DC 20503,

RUSSEL VOUGHT, in his capacity as
Director of the Office of Management and
Budget,
   725 17th Street NW, Suite 9272
   Washington, DC 20503, and

U.S. OFFICE OF MANAGEMENT AND
BUDGET,
   725 17th Street NW, Suite 9272
   Washington, DC 20503,

*Defendants*.

## INTRODUCTION

This action seeks declaratory and injunctive relief with respect to unlawful actions taken by President Donald Trump and his administration to dismantle the Institute for Museum and Library Services (IMLS). The IMLS, a small agency, is the only federal entity dedicated to funding libraries. Libraries are crucial to our country's communities and democratic system. As President Dwight D. Eisenhower said: "The libraries of America are and must ever remain the home of free and inquiring minds. To them, our citizens—of all ages and races, of all creeds and persuasions—must be able to turn with clear confidence that there they can freely seek the whole truth, unvarnished by fashion and uncompromised by expediency." Defendants' actions threaten libraries, museums, and the millions of people who rely on them across the nation.

The first of these actions came on March 14, 2025, when Defendant Trump issued an Executive Order titled "Continuing the Reduction of the Federal Bureaucracy," Exec. Order No. 14,238, 90 Fed. Reg. 13,043 (Mar. 14, 2025) (EO), calling IMLS "unnecessary," *id.* § 1, and

stating it "shall be eliminated," *id.* § 2(a). The EO directed IMLS and other covered agencies to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* § 2(a). It further directed IMLS to "submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent," *id.* § 2(b), and ordered the Director of the Office of Management and Budget to "reject funding requests for such governmental entities to the extent they are inconsistent with this order," *id.* § 2(c).

In the days following the executive order, members of the Department of Government Efficiency (DOGE) gutted the agency. They initially placed all IMLS staff on administrative leave (later to reinstate a handful that remain at least for now) and cut off their access to the agency's office and electronic systems, including email. On April 3, Defendants sent termination notices to virtually all IMLS staff on administrative leave, retaining only 12 IMLS employees. On April 1, 2025, Defendants began canceling IMLS grants. On April 4, Defendant Sonderling fired all 23 members of the National Museum and Library Services Board.

Defendants have already canceled statutorily required grants to several state libraries. It is only a matter of time before Defendants cancel *en masse* IMLS grants that fund activities at libraries across the country. Even if grants are not canceled, the severely reduced workforce will not be able to effectively and timely process grant payments and applications. Many IMLS grantees have already expended funds in reliance on grant awards and have submitted or will soon submit requests for reimbursement to IMLS for these expenditures. Without grant funding or IMLS staff to process reimbursements, local and state libraries will suffer an immediate and irreparable inability to pay vendors or staff hired in reliance on IMLS' promise to make these

reimbursements. In addition, IMLS provides important day-to-day services and advice to libraries across the country, which has already ceased, causing irreparable harm. Time is of the essence.

Defendants took these actions to dismantle IMLS, and they were taken without congressional authorization. Congress is the only entity that may lawfully dismantle the agency, not the President and certainly not DOGE.

Given the ongoing harms suffered by Plaintiffs and Defendants' intent to inflict imminent future harm, Plaintiffs now file this Complaint and will seek a preliminary injunction directing Defendants to reverse these unlawful actions and to halt any further steps to dissolve the agency until the Court has an opportunity to more fully consider the issues on the merits.

## PARTIES

1.     **Plaintiff American Library Association** (ALA) is a non-profit membership organization founded in Philadelphia on October 6, 1876, to promote library services and librarianship. For the last 149 years it has provided leadership for the development, promotion, and improvement of library and information services and the profession of librarianship in order to enhance learning and to ensure access to information for all. It has over 47,000 members including librarians, library patrons, libraries themselves, corporations and other organizations, and members of the public. ALA is the key public advocate to promote public awareness of the crucial role of libraries and librarians. It issues over 100 grants, scholarships, and awards, including the prestigious Caldecott and Newberry medals for children's literature. It provides training for library staff, friends, and trustees, and promotes lifelong learning for all. ALA fights to guarantee the right to read, seek information, and speak freely—for everyone. ALA assists libraries in promoting literacy and digital skills, providing leadership in the transformation of libraries in a dynamic and increasingly global digital environment.

2.      **Plaintiff American Federation of State, County and Municipal Employees, AFL-CIO** (AFSCME) is a national labor organization and unincorporated membership association headquartered in Washington, D.C. AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils, and affiliates located throughout 46 states, the District of Columbia, and Puerto Rico. AFSCME, through its Councils and constituent local unions, represents tens of thousands of employees in public and private libraries and museums across the country.

3.      **Defendant Keith Sonderling,** the Deputy Secretary of the Department of Labor, was designated by President Donald J. Trump on March 20, 2025, as Acting Director of IMLS. He is named in this official capacity.

4.      **Defendant Institute of Museum and Library Services** is an executive department of the federal government that is responsible for supporting library and museum services across the country.

5.      **Defendant Donald J. Trump** is the President of the United States and oversees the executive branch. He is named in this official capacity.

6.      **Defendant Amy Gleason** is the Acting Administrator of the U.S. DOGE Service and the U.S. DOGE Service Temporary Organization in the Executive Office of the President. She is named in this official capacity.

7.      **Defendant U.S. DOGE Service** is an entity that was created within the Executive Office of the President by Executive Order 14158.

