## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN LIBRARY ASSOCIATION, 225 N. Michigan Ave. Suite 1300 Chicago, Illinois 60601,<br><br>AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, 1625 L Street NW Washington, DC 20036,<br><br>*Plaintiffs*,<br><br>v.<br><br>KEITH SONDERLING, in his capacity as Acting Director of the Institute of Museum and Library Services, 955 L'Enfant Plaza North, SW, Suite 4000 Washington, DC 20024,<br><br>INSTITUTE OF MUSEUM AND LIBRARY SERVICES, 955 L'Enfant Plaza North, SW, Washington, DC 20024,<br><br>DONALD TRUMP, in his capacity as President of the United States of America, 1600 Pennsylvania Avenue NW, Washington, DC 20050,<br><br>AMY GLEASON, in her capacity as Acting Administrator of the U.S. DOGE Service and U.S. DOGE Service Temporary Organization, 736 Jackson Place NW Washington, DC 20503,<br><br>U.S. DOGE SERVICE, 736 Jackson Place NW Washington, DC 20503, | Case No. 1:25-cv-01050 |

U.S. DOGE SERVICE TEMPORARY
ORGANIZATION,
   736 Jackson Place NW
   Washington, DC 20503,

RUSSELL VOUGHT, in his capacity as
Director of the Office of Management and
Budget,
   725 17th Street NW, Suite 9272
   Washington, DC 20503, and

U.S. OFFICE OF MANAGEMENT AND
BUDGET,
   725 17th Street NW, Suite 9272
   Washington, DC 20503,

          *Defendants*.

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 3

   I.    The IMLS's Statutory Mandate .................................................................... 3

   II.   Defendants Dismantle the Institute of Museum and Library Services ............................. 5

STANDARD OF REVIEW ............................................................................................... 8

ARGUMENT ..................................................................................................................... 9

   I.    Plaintiffs are likely to succeed on the merits. ..................................................... 9

      A.   Defendants violated the Constitution by unilaterally dismantling a federal agency........ 9

         1.   Shuttering an agency created by statute and with statutorily required functions
violates the principle of separation of powers. ..................................................... 9

         2.   Dismantling IMLS violates the Take Care Clause..................................................... 14

      B.   Defendants violated the Administrative Procedure Act. .............................................. 16

         1.   Defendants' decision to dismantle IMLS is final agency action............................... 16

         2.   Agency Defendants' decision to dismantle IMLS is arbitrary and capricious.......... 18

         3.   Agency Defendants lack statutory authority to dismantle IMLS.............................. 23

         4.   Agency Defendants' decision to dismantle IMLS is contrary to law....................... 23

         5.   By dismantling IMLS, Defendants Sonderling and IMLS unlawfully withhold or
unduly delay mandatory agency action.............................................................. 26

      C.   Defendants' dismantling of IMLS is ultra vires.......................................................... 27

   II.   Plaintiffs will suffer irreparable harm without immediate relief. ..................................... 28

   III.   The balance of equities and public interest strongly favor preliminary relief. ............. 36

# TABLE OF AUTHORITIES

## Cases

*AIDS Vaccine Advocacy Coalition v. Department of State*, No. 25-00400, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ................................................................................................ 13

*Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) ...................................... 27

*Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020) ..................... 37

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................................... 16

*Biden v. Texas*, 597 U.S. 785 (2022) ................................................................................... 18

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) ............................................................ 36

*Cemex Inc. v. Dep't of the Interior*, 560 F. Supp. 3d 268 (D.D.C. 2021) ............................ 29

*CFPB v. Com. Fin. Servs. Ass'n*, 601 U.S. 416 (2024) ....................................................... 25

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ............................. 8

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ................. 8

*City & Cnty. of San Francisco v. Trump*, 897 F. 3d 1225 (9th Cir. 2018) ................. 12, 14, 26

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ................................................................... 24

*Clinton v. City of New York*, 524 U.S. 417 (1998) ............................................................... 12

*Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218 (D.D.C. 2019) ................ 15

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ............ 21, 22

*Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2020) ...................... 28

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) .................................................. 38

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) .................................................. 21

*Endo Par Innovation Co., LLC v. Becerra*, No. CV 24-999, 2024 WL 2988904 (D.D.C. June 10, 2024) ........................................................................................................ 33

*FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293 (2003) ........................................... 24

*FEC v. Cruz*, 596 U.S. 289 (2022) ...................................................................................... 23

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079 (7th Cir. 2008) ................................................................................................................... 34

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ............................................................ 14

*Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919 (1983) ...................................... 12

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) .......................................................... 12, 15

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545 (D.C. Cir. 1999) .................. 15

*Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524 (1838) ........................................................ 13, 15

*Kingdomware Tech., Inc. v. United States*, 579 U.S. 162 (2016) ....................................... 11

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............................... 28

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) .......................... 11

*Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024) ......................... 13

*Medellin v. Texas*, 552 U.S. 491 (2008) ..................................................................................... 13

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................................... 19, 20, 22

*Myers v. United States*, 272 U.S. 52 (1926) .................................................................................. 9

*Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) .................................... 38

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960 (D.C. Cir. 2022) ........... 27, 28

*Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689 (D.C. Cir. 1971) ............ 17

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239, 2025 WL 597959
(D.D.C. Feb. 25, 2025) ............................................................................................... 38

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) .......................................................... 23

*Nat'l Fed'n of Indep. Bus. v. U.S. Dep't of Labor*, 595 U.S. 109 (2022) .................................... 10

*Nat'l R.R Passenger Corp. (Amtrak) v. Sublease Interest Obtained Pursuant to an Assignment
and Assumption of Leasehold Interest Made as of Jan. 25, 2007*, Case. No. 22-1043, 2024 WL
3443596 (D.D.C. July 15, 2024) .................................................................................. 9

*National Treasury Employees' Union v. Vought*, No. 25-0381, 2025 WL 942772 (D.D.C. Mar. 28,
2025) ........................................................................................................... 13, 16, 18

*New York v. Trump*, No. 25-cv-01144, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) .................... 15

*New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025),
*enforced,* No. 25-CV-39-JJM-PAS, 2025 WL 1009025 (D.R.I. Apr. 4, 2025) ........................ 26

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................................... 8, 36

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ................................................................ 26

*Ohio v. EPA*, 603 U.S. 279 (2024) .............................................................................................. 18

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ................................................ 36

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) ......................... 38

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ....................................................... 29

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ........................................... 8, 36

*Seila L. LLC v. CFPB*, 591 U.S. 197 (2020) ................................................................................. 9

*Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 132 F.3d 775 (D.C. Cir. 1998) ................... 1

*Simms v. District of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012) ............................................. 38

*Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261 (D.C. Cir. 2018) ............................... 18

*Tate v. Pompeo*, 513 F. Supp. 3d 132 (D.D.C. 2021) .................................................................. 20

*Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014) ........................................... 28

*TikTok Inc. v. Trump*, 490 F. Supp. 3d 73 (D.D.C.  2020) .......................................................... 38

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992) .............. 29

*Trump v. United States*, 603 U.S. 593 (2024) ................................................................................ 9

*United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194 (2003) ........................................................ 36

*Util. Air Reg. Grp. v. EPA*, 573 U.S. 302 (2014) .......................................................................... 15

*Widakuswara v. Lake*, 25-cv-2390, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ....... 14, 15, 18, 27

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669 (D.C. Cir. 1985) ............................ 28

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................................ 10, 15

## Constitutional Provisions

U.S. Const. art. I, § 1 ...................................................................................................................... 9

U.S. Const. art. I, § 9, cl. 7 ........................................................................................................... 12

U.S. Const. art. II, § 3 ................................................................................................................... 15

## Statutes

2 U.S.C. § 681 .............................................................................................................................. 25

2 U.S.C. § 682 .............................................................................................................................. 25

2 U.S.C. § 684 .............................................................................................................................. 25

20 U.S.C. § 9101 *et seq.* ................................................................................................................ 1

20 U.S.C. § 9102 ............................................................................................................................ 3

20 U.S.C. § 9103 ........................................................................................... 3, 4, 11, 24, 27

20 U.S.C. § 9105a ................................................................................................................... 11, 23

20 U.S.C. § 9108 ........................................................................................... 4, 11, 21, 24, 26, 27

20 U.S.C. § 9121 ........................................................................................................................ 1, 3

20 U.S.C. § 9131 ..................................................................................... 4, 11, 24, 27, 30

20 U.S.C. § 9141 ............................................................................................ 4, 11, 24, 27

20 U.S.C. § 9161 ............................................................................................ 4, 11, 24, 27

20 U.S.C. § 9162 ............................................................................................... 4, 11, 27

28 U.S.C. § 1491 ........................................................................................................................... 29

44 U.S.C. § 3507 ........................................................................................................................... 26

47 U.S.C. § 254 ............................................................................................................................. 21

5 U.S.C. § 706 ................................................................................................. 16, 18, 23, 26

5 U.S.C. § 905 ............................................................................................................................... 10

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 697
    (2024) ................................................................................................................................ 1, 24

**Rules and Regulations**

47 C.F.R. § 54.501(b)................................................................................................ 21

47 C.F.R. § 54.502(d)................................................................................................ 21

Fed. R. Civ. Pr. 65(c)................................................................................................ 38

**Other Authorities**

*A Statement from AFGE Local 3403 on the Status of the Institute of Museum and Library Services*, AFGE Loc. 3403, https://perma.cc/CTZ9-XCUB (last visited Apr. 9, 2025) ............ 6

Arts, Humanities, and Cultural Affairs Act of 1976, Pub. L. 94-462, Title II, 90 Stat. 1971 . 10, 23