8.      **Defendant U.S. DOGE Service Temporary Organization** is an entity that was created within the Executive Office of the President by Executive Order 14158. Together

Defendant U.S. DOGE Service and U.S. DOGE Service Temporary Organization will be referred to as "DOGE" or the "DOGE Defendants."

9.     **Defendant Russel Vought** is the Director of the Office of Management and Budget. He is named in this official capacity.

10.    **Defendant U.S. Office of Management and Budget** is an executive department of the federal government that is responsible for overseeing the federal budget.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically, the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*., and pursuant to 28 U.S.C. § 1361.

12.    Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e), because at least one of Defendants is headquartered in Washington, D.C., and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here.

## LEGAL BACKGROUND

### The IMLS and its Congressional Mandate

13.    Libraries are central to the history and vitality of our democracy. Benjamin Franklin started the first lending library in America almost 300 years ago. Former President Franklin D. Roosevelt said: "I have an unshaken conviction that democracy can never be undermined if we maintain our library resources and a national intelligence capable of utilizing them." Former First Lady Laura Bush, herself a librarian, said: "I have found that the most valuable thing in my wallet is my library card." And as former President Biden explained in Exec. Order No. 14,084, 87 Fed. Reg. 60535 (Sept. 30, 2022), as amended by Exec. Order No. 14,109, § 5 (Sept. 29, 2023):

"[M]useum and library services are essential to the well-being, health, vitality, and democracy of our Nation."

14.    The Supreme Court agrees: "Public libraries pursue the worthy missions of facilitating learning and cultural enrichment." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 203 (2003).

15.    In 1996, in recognition of the critical role libraries play in our nation, Congress passed the Museum and Library Services Act ("MLSA"). Pub. L. No. 115-410, 132 § 5417 (2018) (available at https://perma.cc/B29K-EWZC). The MLSA established the IMLS as an independent agency within the National Foundation on the Arts and the Humanities. *Id.* § 203(a). The MLSA required the Director of the IMLS to award grants to fund library and museum programs and authorized appropriations through 2002. *Id.* §§ 204, 214, 276.

16.    In 2003, President George W. Bush signed into law the Museum and Library Services Act of 2003, which reauthorized federal appropriations to the IMLS. Pub. L. No. 108-184, 117 Stat. 2649 (2003).  In 2010, Congress again reauthorized appropriations to the IMLS and expanded its responsibilities and programs to include policy research and other activities. Pub. L. No. 111-340, 124 Stat. 3606 (2010). Most recently, in 2018, President Trump likewise renewed the MLSA, reauthorizing the IMLS's existing programs and providing new authority to develop programs to support new museum, library, and information professionals. Pub. L. No. 115-410, 132 Stat. 5417 (2018). Congress has continued to fund the IMLS, most recently through the Full Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025). ("2025 Appropriations Act"), which extended appropriations for IMLS conferred in the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 697 (2024)

("2024 Appropriations Act"), until September 30, 2025. Congress appropriated nearly $300 million to the IMLS to carry out its statutory responsibilities.

17.    With respect to library services, the MLSA's purposes are:

(1) to enhance coordination among Federal programs that relate to library, education, and information services;

(2) to promote continuous improvement in library services in all types of libraries in order to better serve the people of the United States;

(3) to facilitate access to resources in all types of libraries for the purpose of cultivating an educated and informed citizenry;

(4) to encourage resource sharing among all types of libraries for the purpose of achieving economical and efficient delivery of library services to the public;

(5) to promote literacy, education, and lifelong learning, including by building learning partnerships with school libraries in our Nation's schools, including tribal schools, and developing resources, capabilities, and programs in support of State, tribal, and local efforts to offer a well-rounded educational experience to all students;

(6) to enable libraries to develop services that meet the needs of communities throughout the Nation, including people of diverse geographic, cultural, and socioeconomic backgrounds, individuals with disabilities, residents of rural and urban areas, Native Americans, military families, veterans, and caregivers;

(7) to enable libraries to serve as anchor institutions to support community revitalization through enhancing and expanding the services and resources provided by libraries, including those services and resources relating to workforce development, economic and business development, critical thinking skills, health information, digital literacy skills, financial literacy and other types of literacy skills, and new and emerging technology;

(8) to enhance the skills of the current library workforce and to recruit future professionals, including those from diverse and underrepresented backgrounds to the field of library and information services;

(9) to ensure the preservation of knowledge and library collections in all formats and to enable libraries to serve their communities during disasters;

(10) to enhance the role of libraries within the information infrastructure of the United States in order to support research, education, and innovation;

(11) to promote library services that provide users with access to information through national, State, local, regional, and international collaborations and networks; and

(12) to encourage, support, and disseminate model programs of library and museum collaboration.

20 U.S.C. § 9121.

18. The President appoints the Director of IMLS with the advice and consent of the Senate for a four-year term. 20 U.S.C. § 9103.

19. The Director's duties are specified by statute. They are mandatory and non-delegable.

20. The Director "*shall* have primary responsibility for the development and implementation of policy to ensure the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United States." 20 U.S.C. § 9103 (emphasis added).