Compl., *Rhode Island v. Trump*, No. 25-cv-128, ECF No. 1 ....................................... 30

Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* (2012), https://perma.cc/QY3T-XWG2 ......................................... 10

Decl. of Blake Doe, *State of Rhode Island v. Trump*, No. 25-cv-128 (D.R.I. Apr. 4, 2025), ECF No. 3-40 ................................................................................................................ 6

FCC, *E-Rate: Universal Service Program for Schools and Libraries*, https://perma.cc/F6NF-FC5G (last visited Apr. 10, 2025) ................................................................................ 21

Fontes Decl., *Rhode Island v. Trump*, No. 25-cv-128, ECF No. 3-1 ........................... 31

Full Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025)................................................................................................................ 12, 24

GAO, *Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564 (Jan. 16, 2020), https://perma.cc/6TMT-3CH2 ........................................................ 25

IMLS, *Evaluation of IMLS's Native Communities Grant Programs* (2024) https://perma.cc/63AY-A33L ................................................................................. 19

IMLS, *Fiscal Year 2025: Congressional Justification* (March 2024), https://perma.cc/C36H-YQ7H................................................................................................................ 19

Inst. of Museum & Libr. Servs., *Keith Sonderling*, https://perma.cc/RH28-KUYX (last visited Apr. 9, 2025) ................................................................................................................ 6

Inst. of Museum & Libr. Servs., *Learn About IMLS: Legislation & Budget*, https://perma.cc/8KPE-B8JA (last visited Apr. 9, 2025) ..................................................... 5, 37

Jennifer Schuessler, *Trump Administration Moves to Shutter Library Agency*, N.Y. Times (Mar. 31, 2025), https://perma.cc/K4F9-XK59 ............................................................... 7, 17

Letter from Robert C. Scott and Alma Adams, Committee on Education and the Workforce, to Keith Sonderling, IMLS Acting Director (Apr. 4, 2025), https://perma.cc/SR6C-HN92 ........ 17

Maine State Library, *Press Release: Maine State Library Layoffs Due to Federal Funding Inaccessibility*, https://perma.cc/W6PA-4LY7 (Apr. 9, 2025) .................................... 7, 30

Marisa Kabas (@marisakabas.bsky.social), Bluesky Social (Apr. 3, 2025, 3:33 PM), https://perma.cc/54F4-CTR8 ................................................................................. 7, 18

National Museum of African American History and Culture Act, Pub. L. 108-184, 117 Stat. 2676 (2003) .................................................................................................................. 24

News Release, Inst. of Museum & Libr. Servs., *Keith E. Sonderling Sworn In as Acting Director of Institute of Museum and Library Services* (Mar. 20, 2025), https://perma.cc/2494-572P ...... 6

OIRA, OMB Control No: 3137-0074, https://perma.cc/A5WX-625R ........................................ 26

U.S. Dep't of the Treas., *How much has the U.S. government spent this year?*, https://perma.cc/PF7C-KEKY (last visited Apr. 9, 2025) ........................................................ 37

**Executive Materials**

Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025) .................................. 1, 5, 14, 17, 20

*Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive & Administer Funds Under Foreign Aid Legis.*, 9 Op. O.L.C. 76 (O.L.C. 1985) .......................................... 10

# INTRODUCTION

"In our system of government, broadly speaking, Congress sets policy to be executed by the President . . . ." *Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998). Congress decided through duly enacted statutes that the policy of the United States would be "to enable libraries to develop services that meet the needs of communities throughout the Nation." 20 U.S.C. § 9121(6). It created a federal agency, the Institute of Museum and Library Services ("IMLS"), to implement this policy, imposing mandatory duties on its Director and Board and appropriating hundreds of millions of dollars annually to fund it. *See generally* Museum and Library Services Act, 20 U.S.C. § 9101 *et seq.*; Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 697 (2024) ("2024 Appropriations Act").

Now, however, President Trump has unilaterally decided that IMLS is "unnecessary." "Continuing the Reduction of the Federal Bureaucracy," Exec. Order No. 14238, 90 Fed. Reg. 13043, § 1 (Mar. 14, 2025) ("Executive Order"). By executive order, he has directed Defendants to "eliminate[]" the "non-statutory components and functions" of IMLS "to the maximum extent consistent with applicable law," and "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* § 2(a). Following a playbook used to dismantle several other congressionally mandated agencies that President Trump disfavors, Defendants immediately began gutting IMLS. Within days, Defendant Keith Sonderling, the newly installed Acting Director of IMLS, fired all members of the National Museum and Library Services Board (the "Board"), placed the entire staff on administrative leave, and sent termination notices to the vast majority of the agency staff. He also began canceling grants and contracts, and, on information and belief, is in the process of ending all or most of the remaining grants. On April 9, 2025, Plaintiff ALA was notified that two of its IMLS grants—

funding programs to engage Spanish-speaking families and to provide resources to library workers to design effective programs for their communities—had been terminated.

The services that IMLS's staff provides and the grants it issues are the lifeblood of the American library system. They are critical to the mission and function of the Plaintiffs and their members. Plaintiff American Library Association ("ALA") has more than 47,000 members, including librarians, libraries, and members of the reading public. Plaintiff American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME") represents library workers throughout the country. Plaintiffs and their members rely on IMLS for its expertise, resources, and grant awards to provide crucial library services and programs. IMLS grant funds are critical to sustaining these services and programs. Without them, libraries would be forced to end many of their programs and cut staff. The harm to libraries and to their users will be devastating.

Defendants' evisceration of IMLS is illegal. The separation of powers and the Take Care Clause prohibit the President and his functionaries from dismantling an agency created by statute. IMLS's governing statute imposes numerous mandatory duties on it and its Director. By reducing IMLS to a husk, Defendants have made it impossible to carry out those duties, violating Congress's commands. Refusing to disburse money Congress appropriated in connection with several statutory grant programs similarly treads upon Congress's appropriations authority and the separation of powers. And even if Defendants' scheme were constitutional, they have violated the Administrative Procedure Act by acting contrary to law and arbitrarily and capriciously. Plaintiffs are therefore highly likely to show that Defendants' actions violate the constitutional separation of powers, the Spending Clause, the Take Care Clause, and the Administrative Procedure Act, and that they are ultra vires. Defendants' actions have begun to cause—and if not halted, will continue to cause—serious and irreparable harm to Plaintiffs and their members. Those factors, plus the

public interest, strongly favor an immediate preliminary injunction to stop Defendants' devastating and unlawful acts until this Court can consider the merits of Plaintiffs' claims.

## BACKGROUND

### I.        The IMLS's Statutory Mandate

Congress created IMLS in the Museum and Library Services Act of 1996 (MLSA) and has repeatedly reauthorized the statute. 20 U.S.C. § 9102 *et seq*. The MLSA created IMLS as an independent agency within the National Foundation on the Arts and the Humanities. 20 U.S.C. § 9102(a). The Director of IMLS is appointed by the President with the advice and consent of the Senate and serves a four-year term. 20 U.S.C. § 9103(a)(2). Every IMLS Director appointed must have special competence regarding library and information services or museum services. 20 U.S.C. § 9103(a)(3).

With respect to library services, the MLSA's purposes include promoting "continuous improvement in library services in all types of libraries in order to better serve the people of the United States"; facilitating access to library resources "for the purpose of cultivating an educated and informed citizenry"; "promot[ing] literacy, education, and lifelong learning, including by building learning partnerships with school libraries in our Nation's schools, including tribal schools, and developing resources, capabilities, and programs in support of State, tribal, and local efforts to offer a well-rounded educational experience to all students." 20 U.S.C. § 9121(2), (3), (5).

The Director's duties under the MLSA are specific, mandatory, and non-delegable. The Director "*shall* have primary responsibility for the development and implementation of policy to ensure the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United

States." 20 U.S.C. § 9103(c)(1) (emphasis added). "In carrying out [this] responsibility the Director *shall*—

> (A) advise the President, Congress, and other Federal agencies and offices on museum, library, and information services in order to ensure the creation, preservation, organization, and dissemination of knowledge;
>
> (B) engage Federal, State, and local governmental agencies and private entities in assessing the museum, library, and information services needs of the people of the United States, and coordinate the development of plans, policies, and activities to meet such needs effectively;
>
> (C) carry out programs of research and development, data collection, and financial assistance to extend and improve the museum, library, and information services of the people of the United States; and
>
> (D) ensure that museum, library, and information services are fully integrated into the information and education infrastructures of the United States.

20 U.S.C. § 9103(c)(2) (emphasis added).

In addition, the MLSA requires the Director to carry out these responsibilities through specific, affirmative, non-delegable statutory mandates. One of these mandates is that the Director "*shall* regularly support and conduct, as appropriate, policy research, data collection, analysis and modeling, evaluation, and dissemination of information to extend and improve the Nation's museum, library, and information services." 20 U.S.C. § 9108(a) (emphasis added). From appropriated amounts the Director "*shall* award grants from minimum allotments . . . to each State." 20 U.S.C. § 9131(b)(1) (emphasis added). The MLSA details a long list of purposes for the State grants. 20 U.S.C. § 9141. The MLSA also specifies a series of additional grants that the Director "shall" award, including grants to Indian tribes and organizations that primarily serve and represent Native Hawaiians, 20 U.S.C. § 9161, and specified "national leadership grants" to "enhance the quality of library services nationwide and to provide coordination between libraries and museums," 20 U.S.C. § 9162(a).