21. "In carrying out [this] responsibility the Director *shall*—

A) advise the President, Congress, and other Federal agencies and offices on museum, library, and information services in order to ensure the creation, preservation, organization, and dissemination of knowledge;

(B) engage Federal, State, and local governmental agencies and private entities in assessing the museum, library, and information services needs of the people of the United States, and coordinate the development of plans, policies, and activities to meet such needs effectively;

(C) carry out programs of research and development, data collection, and financial assistance to extend and improve the museum, library, and information services of the people of the United States; and

(D) ensure that museum, library, and information services are fully integrated into the information and education infrastructures of the United States. 20 U.S.C. § 9103 (emphasis added).

22. The MLSA requires the Director to carry out these responsibilities through specific, affirmative, non-delegable statutory mandates.

23. A key mandate is that the Director "shall regularly support and conduct, as appropriate, policy research, data collection, analysis and modeling, evaluation, and dissemination

of information to extend and improve the Nation's museum, library, and information services." 20

U.S.C. § 9108.

24.     The Director of IMLS is obligated to issue several types of grants to satisfy these

statutory mandates. Many of the grants are set forth in the Library Services and Technology Act

(LSTA), a part of the MLSA. Pub. L. No. 94-462, Subtitle B.

25.     Using funds duly appropriated by Congress, the Director "*shall* award grants from

minimum allotments . . . to each State." 20 U.S.C. § 9131 (emphasis added).

26.     Those grants are to be expended for the purposes of:

(1) expanding services for learning and access to information and educational resources in a variety of formats (including new and emerging technology), in all types of libraries, for individuals of all ages in order to support such individuals' needs for education, lifelong learning, workforce development, economic and business development, health information, critical thinking skills, digital literacy skills, and financial literacy and other types of literacy skills;

(2) establishing or enhancing electronic and other linkages and improved coordination among and between libraries and entities, as described in section 9134(b)(6) of this title, for the purpose of improving the quality of and access to library and information services;

(3) (A) providing training and professional development, including continuing education, to enhance the skills of the current library workforce and leadership, and advance the delivery of library and information services; and (B) enhancing efforts to recruit future professionals, including those from diverse and underrepresented backgrounds, to the field of library and information services;

(4) developing public and private partnerships with other agencies, tribes, and community-based organizations;

(5) targeting library services to individuals of diverse geographic, cultural, and socioeconomic backgrounds, to individuals with disabilities, and to individuals with limited functional literacy or information skills;

(6) targeting library and information services to persons having difficulty using a library and to underserved urban and rural communities, including children (from birth through age 17) from families with incomes below the poverty line (as defined by the Office of Management and Budget and revised annually in accordance with section 9902(2) of title 42) applicable to a family of the size involved;

(7) developing library services that provide all users access to information through local, State, regional, national, and international collaborations and networks; and

(8) carrying out other activities consistent with the purposes set forth in section 9121 of this title, as described in the State library administrative agency's plan.

20 U.S.C. § 9141.

27.    In addition, the Director "*shall* award grants to Indian tribes and to organizations that primarily serve and represent Native Hawaiians . . . to enable such tribes and organizations to carry out [certain] activities." 20 U.S.C. §§ 9131, 9161 (emphasis added). Those grants are required to serve the same purposes as the grants to States.

28.    Funds are also reserved for "national leadership grants." Under this program, the Director "*shall* establish and carry out a program to enhance the quality of library services nationwide and to provide coordination between libraries and museums, including by carrying out activities such as:

(1) building workforce and institutional capacity for managing the national information infrastructure and serving the information and education needs of the public;

(2) (A) research and demonstration projects related to the improvement of libraries or the enhancement of library and information services through effective and efficient use of new and emerging technologies, including projects that enable library users to acquire digital literacy skills and that make information resources more accessible and available; and (B) dissemination of information derived from such projects;

(3) conserving, preserving, and digitizing library materials and resources, giving priority to projects emphasizing coordination, optimizing conditions for storage and future use, offering staff training, avoiding duplication, and providing access by researchers beyond the institution or library entity undertaking the project;

(4) enhancing the ability of libraries to provide services to affected communities in the event of an emergency or disaster through— (A) the development of national, regional, statewide, or local emergency and disaster management plans that— (i) address communication and coordination of information and services for affected communities; and (ii) ensure the preservation of knowledge and library collections; and (B) the implementation of the emergency and disaster management plans described in subparagraph (A), or otherwise enabling libraries to provide services consistent with this chapter to affected communities in the event of an emergency or disaster; and

(5) model programs demonstrating cooperative efforts between libraries and museums. 20 U.S.C. § 9162(a).

29.     Congress also established the National Museum and Library Services Board (Board), which "*shall* advise the Director on general policies with respect to the duties, powers, and authority of the Institute relating to museum, library, and information services." 20 U.S.C. § 9105a(d)(1) (emphasis added). The Board is comprised of 23 members, including 20 who are appointed by the President and "who are specially qualified by virtue of their education, training, or experience" in library or museum services, or their commitment to libraries or museums. *Id.* § 9105a(b)(1).

30.     Congress appropriated $294,800,000 to IMLS through September 30, 2025, "[f]or carrying out the Museum and Library Services Act of 1996 and the National Museum of African American History and Culture Act." 2024 Appropriations Act, 138 Stat. at 697; 2025 Appropriations Act, 139 Stat. at 10–12. The National Museum of African American History and Culture Act (NMAAHC Act) commands the Director of IMLS to establish grant and scholarship programs to support and promote African American museums and studies. Pub. L. No. 108-184, 117 Stat. 2676, 2680 (2003).