IMLS is thus charged by Congress with a long list of critical and *mandatory* duties regarding libraries, which are in turn vital to a functioning democracy. IMLS manages these responsibilities with a workforce of about 75 employees. *See* Inouye Decl. ¶ 4. IMLS currently has over 650 open awards under the grant programs it administers to libraries, totaling over $450 million. Inouye Decl. ¶ 3. In 2024, IMLS issued more than $266 million in grants. Inst. of Museum & Libr. Servs., *Learn About IMLS: Legislation & Budget*, https://perma.cc/8KPE-B8JA (last visited Apr. 9, 2025). Pursuant to its data collection duties, IMLS for decades has maintained the Public Libraries Survey, a longitudinal source of data about American public libraries upon which librarians, researchers, and unions across the country rely. *See* Billinger Decl. ¶¶ 6–8; Fournier Decl. ¶¶ 2–5.

## II.    Defendants Dismantle the Institute of Museum and Library Services

On March 14, 2025, Defendant Trump issued an Executive Order titled "Continuing the Reduction of the Federal Bureaucracy," calling IMLS "unnecessary." Executive Order § 1. The Order seeks to "eliminate [IMLS] to the maximum extent consistent with applicable law," directs IMLS and other covered agencies to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law," *id.* § 2(a), and directs IMLS to "submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent," *id.* § 2(b). It further orders the Director of the Office of Management and Budget to "reject funding requests for such governmental entities to the extent they are inconsistent with this order," *id.* § 2(c).

In the days following the Executive Order, Defendant Trump installed Defendant Keith Sonderling, also currently the Deputy Secretary of the Department of Labor, as Acting Director of

IMLS. News Release, Inst. of Museum & Libr. Servs., *Keith E. Sonderling Sworn In as Acting Director of Institute of Museum and Library Services* (Mar. 20, 2025), https://perma.cc/2494-572P (Sonderling News Release). Defendant Sonderling fails to meet the statutory minimum qualifications for IMLS directorship under 20 U.S.C. § 9103. *See* Inst. of Museum & Libr. Servs., *Keith Sonderling*, https://perma.cc/RH28-KUYX (last visited Apr. 9, 2025). Upon being sworn in, Defendant Sonderling indicated that he would act in "lockstep" with the Trump administration's priorities and that he would use IMLS to further a particular ideological viewpoint: "We will revitalize IMLS and restore focus on patriotism, ensuring we preserve our country's core values, promote American exceptionalism and cultivate love of country in future generations." Sonderling News Release. However, nothing in the MLSA authorizes the agency to favor any particular viewpoint. Congress did not create a propaganda department, but an agency impartially devoted to fostering an educated and informed citizenry.

On March 31, 2025, IMLS, under the direction of Defendant Sonderling, working with members of the Department of Government Efficiency (DOGE)[1], proceeded to gut the agency. *See A Statement from AFGE Local 3403 on the Status of the Institute of Museum and Library Services*, AFGE Loc. 3403, https://perma.cc/CTZ9-XCUB (last visited Apr. 9, 2025) (AFGE Local 3403 Statement). IMLS, with DOGE, first put all of its approximately 75 employees on indefinite administrative leave, forbade them access to IMLS's offices, cut off their access to agency email and computer systems, and informed them that all IMLS grants would be terminated. *See* Inouye Decl. Ex. A–B; Decl. of Blake Doe, *State of Rhode Island v. Trump*, No. 25-cv-128 (D.R.I. Apr. 4, 2025), ECF No. 3-40 ¶ 11 ("Blake Doe Decl."); *see also* Jennifer Schuessler, *Trump*

---

[1] References to the Department of Government Efficiency refer to both the U.S. DOGE Service and the U.S. DOGE Service Temporary Organization and individuals employed directly by those entities or working at their direction.

*Administration Moves to Shutter Library Agency*, N.Y. Times (Mar. 31, 2025), https://perma.cc/K4F9-XK59. IMLS's director of human resources advised the employees that they were put on administrative leave not for performance reasons, but instead "to facilitate the work and operations of the agency." *Id.*; *see also* Inouye Decl. Ex. A–B. On April 3, 2025, Defendant Sonderling and DOGE terminated all but approximately 12 of the IMLS staff, effective May 4, 2025. Inouye Decl. ¶ 4; *see also* Marisa Kabas (@marisakabas.bsky.social), Bluesky Social (Apr. 3, 2025, 3:33 PM), https://perma.cc/54F4-CTR8. On information and belief, half of those who remain are lawyers and a human resources officer; just one program officer remains to administer all library programs, Inouye Decl. ¶ 4; *see also* Blake Doe Decl. ¶ 14. On the same day, Defendant Sonderling fired all 23 members of the statutorily created Board. Inouye Decl. ¶ 6.

Defendants also began canceling IMLS grants. Beginning April 1, 2025, at least three of the State libraries that receive annual grants mandated by the MLSA were informed that their grants were terminated. *Id.* ¶ 14; *see* Inouye Decl. Ex. C. On April 9, 2025, the Maine State Library announced that it was forced to close for two weeks and to fire 13 staff members—30% of its staff—as a direct result of losing IMLS funding. Maine State Library, *Press Release: Maine State Library Layoffs Due to Federal Funding Inaccessibility*, https://perma.cc/W6PA-4LY7 (Apr. 9, 2025).

On April 9, 2025, ALA received letters informing it that two of its IMLS grants were terminated, effective April 8. Inouye Decl. ¶ 23; Inouye Decl. ex. D–E. The terminated grants were issued to fund programs to provide resources to library workers to design effective programs for their communities and to train public library staff in three states to engage Spanish-speaking families in their communities. Inouye Decl. ¶ 22. More grant terminations are certain to follow. And without staff to disburse grant funds or process and administer claims for reimbursement,

grantees will not receive their grant funds, and grantees who have already expended funds in reliance on their awards will be unable to receive reimbursements. *Id.* ¶ 20.

The consequences for librarians, libraries, and the communities that rely on them will be devastating. Libraries are already starting to close and will continue to be forced to reduce services. *See, e.g.*, *id.* ¶ 7–20. Some small rural libraries, including on Native American reservations, may have no other option than to shut down entirely. *Id.* ¶ 18–19. Library users who rely on IMLS-funded services like literacy services, early reading programs, reading for the visually and hearing impaired, and inter-library lending, as well as many more, will find them reduced or eliminated. *See, e.g.*, *id.* ¶ 8; Neal Decl. ¶ 4; Gaber Decl. ¶¶ 9, 11; Willson Decl. ¶ 4; Jacobson Decl. ¶¶ 5–6.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a moving party must demonstrate: "(1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted). The final two factors "merge when the Government is the opposing party." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

This Court applies a "sliding scale" approach, wherein "a strong showing on one factor could make up for a weaker showing on another." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (internal quotation marks and citation omitted) ("not[ing ] tension" with precedent, "but reserv[ing] the question whether the sliding-scale approach remains valid"); *Nat'l R.R Passenger Corp. (Amtrak) v. Sublease Interest Obtained Pursuant to an Assignment and*

*Assumption of Leasehold Interest Made as of Jan. 25, 2007*, Case. No. 22-1043, 2024 WL 3443596, at *1–2 (D.D.C. July 15, 2024) (noting "this court remains bound" by the sliding scale).

## ARGUMENT

Defendants' scheme to dismantle IMLS violates the Constitution, the Museum and Library Services Act, the Impoundment Control Act, and the Administrative Procedure Act. The separation of powers, the Take Care Clause, and the Spending Clause prohibit the executive branch from eliminating an agency, reducing its staff to a skeleton crew that cannot carry out statutorily mandated functions, or refusing to obligate appropriated funds. And even if Defendants possessed constitutional or statutory authority to eviscerate IMLS, they have provided no reasoned explanation for doing so, ignored strong reliance interests, and failed to consider more reasonable alternatives. As a result, Plaintiffs and their members face imminent and irreparable harm: the loss of services, funding, and data that are critical to their ability to pursue their missions, employ librarians, and serve America's many millions of library users.

## I.    Plaintiffs are likely to succeed on the merits.

### A.    Defendants violated the Constitution by unilaterally dismantling a federal agency.

#### 1.    Shuttering an agency created by statute and with statutorily required functions violates the principle of separation of powers.

The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see Trump v. United States*, 603 U.S. 593, 637–638 (2024). The power to make laws rests exclusively with Congress. *See* U.S. Const. art. I, § 1. As part of that authority, the power to establish, reorganize, restructure, and abolish agencies likewise rests squarely with Congress. *See Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction[.]"); *see also Nat'l*

*Fed'n of Indep. Bus. v. U.S. Dep't of Labor*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute."); *Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive & Administer Funds Under Foreign Aid Legis.*, 9 Op. O.L.C. 76, 78 (O.L.C. 1985) (recognizing the "Executive Branch's acquiescence in the need for reorganization legislation in order to restructure or consolidate agencies within the Executive Branch"). The President's role with respect to lawmaking, by contrast, is limited to the "recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

Given the constitutional division of powers, Defendants lack the authority to unilaterally shutter IMLS, an agency established by statute. Arts, Humanities, and Cultural Affairs Act of 1976, Pub. L. 94-462, Title II, 90 Stat. 1971 (codified as amended at 20 U.S.C. § 9102 *et seq*.). Congress has, from time to time, given the President specific, circumscribed authority to reorganize the federal bureaucracy. *See* Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* (2012)**,** https://perma.cc/QY3T-XWG2 ("CRS Report") (summarizing history of Reorganization Acts). But it has consistently declined presidential requests for open-ended reorganization authority. *See id.* at 15–16, 20–23, 32 (describing failed efforts by the Truman, Lyndon B. Johnson, and George W. Bush administrations to obtain permanent reorganization authority). The last Reorganization Act expired in 1984, *see* 5 U.S.C. § 905(b), and Congress has rejected requests for further reorganization authority ever since. CRS Report at 31-33. Because Congress has legislated in this area and *refused* the power that the current Administration is asserting, the President's power is at its "lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). A president cannot unilaterally "eliminate" a congressionally created agency, whether through executive order or otherwise.