31.     IMLS is thus charged by Congress with a long list of critical and mandatory duties to support libraries and museums, which are in turn vital to a functioning democracy.

32.     Until recently, IMLS has managed these responsibilities with a workforce of only 75 employees for library and museum services combined.

33.     IMLS currently has over 650 open awards under the grant programs it administers to libraries, totaling over $450 million. IMLS reported awarding $266.7 million in grants in 2024. Pursuant to its statutory mandate to collect data, IMLS has for decades maintained the Public Libraries Survey, which comprises data from approximately 9,000 public libraries with

approximately 17,000 individual public library outlets across the country. This data includes information about library visits, circulation, collection sizes, hours, staffing, electronic resources, operating revenues, expenditures, and the number of service outlets.

## FACTUAL BACKGROUND

### The Executive Order Asserting That IMLS Is "Unnecessary"

34.    On March 14, 2025, Defendant Trump issued an Executive Order titled "Continuing the Reduction of the Federal Bureaucracy." The White House, *Continuing the Reduction of the Federal Bureaucracy* (Mar. 14, 2025), https://perma.cc/U22J-873R (EO). The Executive Order, without providing any evidence, and contrary to the will of Congress as expressed in the MLSA, asserts that IMLS is "unnecessary." EO § 1. The order directs IMLS and other covered agencies to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* § 2(a).

35.    The order also requires that IMLS "submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent." *Id.* § 2(b).

36.    Finally, the order instructs the Director of the Office of Management and Budget to "reject funding requests for [IMLS] to the extent they are inconsistent with this order." *Id.* § 2(c).

### Keith Sonderling is Designated Acting Director

37.    On March 20, 2025, Defendant Trump designated Deputy Secretary of Labor Keith Sonderling as Acting Director of IMLS. News Release, Inst. of Museum & Libr. Servs., *Keith E. Sonderling Sworn In as Acting Director of Institute of Museum and Library Services* (Mar. 20, 2025), https://perma.cc/2494-572P (Sonderling News Release). Mr. Sonderling fails to meet the

requirements laid down by Congress for a Director. In particular, pursuant to 20 U.S.C. § 9103(a)(3), every Director must either have special competence with regard to library and information services or special competence with regard to museum services. The directorship alternates between an expert in library and museum services every four-year term. *Id.* Mr. Sonderling has no special competence in either field. He is a lawyer with experience in labor and employment law. *See* Inst. of Museum & Libr. Servs., *Keith Sonderling*, https://perma.cc/RH28-KUYX (last visited Apr. 7, 2025).

38.     Upon being sworn in as Acting Director, Mr. Sonderling indicated that his objective would be *not* to support libraries and library services pursuant to the mandates of Congress, but instead to pursue a political agenda and use the agency to engage in viewpoint discrimination. In his own words: "I am committed to steering this organization in lockstep with this Administration to enhance efficiency and foster innovation. We will revitalize IMLS and restore focus on patriotism, ensuring we preserve our country's core values, promote American exceptionalism and cultivate love of country in future generations." Sonderling News Release.

**Defendants Implement a Policy of Dismantling IMLS**

39.     Defendants have adopted and are in the process of implementing a policy of dismantling IMLS.

40.     On March 20, 2025, officials from the Department of Government Efficiency (DOGE) showed up at IMLS's offices to assist Defendant Sonderling in shutting down the agency. *See A Statement from AFGE Local 3403 on the Status of the Institute of Museum and Library Services*, AFGE Loc. 3403, https://perma.cc/CTZ9-XCUB (last visited Apr. 7, 2025) (AFGE Local 3403 Statement). The DOGE staff set up offices within IMLS and obtained access to IMLS's

computer systems. *See* Jennifer Schuessler, *Trump Administration Moves to Shutter Library Agency*, N.Y. Times (Mar. 31, 2025), https://perma.cc/K4F9-XK59.

41.    On March 31, 2025, IMLS supervisors informed staff that all of the agency's approximately 75 employees were being immediately put on administrative leave for up to 90 days. *Id.* IMLS staff were informed that this action was "taken to facilitate the work and operations of the agency." *Id.* All staff members were warned that they were not permitted to be on IMLS's premises. *Id.* Defendants also cut off IMLS employees' access to agency systems, including their agency email accounts. AFGE Local 3403 Statement. IMLS staff were also told that all IMLS grants would be terminated.

42.    The following day, on information and belief, the Acting Director recalled three statutorily mandated employees, a group of five lawyers and an HR specialist, the CFO, and exactly one program officer each for libraries and museums. There is no way for a single program officer for libraries to manage the work of the dozens of employees placed on administrative leave. This significant reduction in staff will dramatically slow the processing of reimbursements due to libraries for awards already granted—assuming the grants are not terminated—as well as processing of applications for important grant award submissions by states and libraries.

43.    On April 1, 2025, a library in Mississippi was forced to stop providing access to Hoopla, an app that lets users read books digitally and stream audiobooks, due to Defendants' suspension of IMLS grant processing. Columbus-Lowndes Public Library System, *IMPORTANT ANNOUNCEMENT: Hoopla Service Suspension*, Facebook (Apr. 1, 2025), https://perma.cc/FZ6T-ML5Q. Another Mississippi library was forced to stop providing access to Hoopla due to Defendants' suspension of IMLS grant funding the following day. Jackson-George

Regional Library System, *Important Update: Hoopla Service Suspended*, Facebook (Apr. 2, 2025), https://perma.cc/CU9S-TPQH.