Nor may an administration decide that an agency's "priorities" include ignoring congressionally required activities. Congress specified numerous structural components of IMLS and activities it must undertake, which Defendants' actions contravene. The Director is statutorily required to be advised by the congressionally established Board, 20 U.S.C. § 9105a, which Defendants have abolished. Congress imposed mandatory duties on the Director, including that he "*shall* have primary responsibility for the development and implementation of policy to ensure the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United States." 20 U.S.C. § 9103 (emphasis added). The MLSA also commands that the Director "*shall* regularly support and conduct, as appropriate, policy research, data collection, analysis and modeling, evaluation, and dissemination of information to extend and improve the Nation's museum, library, and information services." 20 U.S.C. § 9108 (emphasis added). The Director "shall" award grants to states, Indian tribes, and organizations that primarily serve Native Hawaiians. 20 U.S.C. §§ 9131, 9141, 9161. The Director "shall" carry out the National Leadership Grants program "to enhance the quality of library services nationwide." *Id.* § 9162. And Congress required that the Director have special competence in library and information services or museum services, 20 U.S.C. § 9103(a), which Defendant Sonderling lacks.

These duties are not discretionary. "[T]he word 'shall' usually connotes a requirement." *Kingdomware Tech., Inc. v. United States*, 579 U.S. 162, 171 (2016); *see also, e.g.*, *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (recognizing that "shall" is "mandatory" and "normally creates an obligation impervious to judicial discretion"). By firing virtually the entire staff of the IMLS, without whom the agency cannot fulfill its duties, Defendants unconstitutionally flout Congress's commands.

Moreover, since the inception of the MLSA, Congress has repeatedly appropriated funds for IMLS to carry out its mandatory duties. *See* Full Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025) ("2025 Appropriations Act"). Because the Constitution "exclusively grants the power of the purse to Congress, not the President," *City & Cnty. of San Francisco v. Trump*, 897 F. 3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7), "settled, bedrock principles of constitutional law" require the executive branch to expend the funds that Congress duly authorizes and appropriates. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). Even the Executive Order recognizes that Defendants cannot take IMLS below the "minimum presence and function required by law." Executive Order, § 2(a). Congress specified the "minimum presence and function" by appropriating nearly $300 million to IMLS, and Defendants' efforts to leave most of that money unspent through staff and grant terminations violate both the Spending Clause and the Impoundment Control Act. *See In re Aiken Cnty.*, 725 F.3d at 261 n. 1 ("[A] President sometimes has policy reasons (as distinct from constitutional reasons) for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." (citation omitted) (cleaned up)).

Defendants are bound by these statutes. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 954 (1983) (explaining that the "repeal of statutes, no less than enactment, must conform with Art. I"). "As Madison explained in The Federalist No. 47, under our constitutional system of checks and

balances, '[t]he magistrate in whom the whole executive power resides cannot of himself make a law.'" *Medellin v. Texas*, 552 U.S. 491, 527–28 (2008) (alteration in original) (quoting J. Cooke ed., p. 326 (1961)). Holding otherwise "would be clothing the President with a power entirely to control the legislation of congress." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838); *see also Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 908–09 (D.C. Cir. 2024) (holding invalid regulations issued pursuant to an executive order, not pursuant to a congressional delegation of authority).

Other courts have similarly held that the executive branch's shuttering of an agency established by statute or refusal to spend appropriated funds violates the separation of powers. In *National Treasury Employees' Union v. Vought*, the court found a likelihood of success with respect to similar constitutional claims as to the shutdown of the Consumer Financial Protection Bureau, explaining "[w]hile the President is free to propose legislation to Congress to accomplish this aim, the defendants are not free to eliminate an agency created by statute on their own." No. 25-0381, 2025 WL 942772, at *23 (D.D.C. Mar. 28, 2025) (order stayed on appeal on separate grounds, No. 25-5091, 2025 WL 996856 (D.C. Cir. Apr. 3, 2025). Similarly, in *AIDS Vaccine Advocacy Coalition v. Department of State*, the Court found that the plaintiffs were likely to prevail on the merits of their claim that the Administration's executive order directing a pause on all funding provided by U.S. Agency for International Development violated the separation of powers doctrine by disregarding the appropriations that Congress ordered spent. No. 25-00400, 2025 WL 752378, at *14–17 (D.D.C. Mar. 10, 2025). And the District Court for the Southern District of New York recently granted a temporary restraining order enjoining the Administration from taking any actions to shut down the United States Agency for Global Media under the same executive order at issue here. *Widakuswara v. Lake*, 25-cv-2390, 2025 WL 945869, at *11 (S.D.N.Y. Mar.

13

28, 2025). The court found that, among other things, plaintiffs had established a likelihood of success on the merits of their claim that the Closure Order at issue in that case violated the separation of powers doctrine. *Id.* at *7 (citation omitted). As in these cases, by directing that IMLS be "eliminated," firing virtually all IMLS staff, terminating grants, and firing the Board, Defendants have exceeded their constitutional authority and violated the separation of powers.

Nor can Defendants immunize their constitutional trespass into the province of the legislature by relying on the Executive Order's instruction to "eliminate [IMLS] *to the maximum extent consistent with applicable law*." Executive Order § 2(a) (emphasis added). "Savings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language." *City & Cnty. of San Francisco*, 897 F.3d at 1239. Here, the Executive Order "unambiguously commands" that Defendants "eliminate" IMLS funding and programs in contravention of the plain meaning of the statutes that authorize them, so there is "more than a mere possibility that some agency might make a legally suspect decision." *Id.* at 1240. Courts have rejected the idea that an executive order can avoid conflict with constitutional or statutory provisions through "a purely theoretical savings clause, with no method or standard for invoking it, the application of which would undermine the [substantive provisions of the Executive Orders]." *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021); *see City & Cnty. of San Francisco*, 897 F.3d at 1240 ("The Executive Order's savings clause does not and cannot override its meaning.").

### 2. Dismantling IMLS violates the Take Care Clause.

For similar reasons, Defendants' actions violate the Take Care Clause. The Constitution imposes on the President the duty to "take care that the Laws be faithfully executed." U.S. Const., art. II § 3; *see also Morrison v. Olson*, 487 U.S. 654, 690 (1988) (explaining that the President has a "constitutionally appointed duty to 'take care that the laws be faithfully executed'") (quoting

U.S. Const. art. II, § 3). The Supreme Court has explained that "[u]nder our system of government, Congress makes laws and the President . . . faithfully execute[s] them." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) (internal quotation marks and citation omitted). "Just as the Constitution prevents Congress from intruding on the President's power to execute the laws, the President— and his subordinates—do not wield 'authority to set aside congressional legislation by executive order.'" *New York v. Trump*, No. 25-cv-01144, 2025 WL 573771, at *24 (S.D.N.Y. Feb. 21, 2025) (quoting *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999)). This obligation "to see that the laws are faithfully executed refutes the idea that [the President] is to be a lawmaker." *Youngstown*, 343 U.S. at 587. "[T]he President may not decline to follow a statutory mandate . . . simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d at 259. As the Supreme Court has stated, "[t]o contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Kendall*, 37 U.S. at 613. Holding otherwise "would be clothing the President with a power entirely to control the legislation of congress." *Id.*

As explained above, the unilateral dissolution of IMLS by the President and his agents is directly contrary to law, flouting both the MLSA and appropriations statues. The Executive violates the Take Care Clause when it overrides statutes enacted by Congress. *In re United Mine Workers*, 190 F.3d at 551. The dismantling of IMLS thus violates the Take Care Clause. *See Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 244 (D.D.C. 2019) (recognizing that "separation-of-powers principles also drive evaluations of claims brought under the Constitution's Take Care Clause"); *Widakuswara*, 2025 WL 945869, at *6-7 (quoting U.S. Const. art. II, § 3) ("Withholding congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on this constitutional mandate"

to "take Care that the Laws be faithfully executed."). Whether viewed as an encroachment on Congress's exclusive authority to legislate or as a dereliction of the executive's duty to take care that the laws are faithfully executed, the upshot is the same: Unilaterally dismantling the agency violates the balance struck in the Constitution and is unlawful.

### B. Defendants violated the Administrative Procedure Act.

The Administrative Procedure Act (APA) directs courts to "hold unlawful and set aside" final agency actions that are arbitrary, capricious, an abuse of discretion, or in excess of statutory authority or contrary to law. *See* 5 U.S.C. § 706(2). The APA also requires courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). While any of these grounds alone would be sufficient for an injunction, Defendants' decision to dismantle IMLS is unlawful under all of them and should be set aside to restore the *status quo ante* until the Court addresses the merits of Plaintiffs' claims.

### 1. Defendants' decision to dismantle IMLS is final agency action.

Defendants' decision to shut down the IMLS is final agency action subject to this Court's review because it (1) marks "the consummation of the agency's decisionmaking process" without being "of a merely tentative or interlocutory nature" and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted).

A decision to "shut down the agency entirely" is "a final, concrete decision" subject to judicial review under the APA. *Nat'l Treasury Emps. Union*, 2025 WL 942772, at *13. Defendants' actions make plain that the consummation of their decisionmaking process is to effectuate a shutdown of IMLS as Congress intended it to be. Their actions to dismantle the agency have not been "tentative" or "interlocutory," *id.*; they have been deliberate and swift. Since Defendant

16

Trump's condemnation of the IMLS as "unnecessary," Executive Order § 1, Defendants have worked in concert to shut down IMLS.