44.　　Beginning April 1, 2025, Defendants began issuing letters to State grantees informing them that their IMLS grants were being terminated effective immediately. Defendant Sonderling issued a memorandum "authoriz[ing] the termination" of IMLS grants and attaching a template grant termination notice "to be issued to each of the grantees." Thus far, Defendants have issued the template grant termination letters to at least the state libraries of California, Washington, and Connecticut. The grant termination letters state that the grants are "inconsistent with IMLS' priorities. Independently and secondly, the President's March 14, 2025, executive order mandates that the IMLS eliminate all non-statutorily required activities and functions."

45.　　Defendants' actions to shutter IMLS have thus already begun harming libraries.

46.　　On information and belief, on April 3, 2025, Defendants issued termination notices to many, if not all, IMLS staff on administrative leave, i.e., all but the twelve employees that were recalled from leave a few days earlier.

47.　　On April 4, 2025, Defendant Sonderling fired all members of the Board.

48.　　Since then, Defendants have continued to issue notices terminating IMLS grants and contracts. On information and belief, Defendants have been terminating contracts for work conducting research and collecting data from libraries across the country.

**Shutting Down IMLS Will Harm Libraries and their Users**

49.　　Defendants' actions to shut down IMLS will significantly harm the ability of libraries across the country to continue providing services. Library patrons—the majority of Americans—will lose access to services upon which they rely.

50.    IMLS staff includes library professionals who advise librarians around the country on a daily basis. These professionals are an invaluable resource that would be diminished or lost entirely in the event of staff reductions. The National Museum and Library Services Board is comprised of highly qualified experts who similarly provide statutorily required and invaluable advice to the Director of the IMLS, without whose guidance the IMLS would suffer.

51.    As discussed above, supra ¶¶ 24–28, IMLS administers various grants under the MLSA, including LSTA funds. LSTA funds expand technology services, resources, and education, and link libraries electronically, providing library users with access to information through state, regional, national, and international networks. LSTA grants also support programs on workforce development, résumé building, interview preparation, and accessing and applying for jobs online; assisting patrons to complete education or training certification; supporting family literacy classes; helping students with homework, mentoring programs, and summer reading programs; delivering access to government information; providing a community forum for enhanced civic engagement; disability services programs; and so much more.

52.    A reduction, elimination, or freeze of LSTA grant funds would seriously impede important societal and governmental priorities. It would reduce funding for important tools to put people to work or retrain them for new fields. It would reduce literacy programs. It would reduce the availability of critical services for students. It would reduce interlibrary lending programs critical to maximizing scarce library resources.

53.    Pursuant to the MLSA, IMLS also funds and administers the Grants to States Program, which is the largest grant program run by IMLS. It provides funds to State Library Administrative Agencies (SLAAs) using a population-based formula. SLAAs may use federal funds to support statewide initiatives and services; they also may distribute the funds through

subgrant competitions or cooperative agreements to public, Tribal, academic, research, school, and special libraries in their state.

54.    A reduction or elimination of Grants to States would dramatically decrease the state libraries' ability to provide training services for librarians. On information and belief, a reduction or elimination of Grants to States would require state libraries to lay off some of their employees who perform important training and other functions for librarians.

55.    IMLS also funds and administers the Laura Bush 21st Century Librarian Program (LB21), which supports the training and professional development of library and archives professionals; developing faculty and information leaders; and recruiting, educating, and retaining the next generation of library and archives professionals in order to develop a diverse library and archival workforce and meet the information needs of their communities. A reduction or elimination of LB21 funding would seriously impact our nation's ability to train and develop the librarians who are a critical resource for information services in our increasing digital world.

56.    IMLS also funds and administers The Native American Basic Grants (NAB) program and The Native American Library Services Enhancement Grants (NAE) program. NAB programs assist eligible Native communities in establishing, sustaining, and improving library services and operations with their communities. NAE supports a wide variety of activities, including: educational programming for all ages; oral history collection and documentation; digital media and technology enhancements; institutional planning and policy development; professional training, internships, and mentorships; supporting and engaging with cultural practitioners and scholars; research and development of language and cultural material and tools; digitization and digital preservation, and furnishing of library spaces for staff and public, within existing constructed spaces.

57.    If NAB or NAE grants are reduced or eliminated, users of Tribal libraries would lose access to many of the programs and activities they fund. On information and belief, without NAB or NAE grants, some Tribal libraries would be forced to close for lack of funding.

58.    IMLS funds and administers the Native Hawaiian ("NH") Library Services Grant program, which is designed to assist Native Hawaiian serving organizations in sustaining and improving library services with their communities. As information needs change, Native Hawaiian organizations must be able to serve as knowledge and resource centers to benefit their users and the wellness of their communities. The NH program supports organizations across the islands and country. The loss of NH funding would have devastating consequences on the Native Hawaiian organizations that rely on them.

59.    IMLS also collects and maintains data collected from thousands of libraries across the country, including through the Public Libraries Survey, which has been collected annually since 1988 and constitutes an irreplaceable longitudinal source of data about American public libraries. Librarians, researchers, and unions across the country rely on IMLS data, which cannot feasibly be replicated by any other entity.

**Defendants' Actions Irreparably Harm Plaintiffs**

60.    Defendants' evisceration of the agency will have immediate and disastrous consequences for Plaintiffs ALA and AFSCME as well as their members, including librarians, libraries, and the public.