The newly appointed Acting Director of the IMLS, Defendant Sonderling, shortly after announcing the agency's new intent to "steer[] this organization in lockstep with this Administration," Sonderling News Release, proceeded to put *all* of the agency's employees on administrative leave for 90 days, instructing that no employee enter agency premises, Schuessler, *Trump Administration Moves to Shutter Library Agency*, and thereby ensuring no functioning agency. Though Defendant Sonderling recalled a small number of employees, including one program officer each for the library and museum programs, Inouye Decl. ¶ 4, a single program officer cannot do the work of dozens required to keep IMLS running. *See* Letter from Robert C. Scott and Alma Adams, Committee on Education and the Workforce, to Keith Sonderling, IMLS Acting Director (Apr. 4, 2025), https://perma.cc/SR6C-HN92 ("It strains credibility to suggest that [IMLS] can live up to the immensity of MLSA's statutory requirements with an entire staff on administrative leave.") Rather, Defendant Sonderling moved forward "authoriz[ing] the termination" of that work by issuing letters to state grantees to terminate IMLS grants. See Inouye Decl. ¶ 14; Inouye Decl. Ex. C. Shortly thereafter, Defendant Sonderling proceeded to issue termination notices to all employees remaining on administrative leave, Inouye Decl. ¶ 4, and fire all members of the Board, *id.* ¶ 6.

All of Defendant Sonderling's actions as the head of IMLS ring the bell of finality. He has certainly been the agency head from which these decisions have come—not the employees he has terminated nor even the Board he fired. *Compare Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C. Cir. 1971) (holding action by agency head as "signpost[] of authoritative determination, finality[,] and ripeness") *with Soundboard Ass'n v. Fed. Trade*

*Comm'n*, 888 F.3d 1261, 1268 (D.C. Cir. 2018) (holding letter expressing "views of 'staff'" rather than agency authorities was not final agency action). Even if IMLS still exists in name only, an "attempt[] to terminate" agency programming constitutes final agency action. *Biden v. Texas*, 597 U.S. 785, 807 (2022). The change to the agency is unlike normal agency management of programs, but instead a "wholesale cessation of activities." *Nat'l Treasury Emps. Union*, 2025 WL 942772, at *12; *see also Widakuswara*, 2025 WL 945869, at *4 ("The termination of contracts with partner organizations and the dismantling of critical infrastructure leading to the complete halt of agency programming are final agency actions."). This Court "should [] take action to preserve the [IMLS] now, before the case concerning its fate has been resolved[.]" *Nat'l Treasury Emps. Union*, 2025 WL 942772, at *1.

To the detriment of Plaintiffs and countless Americans, legal consequences have already begun to flow from the dissolution of IMLS. IMLS staff have been placed on administrative leave and notified their employment will be terminated by May 4, Inouye Decl. ¶ 4; @marisakabas.bsky.social, Blueskye Social (Apr. 3, 2025, 3:33 PM); grantees—including ALA— have suddenly lost funding, *e.g.*, Inouye Decl. ¶¶ 14, 23–24, Exhibit D, Exhibit E; and the shell IMLS has already become will undoubtedly terminate more grants and fail to timely disburse funds for others, *id.* ¶ 20. As a result, libraries will be forced to discontinue services upon which Americans across the nation rely, *id.* ¶¶ 7–20, 28–34, or even close entirely, *e.g. id.* ¶¶ 18–19.

## 2. Agency Defendants' decision to dismantle IMLS is arbitrary and capricious.

The APA requires agency actions to be both "reasonable *and* reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (emphasis added) (quotation omitted); *see also* 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S.,*

*Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants' decision to dismantle IMLS is arbitrary and capricious in several respects.

*First*, Agency Defendants[2] failed to articulate a reasoned explanation for dismantling IMLS, or for the key actions taken to implement it, such as firing the bulk of IMLS staff, firing the Board, and canceling IMLS grants. For decades, IMLS has provided crucial support to libraries across the country. And IMLS has acknowledged that its work is important. As recently as last year, IMLS justified its budget request to Congress by saying it was "strongly committed" to the "goal of a more equitable America," and that IMLS served that goal because "social mobility within communities can be tied to the proximity of cultural institutions and particularly libraries." IMLS, *Fiscal Year 2025: Congressional Justification*, at 3 (March 2024), https://perma.cc/C36H-YQ7H. In particular, IMLS has continually recognized the importance of its Native Communities Grant Programs: "IMLS's Native Communities grant programs have been effective in their allowed flexibility of the use of funds" by providing "small, hard-to-reach Indigenous communities access to much-needed funding." IMLS, *Evaluation of IMLS's Native Communities Grant Programs*, at 6 (2024) https://perma.cc/63AY-A33L. Agency Defendants failed to explain their about-face regarding the continued importance of IMLS and its programs. *See FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (An agency may not "depart from a prior policy *sub silentio*" and "must show that there are good reasons for the new policy.").

The shred of clarification Agency Defendants have offered—that its programs and grants are "inconsistent with IMLS' priorities," Inouye Decl. Ex. C—comes nowhere close to "a rational connection between the facts found and the choice made." *Motor Vehicles*, 463 U.S. at 43. Their

---

[2] "Agency Defendants" means Defendants Sonderling, IMLS, Gleason, U.S. DOGE Service, U.S. DOGE Service Temporary Organization, Vought, and OMB.

sole explanation for placing virtually the entirety of IMLS's staff on administrative leave pending their imminent termination—that it will somehow "facilitate the work and operations of the agency," Inouye Decl. Ex. A–B—is manifestly irrational. Nor is it sufficient for them to point to the Executive Order as justification for their actions without further articulation. *Tate v. Pompeo*, 513 F. Supp. 3d 132, 143 (D.D.C. 2021) ("The means by which the Secretary implements the Proclamations are therefore within the discretion of the Secretary, are not dictated by the Proclamations themselves, and require the Secretary to exercise judgment." And even imputing the executive order's rationale—that IMLS is "unnecessary," EO § 1—to Agency Defendants does not constitute a reasoned explanation. Firing the staff necessary to evaluate IMLS grant requests and "ensure that scarce federal resources are used appropriately," Neal Decl. ¶ 6, furthermore highlights the capriciousness of Agency Defendants' decision.

*Second*, Agency Defendants "entirely failed to consider an important aspect of the problem," *Motor Vehicles*, 463 U.S. at 43, firstly the severe and obvious harms that would ensue from shutting down the country's primary funder of library services. Librarians across the country rely daily on IMLS library professionals as resources, and IMLS administers funds that support library programs and services including, but not limited to, supporting the training of library professionals, workforce development, and educational and literacy programming. *See* Inouye Decl. ¶¶ 5, 7–20. Defendants' dismantling of IMLS has already resulted in terminating grants, *e.g.,* *id.* ¶ 14, Ex. C, and remaining grants are expected to be terminated en masse. *See* Francis Decl. ¶¶ 23–25. Even grants not formally terminated will likely go unpaid, and reimbursement requests will likely be ignored, given IMLS is now operating on a skeleton staff that will not be able to keep up with the day-to-day operations of a 75-person agency. Inouye Decl. ¶¶ 20, 27; Neal Decl. ¶ 5. As a result of Defendants' actions, librarians across the country will lose access to crucial

resources, *see* Adams Decl. ¶¶ 7–9, and libraries will be forced to end programs funded by grants and cut staff, *see id.*, Willson Decl. ¶¶ 3–5, Bradley Decl. ¶¶ 3–4, Inouye Decl. ¶ 23. Agency Defendants gave no apparent consideration to these consequences, rendering the shutdown decision arbitrary and capricious.

Agency Defendants also failed entirely to consider how dismantling IMLS will impact programs administered by other executive agencies pursuant to their statutory mandates. For example, in dismantling IMLS, Agency Defendants have fired the staff and canceled the contracts necessary to fulfill IMLS's data collection duties, 20 U.S.C. § 9108, which include maintaining the Public Libraries Survey, an irreplaceable longitudinal source of data about American public libraries. Failing to continue collecting and maintaining this data will almost certainly harm the Federal Communications Commission's (FCC) ability to implement the E-Rate program, which provides Universal Service Fund funding to subsidize broadband internet access to libraries and public schools pursuant to congressional mandate. *See* 47 U.S.C. § 254(h)(2)(A); FCC, *E-Rate: Universal Service Program for Schools and Libraries*, https://perma.cc/F6NF-FC5G (last visited Apr. 10, 2025). The E-Rate program relies on Public Libraries Survey data, including library square footage, to determine libraries' funding eligibility. *See* 47 C.F.R. §§ 54.501(b), 54.502(d). Defendants appear to have given no thought to how the FCC can continue to administer the E-Rate program after IMLS fails to maintain Public Libraries Survey data.

*Third*, Agency Defendants entirely neglected serious reliance interests on the continued existence of IMLS and its grant programs. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) ("When an agency changes course, . . . it must be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). Libraries rely

on IMLS expertise, Inouye Decl. ¶ 5, on IMLS funding to continue numerous programs across the country, *id.* ¶¶ 7–21, Adams Decl. ¶¶ 3–9, Willson Decl. ¶¶ 3–5, Bradley Decl. ¶¶ 3–4, and on getting reimbursed for expenses already incurred, Neal Decl. ¶ 8, Inouye Decl. ¶¶ 23–24, 28.