61.    ALA receives approximately $2,456,454 in grants annually from IMLS and will thus suffer a direct financial injury as a result of Defendants' actions to dismantle IMLS, including the cancellation or refusal to disburse IMLS grants. ALA expects it will need to halt some of its public programs work and cancel contracts with vendors as a result of Defendants' actions.

62.    For example, ALA will be forced to abandon a project to develop resources for library workers to learn programming skills midway through the prototyping process because it has received only part of the approximately $170,000 Laura Bush 21st Century Librarianship grant money for the project. These resources are intended for library workers with no formal library education, so ALA's inability to provide them will in turn disproportionately harm library workers in small or rural communities where free professional development is needed most.

63.    ALA will also be irreparably harmed by Defendants' failure to collect, maintain, and make available data IMLS has historically provided pursuant to its statutory mandates. ALA staff rely on this data to perform crucial research and other work. The data IMLS provides cannot be obtained anywhere else. If research is halted, even if not permanently, damage to longitudinal research, which relies on connecting past and future data points, will be irreparable.

64.    Defendants' actions have also harmed ALA's ability to serve its members and, if they persist, will continue to harm ALA. As a result of Defendants' actions, ALA has diverted significant time and resources to addressing its members' questions and concerns about the shutdown of IMLS and its impact on them. ALA has needed to divert resources away from other priorities to respond to the shutdown of IMLS.

65.    ALA is the premier national advocate for its members, including libraries and librarians. Defendants' actions in shuttering IMLS—including by suspending all grant funds—harms ALA's members.

66.    Defendants' actions to dismantle IMLS will also harm librarians, libraries, and members of the public who are members of ALA. IMLS grants are critical to the functioning of libraries around the country, particularly in rural and poor areas, and libraries on Native American tribal lands. As a result of the cancellation of IMLS grants, many libraries will have to fire

personnel, default on contracts, and restrict or end provision of essential services. Some may even have no choice other than to close down.

67.    Even if Defendants were not to cancel the grants that support these programs, without any agency personnel to approve and process grant applications, there is no way to disburse funds. In many cases, libraries have already spent approved funds and have or will seek reimbursement by IMLS for those expenditures. Because there are no employees to process these claims, the libraries will suffer direct and immediate financial harm. Indeed, ALA has at least one reimbursement request currently pending with the IMLS; given Defendants' shutdown of IMLS, ALA does not expect the reimbursement request to be processed.

68.    ALA members also rely on data collected, maintained, and made available by IMLS to complete their work. They will be irreparably harmed by Defendants' failure to maintain the data, which cannot be accessed anywhere else.

69.    Defendants' actions to shut down IMLS have harmed, and will continue to harm, AFSCME in numerous respects. First, AFSCME has been required, through its constituent locals and affiliates, to divert significant resources to clear the roadblocks to its core representational activities erected by the shuttering of IMLS. Defendants' actions have caused significant confusion regarding the impact that closing IMLS and canceling its grants will have on members' terms and conditions of employment. The local unions are expending significant time corresponding with library management to understand the impacts of the funding loss and to convey that information to members.

70.    Defendants' shuttering of IMLS will also harm AFSCME's bargaining efforts on behalf of its membership employed at libraries. AFSCME bargaining teams rely on the IMLS Public Libraries Survey, which comprises data from approximately 9,000 public libraries with

approximately 17,000 individual public library outlets across the country, when negotiating with employers over the terms of collective bargaining agreements. The PLS data includes information about library visits, circulation, collection sizes, hours, staffing, electronic resources, operating revenues, expenditures, and the number of service outlets. This comprehensive survey offers points of comparison that AFSCME negotiators use to secure beneficial contract terms for AFSCME members. One foreseeable consequence of Defendants' actions to shut down IMLS is that PLS data will no longer be maintained or made available. It would be impossible to replicate the scope of information the PLS provides and it would be prohibitively expensive to even try.

71.     Finally, a foreseeable consequence of Defendants' actions to shutter IMLS is that AFSCME members will lose their jobs as a result of Defendants' funding cuts. The union stands to be financially harmed by the resultant loss of member dues.

72.     Defendants' actions to dismantle IMLS will also injure AFSCME's local affiliates and their members. For example, a member of AFSCME local 3800 works for Minitex, a publicly funded library consortium of the Minnesota Offices of Higher Education and the University of Minnesota Libraries, that relies on over $1 million of IMLS grants. The loss of these funds would lead to a reduction in Minitex's services and staffing. A supervisor instructed Minitex staff not to begin spending IMLS grant funds on a project scheduled to begin April 1, 2025, in anticipation of IMLS funding cuts. The union member fears he will lose his job, as will other Minitex staff, as a result of Defendants' dismantlement of IMLS.

73.     As another example, AFSCME Local 1808 represents library employees in the District of Columbia Public Library (DCPL), which receives more than $1 million in grants each year through the IMLS Grants to States program to fund a variety of programs, including disability

services and literacy programs, as well as a number of DCPL positions. Without these grants, DCPL would be forced to cut programming and staff.

## CAUSES OF ACTION

### Count One
### Violation of Separation of Powers
### (Against all Defendants)

74.     Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

75.     Plaintiffs have a non-statutory right of action to declare unlawful official action that is ultra vires.

76.     The President of the United States has only those powers conferred on him by the Constitution and federal statutes.