For example, Librarians, researchers, and unions across the country rely on IMLS data— and Public Libraries Survey data in particular—which cannot feasibly be replicated by any other entity. *See* Billinger Decl. ¶ 8; Inouye Decl. ¶ 33; Fournier Decl. ¶¶ 8–11. Even a temporary pause in data collection and maintenance will harm the integrity of the longitudinal data and consequently injure those researchers who rely on it. *See* Fournier Decl. ¶¶ 10–11. Additionally, library users rely on continued access to their libraries and their programs, such as accessing digital collections or expensive textbooks for graduate school programs. *See* Francis Decl. ¶¶ 10–14, Jacobson Decl. ¶¶ 3–6. Agency Defendants' actions to shutter IMLS will immediately and irreparably harm researchers, libraries, and the patrons who rely on them. Agency Defendants failed "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns," *Regents of the Univ. of California*, 591 U.S. at 33, as the APA requires.

*Fourth*, Agency Defendants failed to consider alternatives less drastic than abruptly shutting down the IMLS. *See Motor Vehicles*, 463 U.S. at 51. Agency Defendants could have considered targeted reductions in IMLS staff or grants, consistent with the agency's various legal obligations, that would accomplish the administration's policy goals while accounting for established reliance interests and averting throwing the countries' libraries into a state of chaos. They chose not to. Instead, they decided to "eliminate" IMLS, leaving the agency unable to carry out both its general mission and specific actions and functions required by statute and with

corresponding harm. Failure to consider a less drastic course renders the decision arbitrary and capricious.

### 3.  Agency Defendants lack statutory authority to dismantle IMLS.

"Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "An agency," in other words, "'literally has no power to act' . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). Under the APA, courts must hold unlawful final agency action taken "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

Agency Defendants lack statutory authority to shut down IMLS. In the Museum and Library Services Act, Congress mandated that IMLS exist as a functioning agency. Arts, Humanities, and Cultural Affairs Act of 1976, Title II, § 203(a). Congress passed no subsequent statute authorizing Agency Defendants to undo the agency or prevent it from functioning as Congress intended.

Agency Defendants lack statutory authority to eliminate the Board, which was also created by statute. 20 U.S.C. § 9105a. Congress mandated that the Board consist of 23 members with specialized expertise in library and museum services, to advise the IMLS Director on policy matters in carrying out IMLS's duties. *Id.* § 9105a(b)(1), (d)(1). Yet on April 4, 2025, Defendant Sonderling fired all 23 Board members. Neal Decl. ¶ 7. No statute gives Defendant Sonderling authority to do so.

### 4.  Agency Defendants' decision to dismantle IMLS is contrary to law.

The APA further directs courts to hold unlawful final agency action "found to be . . . otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). That reference to "law," the Supreme Court has held, "means, of course, any law, and not merely those laws that the agency itself is

charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original). Plaintiffs are likely to prevail on their claim that Agency Defendants' decision to dismantle IMLS is contrary to the MLSA, appropriations acts, the Impoundment Control Act, and the Paperwork Reduction Act.

As discussed *supra*, pages 3–5, in the MLSA, Congress requires the Director of IMLS to perform various duties. For example, the Director "shall" advise other federal departments on museum and library services, carry out research programs and data collection, and issue various types of grants for purposes. *See, e.g.*, 20 U.S.C. §§ 9103, 9108, 9131, 9141, 9161. When an agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). In the MLSA, Congress left no wiggle room: the IMLS Director *must* perform the duties and issue the grants prescribed. By shutting down IMLS—including firing the bulk of its staff, eliminating the Board, and terminating grants under these programs—Defendants have acted contrary to the MLSA's requirements.

Agency Defendants are also violating statutes that appropriated funds to IMLS to implement its statutory duties through September 30, 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9 ("2025 Appropriations Act"); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 697 ("2024 Appropriations Act"). Congress appropriated $294,800,000 to IMLS "[f]or carrying out the Museum and Library Services Act of 1996 and the National Museum of African American History and Culture Act." 2024 Appropriations Act, 138 Stat. at 697.[3] Notably, Congress did not appropriate, for example, "up to" $294,800,000, or instruct IMLS to implement its duties using

---

[3] The National Museum of African American History and Culture Act (NMAAHC Act) commands the Director of IMLS to establish grant and scholarship programs to support and promote African American museums and studies. Pub. L. 108-184, § 7, 117 Stat. 2676, 2680 (2003).

"sums not exceeding" that amount; rather Congress appropriated precisely $294,800,000 to IMLS, indicating its intention for IMLS to make a good faith effort to obligate and expend the full amount to carry out its duties and issue statutorily mandated grants. *Cf. CFPB v. Com. Fin. Servs. Ass'n*, 601 U.S. 416, 432-33 (2024); *id*. at 442-43 (Kagan, J., concurring) (observing that Congress uses specific language, such as appropriating "sums not exceeding" or "up to" an amount for a particular purpose, when it intends to give the agency discretion to spend less than that amount).

IMLS has terminated the bulk of its staff, including those necessary to screen grant applications and disburse IMLS funds. *See* Inouye Decl. ¶¶ 4, 20; Neal Decl. ¶ 4. As a result, IMLS will be unable to continue fulfilling its statutory duties and issuing grants or disbursing grant funds, or collecting and maintaining data, as Congress mandated. *See CFPB*, 601 U.S. at 432–33; *id*. at 442–43 (Kagan, J., concurring). Indeed, Agency Defendants' actions to "eliminate[]" IMLS all but guarantee the agency will not expend appropriated funds, in violation of the 2024 and 2025 Appropriations Acts.

Agency Defendants' actions to terminate grants and fire the staff necessary to screen and process grants are also contrary to the Impoundment Control Act (ICA), 2 U.S.C. § 681 *et seq.*, which restricts the executive branch's authority to refuse to spend funds that Congress has appropriated. The ICA prohibits an agency from "(A) withholding or delaying the obligation or expenditure of budget authority . . . provided for projects or activities; or (B) . . . effectively preclud[ing] the obligation or expenditure of budget authority" except under specified circumstances. 2 U.S.C. §§ 682(1), 684(b). Deferring obligations for policy reasons—such as a grant award being "inconsistent with [this administration's] priorities," a Decl. Ex. C, is not permitted. *See* GAO, *Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, at 6 (Jan. 16, 2020), https://perma.cc/6TMT-3CH2; *see also City & Cnty.*

*of San Francisco*, 897 F.3d at 1235  ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."); *New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *11 (D.R.I. Mar. 6, 2025), *enforced,* No. 25-CV-39-JJM-PAS, 2025 WL 1009025 (D.R.I. Apr. 4, 2025).

Finally, Agency Defendants have violated the Paperwork Reduction Act, which prohibits an agency from making "a substantive or material modification to a collection of information after such collection has been approved by the" Director of OMB, without prior approval. 44 U.S.C. § 3507(h)(3). The Public Libraries Survey and other IMLS research and data projects are "collections of information" previously approved by OMB under the Paperwork Reduction Act. *See* OIRA, OMB Control No: 3137-0074, https://perma.cc/A5WX-625R (approving Public Libraries Survey through November 30, 2027). In dismantling IMLS, Agency Defendants have fired the staff necessary to fulfill IMLS's data collection duties, 20 U.S.C. § 9108, which include maintaining the Public Libraries Survey. IMLS has also terminated contracts with researchers who collect data for the Public Libraries Survey. Fournier ¶ 8. Failing to collect the data necessary to the survey constitutes, at minimum, a "substantive or material modification" to the approved data collection. Yet, on information and belief, IMLS has not obtained the statutorily required approval from OMB to make this modification.

### 5.   *By dismantling IMLS, Defendants Sonderling and IMLS unlawfully withhold or unduly delay mandatory agency action.*

The APA also provides that a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). This type of APA claim arises "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases in original). It is akin to mandamus under the All Writs Act. *Id*. at 63.

For the reasons discussed above, *supra* pages 16–18, Defendants' decision to dismantle IMLS is a final agency action. By choosing to dismantle IMLS, Defendants have also chosen not to fulfill mandatory duties required by statute, including maintaining data collection programs and databases, *see* 20 U.S.C. §§ 9103, 9108, and awarding various grants, *see id.* §§ 9131, 9141, 9161, 9162. This Court should compel Defendants IMLS and Sonderling to act to come into compliance with these statutes. *See Widakuswara*, 2025 WL 945869, at *8 ("By terminating and threatening to terminate the majority of USAGM [U.S. Agency for Global Media] staff, cancelling grants to its grantee networks abroad, and shutting down the transmitters that serve as the conduits for any radio programming to listeners abroad, Defendants have failed to carry out the clear, specific statutory mandates of the agency's governing statute. None of the statutory requirements enumerated above can be effectuated if the agency has been shuttered.").

### C.  Defendants' dismantling of IMLS is ultra vires.

Because Defendants have violated applicable statutes and acted beyond their statutory authority in dismantling IMLS, their actions are ultra vires and should be enjoined by the Court. "Review for ultra vires acts rests on the longstanding principle that if an agency action is 'unauthorized by the statute under which the agency assumes to act,' the agency has 'violated the law' and 'the courts generally have jurisdiction to grant relief.'" *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)) (cleaned up). As discussed above, *supra* 11–13, 23–24, Defendants have violated clear mandates in the MLSA. That Defendants offered no legitimate

"contemporaneous justification" is further evidence of ultra vires action. *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 975 (internal quotations and citations omitted).