77.     Congress has the exclusive authority under Article I of the Constitution to pass laws creating government agencies, to assign their duties, and to appropriate funds for the effectuation of those duties.

78.     Congress has the exclusive power under the Spending Clause and the Appropriations Clause to establish and fund federal programs and to direct payment of federal funds to the states for purposes defined by Congress.

79.     The President may not confer powers upon other federal Officers or Departments within the Executive Branch that he does not himself possess.

80.     Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law.

81.     The President does not have the power under the Constitution unilaterally to amend statutes.

82.    Defendants' actions to close IMLS, including issuing the Executive Order determining that IMLS is "unnecessary" and should be "eliminated," placing the vast majority of IMLS staff on indefinite administrative leave and then terminating their employment, beginning to terminate grants en masse, and firing all members of the Board, exceed presidential and executive authority and usurp legislative authority conferred by the Constitution, in violation of the separation of powers.

**Count Two**
**Violation of Take Care Clause**
**(Against all Defendants)**

83.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

84.    Article II of the Constitution confers upon the President the duty to "take care that the Laws be faithfully executed." U.S. Const., art. II, § 3.

85.    The Take Care Clause is judicially enforceable against presidential actions that violate or undermine statutes duly enacted by Congress.

86.    The MLSA and the NMAAHC Act contain a number of mandatory duties that the Director "shall" perform. Congress also passed statutes appropriating funds to IMLS to implement its statutory responsibilities. *See* 2024 Appropriations Act, 138 Stat. at 697; 2025 Appropriations Act, 139 Stat. at 10–12.

87.    President Trump's actions to dismantle IMLS violate the Take Care Clause because they are directly contrary to the duly enacted statutes establishing IMLS as an independent agency, establishing the Director's mandatory duties, establishing the Board, and appropriating funds to IMLS and directing IMLS to use such funds to carry out its statutory duties to aid libraries. President Trump also designated Defendant Sonderling to serve as Acting Director of IMLS, in violation of the criteria for Directors set forth in the MLSA.

**Count Three**
**Violation of the Administrative Procedure Act—706(2)(A)–(C)**
**(Against Defendants Sonderling, IMLS, Gleason, U.S. DOGE Service, U.S. DOGE Service**
**Temporary Organization, Vought, and OMB)**

88.     Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

89.     Under the APA, a court "shall" "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

90.     The decision to implement the Executive Order "Continuing the Reduction of the Federal Bureaucracy" to shut down IMLS, including via placing staff on leave, freezing or terminating grants administered by the agency, and firing the Board, is final agency action.

91.     Defendants' effective dismantlement of IMLS and the actions they have taken to prevent it from functioning are arbitrary and capricious in multiple respects.

92.     First, Defendants failed to articulate any reasoned explanation for dismantling the agency.  Defendants also failed to explain the abrupt change in policy, after decades, regarding the importance of IMLS grants and the agency itself to American libraries.

93.     Second, Defendants failed to consider the catastrophic consequences of shutting down IMLS, including terminating the vast majority of IMLS staff and terminating IMLS grants, on American libraries and their users.

94.     Third, Defendants failed to account for the substantial reliance interests in the continued existence of IMLS. Hundreds of libraries around the country have based their budgets and programs on the availability of grants issued by IMLS. In many cases, funds have already been spent on the strength of IMLS's representation that the expenses would be reimbursed through federal grants.

95.    Fourth, Defendants failed entirely to consider alternatives to dismantling IMLS and to give a reasoned explanation for rejecting them.

96.    Defendants lack the discretion to suspend or terminate grant funding that Congress has appropriated for that purpose and has required the agency to disburse. Defendants also lack the discretion to eliminate the Board. Defendants' actions to shut down IMLS are arbitrary and capricious because they impede, rather than enhance, their ability to perform IMLS's functions and statutorily mandated duties.

97.    Defendants' dismantlement of IMLS is contrary to constitutional right.

98.    Defendants' actions to dismantle IMLS—and in particular their termination of grants, with the stated goal of "restor[ing] focus on patriotism, . . . core values, . . . [and] American exceptionalism"—is contrary to the First Amendment because it imposes an unconstitutional condition—refraining from expression or association that is inconsistent with these goals—on federal funding.

99.    Defendants' actions to dismantle IMLS are contrary to law and in excess of statutory authority.

100.    Only Congress has the authority to abolish federal executive agencies or to enact, amend, or repeal statutes. No defendant possesses the statutory authority to dismantle or prevent the functioning of IMLS.

101.    Defendants' actions to dismantle IMLS are contrary to law and in excess of statutory authority because they violate the MLSA, which established IMLS as an independent agency by statute. MLSA § 203(a).

102.    Defendants' actions to dismantle IMLS are contrary to law and in excess of statutory authority because the 2025 Appropriations Act, 139 Stat. at 10–12, the MLSA, and the

25

NMAAHC Act create mandatory, non-discretionary duties for Defendants to make available congressionally appropriated funds and issue certain grants. Defendants lack the authority to violate these statutes. And by mass firing IMLS staff required to effectively implement IMLS's statutory duties, and eliminating the Board, Defendants' actions are contrary to these statutes.

103.    The dissolution of IMLS is also contrary to other laws, including but not limited to the Impoundment Control Act, 2 U.S.C. §§ 682–88, which prohibits unlawful deferral of the disbursement of appropriated funds, and the Paperwork Reduction Act, 44 U.S.C. § 3507(h)(3), which prohibits an agency from making a substantive or material modification to a data collection that has been approved by the director of the Office of Management and Budget without prior approval.