## II.    Plaintiffs will suffer irreparable harm without immediate relief.

To establish irreparable harm, a movant must demonstrate that it faces an "injury that is 'both certain and great; it must be actual and not theoretical,' and of a nature 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014) (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "[O]bstacles" that "make it more difficult for [Plaintiffs] to accomplish their primary mission" suffice to show irreparable injury. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). For example, a "forced diversion of resources" that will "perceptibly impair" a plaintiff's program constitutes irreparable harm sufficient to grant preliminary relief. *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 41–42 (D.D.C. 2020) (quoting *League of Women Voters*, 838 F.3d at 8). Similarly, "if a plaintiff has shown that financial losses are certain, imminent, and unrecoverable, then the imposition of a preliminary injunction is appropriate and necessary." *Tex. Children's Hosp.*, 76 F. Supp. 3d at 242 (quoting *Wis. Gas*, 758 F.2d at 53) (cleaned up).

*First*, Plaintiff ALA has already been harmed by Defendants' unlawful actions. On April 9, 2025, ALA received letters informing it that two of its IMLS grants were terminated, effective April 8. Inouye Decl. ¶¶ 23–24; Inouye Decl. ex. D–E. The substantively identical termination letters state:

> IMLS has determined that your grant is unfortunately no longer consistent with the agency's priorities and no longer serves the interest of the United States and the IMLS Program. IMLS is repurposing its funding allocations in a new direction in furtherance of the President's agenda. Independently and secondly, the President's March 14, 2025 executive order mandates that the IMLS eliminate all non-statutorily required activities and functions.

Inouye Decl. ex. D–E. These grants fund two critical programs. One program provides resources for library workers so that they can design more compelling and effective programs for their communities across the country. Inoue Decl. ¶ 22. This project is especially beneficial for libraries without credentialed librarians, often in smaller and/or rural libraries. *Id.* The other program trains public library staff from California, Georgia, and Massachusetts on best practices for collaborating with Spanish-speaking community members, and on using principles of co-design to improve library services for families. *Id.*

Defendants have terminated funding for these programs midstream. As a result of these grant cancellations, ALA will be unable to continue funding these vital projects. *Id.* ¶ 24. The ALA member libraries and their communities who rely on the program to engage Spanish-speaking families will be harmed. That program was intended to boost Spanish-speaking families' engagement with their local libraries and the services they provide; ending the program midstream will almost certainly result in a reduction of that engagement. *Id.* Similarly, communities across the country will be harmed by Defendants' terminating the grant to support resources to library staff to design compelling and efficient programs. *Id.*[4]

If Defendants are allowed to proceed with their unlawful plan to eliminate IMLS, Plaintiffs and their members will continue to suffer a variety of irreparable harms. They will lose—and, in

---

[4] That this case concerns the termination of government grants and contracts does not deprive this Court of jurisdiction over Plaintiffs' claims. Although the Tucker Act, 28 U.S.C. § 1491(a)(1) has been read to "impliedly forbid contract claims from being brought in district court," *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618-19 (D.C. Cir. 2017) (cleaned up), whether a claim falls under the Tucker Act "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded only on a contract, or whether they stem from a statute or the Constitution." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis added), *overruled on other grounds by Perry Cap.*, 864 F.3d at 620; *Cemex Inc. v. Dep't of the Interior*, 560 F. Supp. 3d 268, 276 (D.D.C. 2021). Plaintiffs bring claims under the Constitution and the APA, arising from Defendants' unlawful dismantling of an entire executive agency. *See* Compl. ¶¶ 74–118.

many cases, are currently losing—access to the day-to-day services for which they rely on IMLS, its staff, and programs that it funds. They face the imminent threat of being forced to shutter programs and lay off staff if their own funding access is impeded. AFSCME represents library workers who will likely lose their jobs, as well as workers who can expect to see their workloads increase due to staffing and programming cuts. And IMLS will no longer collect and disseminate critical longitudinal data that Plaintiffs regularly use.

*Second*, in addition to terminating ALA's grants, Defendants have already cut off funding for programs that directly benefit Plaintiffs and their members. As laid out in more detail in *Rhode Island v. Trump*, Defendants have terminated numerous states' grants under the statutorily mandated Grants to States program. Inouye Decl. ¶ 14; Compl. ¶ 70, *Rhode Island v. Trump*, No. 25-cv-128, ECF No. 1. These grants pay the salaries of dozens of state library personnel who provide training services and other support to Plaintiff ALA's member libraries. *See, e.g.*, Inouye Decl. ¶ 13. They also fund numerous programs that State Library Administrative Agencies provide to Plaintiff ALA's member libraries and Plaintiff AFSCME's member library staff, such as continuing education. *See, e.g.*, *id.* ¶¶ 12–13; Gaber Decl. ¶ 8, 21; Adams Decl. ¶ 6; Bradley Decl. ¶ 4; Neal Decl. ¶ 4. As a result of Defendants' termination of IMLS grants, the Maine State Library has already announced it will close for two weeks and fire 30% of its staff. Maine State Library, *Press Release: Maine State Library Layoffs Due to Federal Funding Inaccessibility* (Apr. 9, 2025).

If Defendants are not enjoined, these funding cuts will soon be joined by termination of the additional states' funding under the Library Services and Technology Act ("LSTA"),[5] which will further impair libraries' ability to obtain state-required training for librarians, including ALA

---

[5] The LSTA is a subchapter of the MLSA and commands the Director of IMLS to issue grant awards to the states. 20 U.S.C. § 9131 *et seq.*

members. Ending LSTA grants would dramatically decrease State libraries' ability to provide training services and likely require State libraries to lay off additional employees who provide training. Inouye Decl. ¶ 13. As explained by librarians in Maryland, the annual funding their libraries receive for training is necessary to ensure that staff members meet state law certification requirements. Newman Decl. ¶¶ 7–8; Willson Decl. ¶ 3. Staff receive training in customer service, de-escalation techniques, practical strategies for working with individuals experiencing homelessness, communication, and best practices in early literacy instruction, among other things. Willson Decl. ¶ 3; Gaber Decl. ¶ 16. As a Maryland librarian explains, if LSTA grants to the Maryland State Library are cut, her county library would be unable to pay for the interlibrary loan system, training for staff, and electronic resources. Newman Decl. ¶ 9. The Arizona Secretary of State similarly stated that loss of IMLS funding would result in "an immediate and ongoing disruption of services," including disruptions to its academic and business databases and delays in the procurement of essential technology. Fontes Decl. ¶¶ 19, 23, *Rhode Island v. Trump*, No. 25-cv-128, ECF No. 3-1.

The imminent termination of non-state grants will similarly harm Plaintiffs and their members. For example, the Minitex consortium serves libraries throughout Minnesota, providing (among many other services) a catalog of 10 million items that the libraries can offer to their patrons. Francis Decl. ¶ 11. Minitex receives more than $1 million in IMLS funding, the loss of which "would lead to a reduction in Minitex's services and staffing." *Id.* ¶¶ 22–23. It has already halted project grants due to the anticipated loss of IMLS funding. *Id.* ¶ 25. As a result, libraries throughout Minnesota—including numerous ALA member libraries—will likely lose access to the very lending materials they offer to their patrons, impeding their core mission.

As another example, the director of a university library explained that IMLS funding is currently supporting the nationwide expansion of a graduate program to provide specialized training to librarians who wish to advance their careers. Bradley Decl. ¶ 3. Without that funding, the library will be forced to fire the program manager and the imminent expansion will not go forward. *Id.* As a result, prospective and current librarians around the country will not be able to receive training that significantly expands their career opportunities and will be unable to fill vacant specialized positions. *Id.*

*Third*, Plaintiffs' members are at imminent risk of losing funding themselves if Defendants' evisceration of IMLS continues. As the Librarian Emeritus of Columbia University, who has spent over 60 years dedicated to library services and was, until last week, a member of the IMLS advisory board, explains: "Any interruption in IMLS funding would have direct and immediate consequences for libraries and the communities that rely on them. Important services would have to be eliminated and some small libraries would have to reduce hours or even shut down." Neal Decl. ¶ 4. This would significantly impair their organizational mission, to say nothing of the harm to the communities that depend on those libraries to provide vital and timely services to the public.

The resulting harms would be devastating and irreparable across a variety of programs and services that Plaintiffs' members provide and rely on. IMLS supports state library programs and services through several kinds of grants. For example, elimination of National Leadership Grants would have an immediate effect on libraries' ability to provide vital services such as early learning, literacy, financial literacy, and digital access programs. Inouye Decl. ¶¶ 9, 15; Naficy Decl. ¶ 2. Without these funds, libraries will likely have to lay off staff members and cancel programs. Naficy Decl. ¶ 7, 8. In turn, these cuts "will be felt keenly" by library users, "who look to the library as a lifeline for information, community, betterment, career advancement, and basic modern

connectivity." Johnston Decl. ¶ 14. An abrupt halt in library services or programs upon which community members rely would thus harm the goodwill of libraries within their communities. *Cf. Endo Par Innovation Co., LLC v. Becerra*, No. CV 24-999, 2024 WL 2988904, at *8 (D.D.C. June 10, 2024) (finding loss of goodwill with customers irreparable harm).

Another key goal of the MLSA is to provide grants for tribal and Native Hawaiian libraries. These are directed at serving some of the poorest and most remote communities in our nation. Inouye Decl. ¶¶ 18–19. The elimination of such grants would result in a dramatic reduction in services to these communities, and some tribal libraries would likely have to shut down. *Id.* ¶ 18. Indeed, one librarian who works for a library that serves both a tribal community college and the entire reservation has explained that it would have to "cut literacy programs in a place that is a book desert"; either lose its library catalog or at least not be able to support the catalog as currently funded; and be unable (as a result of IMLS staff being fired) to ask for assistance from professionals at the State Library. Adams Decl. ¶¶ 7–9. Losing access to the library catalog would threaten the college's accreditation. *Id.* ¶ 7. Another librarian in a western state explained the "devastating impact" that the loss of IMLS funding will have on many rural and tribal libraries. Bradley Decl. ¶ 4. For some, IMLS grants are the only source of funding, and the "[r]eduction or elimination of IMLS funds will cause a reduction or elimination of library services[.]" *Id.* ¶ 4.