## Count Four
### Violation of the Administrative Procedure Act—706(1)
### (Against Defendants Sonderling, IMLS)

104.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

105.    Under the APA, a court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

106.    The MLSA imposes mandatory duties on the Director of IMLS to disburse various grants. Additionally, Congress appropriated funds for IMLS to expend for this purpose. *See* 2024 Appropriations Act, 138 Stat. at 697; 2025 Appropriations Act, 139 Stat. at 10–12. Defendants have non-discretionary duties to issue grants and to disburse funds appropriated for that purpose.

107.    The Court should thus compel Defendants to issue the grants they are statutorily required to issue and to disburse the funds Congress appropriated for that purpose.

## Count Five
### Ultra Vires
### (Against All Defendants)

108.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

109.    This Court has inherent equitable power to enjoin executive ultra vires conduct.

110.    Neither the President nor an agency or its officials may take any action that exceeds the scope of their constitutional and/or statutory authority. An agency acts ultra vires when it plainly acts in excess of its delegated powers or has violated the law.

111.    No statute, constitutional provision, or other source of law authorizes Defendants to dismantle IMLS, to suspend or cancel grants IMLS is statutorily required to disburse, to eliminate the Board, or to prevent IMLS from accessing congressionally appropriated funds.

112.    Defendants' unlawful actions to dismantle IMLS are ultra vires.

### Count Six
### Violation of the First Amendment
### (Against all Defendants)

113.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

114.    The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . ." The Supreme Court has long interpreted the First Amendment to bar actions by the Executive Branch abridging freedom of speech.

115.    Defendant Sonderling stated that Defendants' actions are intended to "restore focus on patriotism, ensuring we preserve our country's core values, promote American exceptionalism and cultivate love of country in future generations." This statement makes clear that Defendants intend to deny IMLS funding or terminate IMLS grants to recipients or for programs that have expressed, advocated for, or are merely associated with, political, personal, or moral viewpoints disfavored by Defendants: namely, viewpoints about American history and culture that the President and his administration do not like.

116.    Because Defendants are conditioning receipt of federal funding on recipients' exercise of their First Amendment rights of expression and association, their actions are regulated by the First Amendment.

117.    Because Defendants' actions to limit funding to recipients or programs that promote their favored viewpoint burdens core political speech and association rights, and expressly discriminates based on viewpoint, it is subject to strict scrutiny.

118.    Because Defendants' actions to so limit federal funding are not "the least restrictive means of achieving a compelling state interest," *see Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (internal quotation marks and citation omitted), it fails strict scrutiny.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

a.    Declare unlawful and set aside the decision to shut down IMLS, and Defendants' actions to shut down IMLS, as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C).

b.    Declare Defendants violated the APA, 5 U.S.C. § 706(1).

c.    Declare that Defendants violated the separation of powers and the Take Care Clause.

d.    Issue a preliminary injunction directing defendants to:

    i.    Immediately cease actions to shut down IMLS's operations in a manner not authorized by Congress;

    ii.  Take all necessary steps to return IMLS and its employees and grantees to their status prior to March 31, 2025, including by reinstating all employees that were placed on administrative leave or given termination notices, and to take no further action to reduce IMLS's workforce;

    iii.  Reopen the IMLS office to staff;

    iv.  Restore all IMLS computer systems and webpages, including IMLS staff's access to databases, systems, and email accounts;

    v.  Restore funding pursuant to the terms of all grants, cooperative agreements, and contracts, consistent with the terms of the agreements and any relevant statutes and regulations;

    vi.  Comply with Congressional statutes that require the IMLS Director to carry out various programs and award various grants, *see* 20 U.S.C. §§ 9103, 9108, 9131, 9141, 9161, 9162.

e.    Order Defendants to cease violating Plaintiffs' First Amendment rights by imposing an unconstitutional condition on obtaining IMLS grants.

f.    Order Defendants to file a status report with the Court within 24 hours of entry of a preliminary injunction, and at regular intervals thereafter, confirming compliance with these orders.

g.    Issue a permanent injunction barring Defendants from taking any action to dissolve IMLS absent the authorization of Congress;

h.    Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

i.    Grant such other relief as the Court deems necessary, just, and proper.

April 7, 2025

Respectfully submitted,

*/s/Rachel L. Fried*
Rachel L. Fried (DC Bar No. 1029538)
Orlando Economos (DC Bar No. 90013791)
Kayla M. Kaufman (DC Bar No. 90029091)
Robin F. Thurston (DC Bar No. 1531399)
Skye Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
rfried@democracyforward.org
oeconomos@democracyforward.org
kkaufman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*/s/ Chris Gair*
Chris Gair (Ill. Bar No. 6190781)*
Vilia Dedinas (Ill. Bar No. 6191614)*
John Gallo (Ill. Bar No. 6193988)*
Ingrid Yin (Ill. Bar No. 6339857)*
Gair Gallo Eberhard LLP
1 E. Wacker Drive, Suite 2600
Chicago, Illinois 60601
(312) 600-4900
cgair@gairgallo.com
vdedinas@gairgallo.com
jgallo@gairgallo.com
iyin@gairgallo.com

*Motion to appear *pro hac vice* forthcoming

*Counsel for Plaintiffs*