ALA and its members have relied on IMLS grants in hiring staff and entering into vendor contracts. ALA has made specific commitments, including for staff services and vendor contracts, on the strength of its active $2.4 million in awards from IMLS. Inouye Decl. ¶ 26. ALA already has pending reimbursements to pay for those commitments, and Defendants appear to have already begun to stop payments. *Id.* ¶¶ 20, 23–24, 26. Reimbursement requests that are typically processed in four days have gone unpaid for two weeks. *Id.* Likewise, libraries that have already spent funds

in reliance on IMLS grants may be unable to pay their vendors and will have to terminate staff. Inouye Decl. ¶ 28; Neal Decl. ¶ 8; Gaber Decl. ¶¶ 23–24. Their ability to serve their communities and carry out their organizational missions will be deeply and irreparably compromised.

*Fourth*, Defendants' cuts—both the funding terminations that have already occurred and the imminent ones that Defendants intend to execute—will cost untold numbers of AFSCME members their jobs. *See, e.g.*, Francis Decl. ¶ 27; Gaber Decl. ¶¶ 3, 24. Numerous library positions are funded wholly or in part by IMLS grants. *See, e.g.*, Inouye Decl. ¶ 13; Gaber Decl. ¶ 23. And in some cases, libraries and other entities reliant on IMLS funds will be forced to cut a significant percentage of their staff. For example, Minitex will likely need to cut 10 of its 30 bargaining unit positions. Francis Decl. ¶ 27. This sudden loss of significant expertise and institutional knowledge at libraries and library-adjacent entities across the country will be impossible to recover. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1095 (7th Cir. 2008) (finding inadequate legal remedy where "potential loss of institutional knowledge accompanying the unwanted termination of employees" was "virtually impossible" to calculate in damages).

*Fifth*, IMLS provides non-monetary benefits that the ALA, AFSCME, and their members will lose access to as a result of Defendants' actions. IMLS staff advise librarians around the country on a daily basis. Inouye Decl. ¶ 5. These professionals are an invaluable resource that would be lost entirely due to the termination of almost the entire IMLS staff and will be felt immediately. Neal Decl. ¶ 5.

IMLS is also a leader for research in the library field, and especially when there is a compelling national interest. Inouye Decl. ¶ 33; *see also* Cooper Decl. ¶¶ 4-6. The agency coordinates with the states to facilitate regular, authoritative, and systematic data collection,

analysis, and reporting. Inouye Decl. ¶ 33. The Public Libraries Survey, for example, provides statistics of public libraries in the United States, analogous to the U.S. Census Bureau for people. Data are collected annually from approximately 9,000 public libraries with approximately 17,000 individual public library outlets (main libraries, branches, and bookmobiles) in the 50 states, the District of Columbia, and outlying territories. Fournier Decl. ¶ 2; *see also* Billinger Decl. ¶ 6. It would be impossible to achieve the same standard of research through a de-centralized system comprising independently managed state programs. Inouye Decl. ¶¶ 33-34. The loss of this data for even a short period of time will irreparably harm Plaintiffs, as would significant gaps in the data collected. A disruption in data collection will mean that studies currently underway will not be completed and studies for which data has been collected will not be analyzed and reported, and will result in a loss of data used for longitudinal studies and analyses which will deprive the public of valuable information about trends in library services. Fournier Decl. ¶¶ 10–11. ALA would further be harmed by the loss of Public Libraries Survey data, as it is a subgrantee for a project to provide guidance and tools to help public libraries reach audiences with stories that relies on that data. Inouye Decl. ¶ 25.

IMLS's Public Libraries Survey data is also critical to AFSCME's ability to negotiate collective bargaining agreements and cannot be replicated outside of the survey. Billinger Decl. ¶¶ 7-8. Losing this data "will immediately reduce the bargaining power of all AFSCME-affiliated unions representing library employees around the country." *Id.* ¶ 8. Given the binding nature of collective bargaining agreements and the limited bases for reopening them, this harm will be irreparable for any AFSCME affiliate whose collective bargaining agreement is under negotiation or about to expire—like Local 3800 in Minnesota, whose current agreement expires less than 90 days from now. Francis Decl. ¶ 28.

In sum, Defendants' dismantling of IMLS has impaired and will continue to impair Plaintiffs' ability "to accomplish their primary mission" in numerous ways. *League of Women Voters*, 838 F.3d at 9. Preliminary injunctive relief is required to ensure that these harms are minimized while the Court resolves this litigation on the merits.

### III.    The balance of equities and public interest strongly favor preliminary relief.

The final two factors to consider in weighing whether to order preliminary relief—the balance of equities and the public interest—"merge when the Government is the opposing party." *Pursuing Am.'s Greatness*, 831 F.3d at 511 (quoting *Nken*, 556 U.S. at 435). These factors weigh heavily in favor of preliminary relief here.

The public has a strong interest in the required execution of the MLSA enacted by Congress, and, specifically, in the IMLS's continued funding and operation of the ALA and its member public libraries. The public benefits from its libraries being enabled to "pursue the worthy missions of facilitating learning and cultural enrichment." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 203 (2003); *see also* 20 U.S.C. § 9121 (laying out purposes of MLSA).

By contrast, Defendants have no legitimate interest in unlawfully dissolving the IMLS, preventing it from fulfilling its statutory duties, and in turn preventing Plaintiffs and their members from being able to continue providing crucial services and programs reliant upon IMLS funding. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks and citations omitted), and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). Instead, "there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Id.* (internal quotation marks and citations

omitted). Simply put: the public has a strong interest in Defendants abiding by the law, thus continuing operations of the IMLS.

Any interest Defendants may claim to possess in (purported) prudential fiscal management cannot justify a rapid and wholesale defunding of an agency whose budget typically amounts to a miniscule fraction of federal spending: In 2024, the IMLS awarded $266.7 million,[6] while total federal expenditures were $6.75 trillion,[7] meaning IMLS comprised less than 0.004% of federal expenditures. Abruptly dismantling IMLS is the type of "drastic" government action with "far-reaching consequences" that courts have found counsels in favor of emergency relief, even where the government's countervailing interest has been significantly more compelling than Defendants' present interest here. *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 501–03 (D. Md. 2020) (finding equities and public interest weighed in favor of enjoining drug price regulation issued during pandemic). Given the strong interest in preserving the American tradition of public libraries, and the absence of any interest in perpetuating Defendants' unlawful action, the equities weigh heavily in favor of Plaintiff's injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction enjoining Defendants from taking further steps to dissolve IMLS, including by freezing or terminating awarded grant funds, transferring IMLS's reserve funds or otherwise using them for a purpose other than the operation of IMLS, or reducing IMLS's staff, and requiring Defendants

---

[6]Inst. of Museum & Libr. Servs., *Learn About IMLS: Legislation & Budget*, https://perma.cc/8KPE-B8JA (last visited Apr. 9, 2025).
[7] *See* U.S. Dep't of the Treas., *How much has the U.S. government spent this year?*, https://perma.cc/PF7C-KEKY (last visited Apr. 9, 2025).

to take all necessary steps to return IMLS and its employees, grantees, and contractors to their status prior to March 31, 2025.[8]

Dated: April 10, 2025                                    Respectfully submitted,

                                                        /s/ Rachel L. Fried
                                                        Rachel L. Fried (DC Bar No. 1029538)
                                                        Orlando Economos (DC Bar No. 90013791)
                                                        Kayla M. Kaufman (DC Bar No. 90029091)
                                                        Robin F. Thurston (DC Bar No. 1531399)
                                                        Skye Perryman (DC Bar No. 984573)
                                                        Democracy Forward Foundation
                                                        P.O. Box 34553
                                                        Washington, DC 20043
                                                        (202) 448-9090
                                                        rfried@democracyforward.org
                                                        oeconomos@democracyforward.org
                                                        kkaufman@democracyforward.org
                                                        rthurston@democracyforward.org
                                                        sperryman@democracyforward.org


                                                        /s/ Chris Gair
                                                        Chris Gair (Ill. Bar No. 6190781)*
                                                        Vilia Dedinas (Ill. Bar No. 6191614)*
                                                        John Gallo (Ill. Bar No. 6193988)*
                                                        Ingrid Yin (Ill. Bar No. 6339857)*
                                                        Gair Gallo Eberhard LLP
                                                        1 E. Wacker Drive, Suite 2600
                                                        Chicago, Illinois 60601

---

[8] No bond should be required under Fed. R. Civ. Pr. 65(c). This Court has "broad discretion . . . to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all." *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). Security should be waived when compliance with the preliminary injunction raises no risk of monetary loss to the defendant—and Defendants here have not met their burden to provide any evidence of such a risk. *See TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 n.4 (D.D.C. 2020) (bond is inappropriate where plaintiff seeks "to vindicate important interests, and there is no risk that Defendants will suffer monetary harm"). In similar cases, courts in this Circuit have determined bond unnecessary. *See, e.g., Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025).

(312) 600-4900
cgair@gairgallo.com
vdedinas@gairgallo.com
jgallo@gairgallo.com
iyin@gairgallo.com

*Counsel for Plaintiffs*

*Pro hac vice* application pending