**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN LIBRARY ASSOCIATION, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 25-cv-01050-RJL |
| KEITH SONDELING, in his capacity as Acting Director of the Institute of Museum and Library Services, *et al.*, | |
| Defendants. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

    I.   Statutory Background ........................................................................................... 2

    II.  Factual Background ............................................................................................. 3

    III. Procedural History .............................................................................................. 3

LEGAL STANDARD ....................................................................................................... 7

ARGUMENT ................................................................................................................... 8

    I.   Plaintiffs Cannot Establish Likelihood of Success on the Merits. ....................... 8

        A.     Plaintiffs Do Not Have Standing to Demand the Broad Relief They Seek. ........... 8

            1.   Plaintiffs Lack Standing to Categorically Enjoin the Executive Order's Implementation. ................................................................................................ 9

            2.   Plaintiffs Do Not Have Organizational Standing to Assert Claims on their Members' Behalf. ........................................................................................... 10

        B.     Plaintiffs' Claims Regarding Potential Future Injury are Not Ripe. ..................... 14

        C.     To the Extent they are Justiciable, Plaintiffs' Claims Must Be Heard by Another Court or Administrative Body. ................................................................................. 16

            1.   Insofar as Plaintiffs Challenge Defendants' Actions Concerning their Grants, the Tucker Act Vests Exclusive Jurisdiction Over Such Claims in the Court of Federal Claims. ............................................................................................... 17

            2.   Administrative Bodies Identified in the Civil Service Reform Act of 1978 are the Exclusive Channels for Any Challenge to the Propriety of Federal Employee Removals. ........................................................................................ 23

        D.    Plaintiffs are Unlikely to Succeed on the Merits of their APA Claims. ............... 25

            1.   Plaintiffs Do Not Seek Judicial Review of a Discrete Final Agency Action. 25

            2.   Defendant's Re-Structuring Decisions are Committed to Agency Discretion ...................................................................................................................... 29

        E.     Plaintiffs Cannot Show a Likelihood of Success on their Claims Grounded in Statute. ............................................................................................................... 33

        F.     Plaintiffs Cannot Show a Likelihood of Success on their Constitutional Claims. 36

        G.    Plaintiffs' *Ultra Vires* Claims Lack Merit. ......................................................... 40

    II.  Plaintiffs Have Failed to Demonstrate that They Will Suffer Irreparable Harm Unless the Court Grants the Requested Relief. ................................................................................. 41

III.  The Balance of the Equities and the Public Interest Support Rejection of Plaintiffs'
      Motion. ................................................................................................................. 43

IV.  Plaintiffs Should Be Ordered to Post Security in Connection with Any Preliminary
      Injunctive Relief And Any Preliminary Relief Should Be Stayed To Allow Consideration
      of Whether to Appeal ........................................................................................... 44

      CONCLUSION ..................................................................................................... 45

# TABLE OF AUTHORITIES

Cases

*Action All. of Senior Citizens of Greater Philadelphia v. Sullivan,*
930 F.2d 77 (D.C. Cir. 1991) ........................................................................................... 35

*Adams v. Vance,*
570 F.2d 950 (D.C. Cir. 1978) ............................................................................................ 7

*Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.,*
357 F.3d 62 (D.C. Cir. 2004) ........................................................................................... 21

*Allen v. Wright,*
468 U.S. 737 (1984) .......................................................................................................... 38

*Am. Ass'n of Colleges For Teacher Educ. v. McMahon,*
No. 25-1281 (4th Cir. Apr. 10, 2025), ECF No. [30] ...................................................... 22

*Am. Bioscience, Inc. v. Thompson,*
269 F.3d 1077 (D.C. Cir. 2001) ....................................................................................... 26

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) ......................................................................................... 24

*Am. Immigr. Lawyers Ass'n v. Reno,*
199 F.3d 1352 (D.C. Cir. 2000) ....................................................................................... 13

*Am. Sch. of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902) ............................................................................................................ 41

*Appalachian Energy Grp. v. EPA,*
33 F.3d 319 (4th Cir. 1994) .............................................................................................. 28

*AT&T Corp. v. FCC,*
220 F.3d 607 (D.C. Cir. 2000) ......................................................................................... 30

*Baker v. Carr,*
369 U.S. 186 (1962) .......................................................................................................... 39

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.,*
502 U.S. 32 (1991) ............................................................................................................ 41

iv

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................................ 27

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)........................................................... 7, 42

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948)......................................................................... 28, 40

*Church v. Biden*,
573 F. Supp. 3d 118 (D.D.C. 2021) ........................................................ 42

*City of New Haven v. United States*,
809 F.2d 900 (D.C. Cir. 1987)................................................................. 34

*City of New York v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) .................................................................. 29

*Clapper v. Amnesty Intern. USA*,
568 U.S. 398 (2013)................................................................................ 15

*Clinton v. Jones*,
520 U.S. 681 (1997)................................................................................ 40

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) ................................................................ 25

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
880 F.2d 603 (1st Cir. 1989) .................................................................. 27

*Dabney v. Reagan*,
542 F. Supp. 756 (S.D.N.Y. 1982) ......................................................... 34

*Dalton v. Specter*,
511 U.S. 462 (1994)................................................................. 36, 37, 38, 39

*Department of Education v. California*,
No. 24A910, 2025 WL 1008354 (Apr. 4, 2025)............................... passim

*Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*,
18 F.4th 38 (1st Cir. 2021)...................................................................... 44

*Drake v. FAA*,
291 F.3d 59 (D.C. Cir. 2002) ................................................................................. 32

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) ................................................................................. 45

*Elgin v. Dep't of the Treasury*,
567 U.S. 1 (2012) ................................................................................................. 24

*EPA v. Brown*,
431 U.S. 99 (1977) ................................................................................................ 28

*Equal Rights Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ............................................................................ 11

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ............................................................................................. 30

*Feng Wang v. Pompeo*,
354 F. Supp. 3d 13 (D.D.C. 2018) .......................................................................... 8

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ................................................................................. 11, 12, 14

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ............................................................................................. 40

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980) ............................................................................................. 28

*Fund For Animals v. Norton*,
295 F. Supp. 2d 1 (D.D.C. 2003) .......................................................................... 27

*Gen. Land Off. v. Biden*,
722 F. Supp. 3d 710 (S.D. Tex. 2024) ................................................................... 34

*Gill* v. *Whitford*,
138 S. Ct. 1916 (2018) ......................................................................................... 10

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U. S. 204 (2002) ............................................................................................ 20

*Hammer v. United States,*
989 F.3d 1 (D.C. Cir. 2021) ............................................................... 18

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ............................................................................ 11

*Heckler v. Chaney,*
470 U.S. 821 (1985) ............................................................................ 32

*Hi-Tech Pharmacal Co. v. FDA,*
587 F. Supp. 2d 1 (D.D.C. 2008) ....................................................... 41

*Hunt v. Washington State Apple Advertising Comm'n,*
432 U.S. 333 (1977) ............................................................................ 13

*Indep. Equip. Dealers Ass'n v. EPA,*
372 F.3d 420 (D.C. Cir. 2004) ........................................................... 28

*Ingersoll-Rand Co. v. United States,*
780 F.2d 74 (D.C. Cir. 1985) ............................................................. 19

*Kowalski v. Tesmer,*
543 U.S. 125 (2004) ............................................................................ 13

*Lampon-Paz v. OPM,*
732 F. App'x 158 (3d Cir. 2018) ........................................................ 24

*Leedom v. Kyne,*
358 U.S. 184 (1958) ............................................................................ 41

*Lincoln v. Vigil,*
508 U.S. 191 (1993) ............................................................... 30, 31, 32

*Lujan v. Defs. of Wildlife,*
504 U.S. 555, 560 (1992) ................................................................. 9, 39

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990) ....................................................... 25, 26, 39

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) ............................................................. 39

*Maryland v. King,*
567 U.S. 1301 (2012) ................................................................................................ 44

*Mass. Fair Housing Ctr v. Dep't of Housing and Urban Dev.,*
No. 3:25-cv-30041-RGS (D. Mass. Apr. 14, 2025), ECF No. [42] ...................... 21, 22

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ................................................................................................... 7

*Mississippi v. Johnson,*
71 U.S. (4 Wall.) 475 (1866) ............................................................................... 39, 40

*Morrison v. Olson,*
487 U.S. 654 (1988) ................................................................................................. 40

*Murthy v. Missouri,*
603 U.S. 43 (2024) ..................................................................................................... 9

*Mylan Pharms., Inc. v. Shalala,*
81 F. Supp. 2d 30 (D.D.C. 2000) ............................................................................... 8

*Nat'l Coal. for Students with Disabilities v. Miller,*
298 F. Supp. 2d 16 (D.D.C. 2002) ........................................................................... 13

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
538 U.S. 803 (2003) ................................................................................................. 14

*Nat'l Taxpayers Union, Inc. v. United States,*
68 F.3d 1428 (D.C. Cir. 1995) ................................................................................. 11

*Nken v. Holder,*
556 U.S. 418 (2009) .............................................................................................. 7, 43

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55, 62 (2004) ............................................................................................. 25

*Open Tech. Fund v. Pack,*
470 F. Supp. 3d 8 (D.D.C. 2020) ............................................................................. 44

*Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs,*
87 F.3d 1242 (11th Cir. 1996) .................................................................................. 27

*Printz v. United States*,
521 U.S. 898 (1997)................................................................... 40

*Pub. Citizen v. Stockman*,
528 F. Supp. 824 (D.D.C. 1981)................................................. 34

*Pub. Citizen, Inc. v. Trump*,
297 F. Supp. 3d 6 (D.D.C. 2018)................................................ 38

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
45 F.4th 353 (D.C. Cir. 2022).................................................... 28

*Renne v. Geary*,
501 U.S. 312 (1991).................................................................... 13

*Rhode Island et al. v. Trump et al.*,
No. 25-cv-00128 (D. R.I.)........................................................... 14

*Safari Club Int'l v. Jewell*,
47 F. Supp. 3d 29 (D.D.C. 2014)................................................ 42

*Saul v. United States*,
928 F.2d 829 (9th Cir. 1991)...................................................... 24

*SEC v. Chenery Corp.*,
332 U.S. 194, 196 (1947)............................................................ 31

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197, 207 (2020)............................................................ 20

*Sissel v. Wormuth*,
77 F.4th 941 (D.C. Cir. 2023)..................................................... 30

*Slattery v. United States*,
635 F.3d 1298 (Fed. Cir. 2011)................................................... 18

*Solutions in Hometown Connections v. Noem*,
No. 8:25-cv-885 (D. Md. Apr. 8, 2025), ECF No. [46].............. 22

*State v. Musk.*,
---F. Supp. 3d ---, 2025 WL 520583 (D.D.C. 2025)................... 42

*Sterling Com. Credit-Michigan, LLC v. Phoenix Indus. I, LLC,*
762 F. Supp. 2d 8 (D.D.C. 2011) ............................................................... 7

*Strait Shipbrokers Pte. Ltd. v. Blinken,*
560 F. Supp. 3d 81 (D.D.C. 2021) .............................................................. 8

*Sullivan v. United States,*
395 U.S. 169 (1969) ................................................................................ 33

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ................................................................................. 9

*Trump v. New York,*
529 U.S. 125 (2020) ............................................................................... 14

*Trump v. Sierra Club,*
140 S. Ct. 1 (2019) ................................................................................. 34

*Turlock Irrigation Dist. v. Fed. Energy Reg. Comm'n,*
786 F.3d 18 (D.C. Cir. 2015) ................................................................... 11

*United States Conference of Catholic Bishops v. U.S. Dep't of State,*
No. 1:25-CV-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ................... 21

*United States v. Fausto,*
484 U.S. 439, 445 (1988) ......................................................................... 24

*United States v. Hansen,*
599 U.S. 762 (2023) ................................................................................ 10

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
454 U.S. 464 (1982) ................................................................................ 10

*Veit v. Heckler,*
746 F.2d 508 (9th Cir. 1984) .................................................................... 25

*Vermont Yankee Nuclear Power Corp. v. NRDC,*
435 U.S. 519 (1978) ........................................................................... 31, 32

*Warth v. Seldin,*
422 U.S. 490 (1975) ................................................................................ 10

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)......................................................................................................... 7

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ............................................................................. 42, 43

Statutes

20 U.S.C. § 9102 ................................................................................................................ 2
20 U.S.C. § 9103 ................................................................................................................ 2
20 U.S.C. § 9105 ........................................................................................................... 2, 16
20 U.S.C. § 9108 ........................................................................................................... 3, 19
28 U.S.C. § 1491 ............................................................................................................. 18
44 U.S.C. § 3501 ............................................................................................................. 35
44 U.S.C. § 3504 ............................................................................................................. 36
44 U.S.C. § 3507 ............................................................................................................. 35
44 U.S.C. § 3508 ............................................................................................................. 36
5 U.S.C. § 701 ................................................................................................................. 32
5 U.S.C. § 704 ................................................................................................................. 28
5 U.S.C. § 706 ................................................................................................................. 27

Other Authorities

2 C.F.R. § 200.340 .......................................................................................................... 38

Exec. Order No. 14238, 90 FR 13043 (Mar. 14, 2025) ....................................... 1, 3, 16

H.R. Rep. No. 93-658, 93d Cong., 1st Sess. 41 (1971) .................................................. 35

Pub. L. 119-4, 139 Stat. 9 (2025) ................................................................................... 33

Pub. L. No. 93-344, 88 Stat. 297 (1974) ........................................................................ 34

Pub. L. No. 95-454, 92 Stat. 1111 (1978) ...................................................................... 23

Rules

Fed. R. Civ. P. 65(c) ....................................................................................................... 45

## INTRODUCTION

Defendants respectfully submit this opposition to Plaintiffs' Motion for Preliminary Injunction, ECF No. 13.

On March 14, 2025, President Trump issued Executive Order No. 14,238, titled "Continuing the Reduction of the Federal Bureaucracy," Exec. Order No. 14238, 90 FR 13043 (Mar. 14, 2025), requiring that the Institute of Museum and Library Services (IMLS), along with other agencies not at issue here, reduce its work to only that which is required by statute. IMLS is currently working to comply with that directive. Plaintiffs, two organizations opposed to this change in Federal policy, ask this Court to intervene and issue a sweeping emergency order, *inter alia*, immediately reinstating federal employees who have been placed on leave or whose positions have been terminated, and reinstating federal grants or contracts that have been terminated. For several reasons, this Court cannot and should not issue such relief.

To begin, earlier this month, the Supreme Court underscored that a court assessing a request for preliminary relief must first assure itself of its jurisdiction. *See Department of Education v. California*, No. 24A910, 2025 WL 1008354 (Apr. 4, 2025) (staying a temporary restraining order requiring reinstatement of terminated grants, because the district court lacked jurisdiction over such claims). Here, this Court lacks jurisdiction for several reasons. First, the plaintiff organizations lack standing to seek the broad relief they request in their Motion, which extends far beyond that which would remedy any purported injury they themselves might suffer. Additionally, because their Motion is grounded in Plaintiffs' fears about the agency being altogether "dismantled" or being unable to carry out statutory functions going forward, Plaintiffs' claims are also largely un-ripe. Moreover, to the extent they are justiciable, Plaintiffs' claims cannot be addressed by this court, or any district court, but rather must be heard by other

1

adjudicative bodies altogether.  Specifically, claims based on grant agreements must be heard by the Court of Federal Claims, and claims focused on Federal employment must first be adjudicated by the administrative bodies Congress established to address such disputes.

Moreover, the lack of subject matter jurisdiction is but one of several reasons why the Plaintiffs cannot demonstrate a likelihood of success on the merits in this matter.  Indeed, none of the four factors informing whether a party is entitled to preliminary relief favors entry of a preliminary injunction.  Plaintiffs have made no showing of cognizable irreparable harm likely to result in the absence of preliminary relief; and the balance of equities and the public interest cut against Plaintiffs' request.

For all the reasons discussed herein, the Court should deny the Plaintiffs' request for a preliminary injunction.

## **BACKGROUND**

### I.    **Statutory Background**

Congress established the Institute of Museum and Library Services ("IMLS") in 1996. 20 U.S.C. § 9102.  IMLS is headed by a director, whose "primary responsibility" is the "development and implementation of policy to ensure the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United States."  *Id.* § 9103(a), (c).  To that end, the director is entitled to "appoint and determine the compensation of such employees as the Director determines to be necessary to carry out the duties of the Institute."  *Id.* § 9105(a).  The director is also "authorized to enter into grants, contracts, cooperative agreements, and other arrangements with Federal agencies, public and private organizations, and other entities with expertise the Director determines appropriate" to carry out policy objectives and fulfill statutory

responsibilities.  *Id.* § 9108(c).

## II.    Factual Background

On March 14, 2025, President Trump issued Executive Order No. 14,238, titled

"Continuing the Reduction of the Federal Bureaucracy."  Exec. Order No. 14238, 90 FR 13043

(Mar. 14, 2025).  The Order calls for the "reduction in the elements of the Federal bureaucracy

that the President has determined are unnecessary."  *Id.* § 1.  The Order directs that IMLS and six

other agencies not at issue in this litigation—the Minority Business Development Agency, the

Federal Mediation and Conciliation Service, the United States Agency for Global Media, the

Woodrow Wilson International Center for Scholars in the Smithsonian Institution, the United

States Interagency Council on Homelessness, and the Community Development Financial

Institutions Fund—"shall be eliminated to the maximum extent *consistent with applicable law,*

and such entities shall reduce the performance of their statutory functions and associated

personnel to the minimum presence and function required by law."  *Id.* § 2(a) (emphasis added).

The Order instructs the head of each agency to submit a report to the Office of Management and

Budget ("OMB") "confirming full compliance with this order and explaining which components

or functions of the governmental entity, if any, are statutorily required and to what extent." *Id.* §

2(b).  Although the Executive Order places certain obligations upon OMB in overseeing the

Order's implementation, OMB is not itself subject to the Order. *See id.*

## III.    Procedural History

Plaintiff American Library Association ("ALA") "is a non-profit membership

organization" that "advocate[s] to promote public awareness of the crucial role of libraries and

librarians."  *Id.* ¶ 1.  Plaintiff ALA has over 47,000 members "including librarians, library

patrons, libraries themselves, corporations and other organizations, and members of the public."

*Id*.  Plaintiff ALA held or holds five IMLS grants.  *See* ECF No. 13-2 ¶ 22.  On April 9, 2025, IMLS terminated Plaintiff ALA's grants as inconsistent with the agency's priorities and in accordance with Executive Order 14,238.  *Id*. ¶ 23.  Plaintiff American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME") "is a national labor organization and unincorporated membership association," which "through its Councils and constituent local unions, represents tens of thousands of employees in public and private libraries and museums across the country."  ECF No. 1 ¶ 2.

On April 7, 2025, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief. ECF No. 1.  The Complaint asserts six counts: (1) Count I—violation of separation of powers against all Defendants, *id*. at 23–24; (2) Count II—violation of the Take Care clause against all Defendants, *id*. at 24; (3) Count III— arbitrary and capricious agency actions in violation of the APA against Defendants Sonderling, IMLS, Gleason, U.S. DOGE Service, U.S. DOGE Service Temporary Organization, Vought, and OMB, *id*. at 25–27; (4) Count IV—violation of the APA in failing to disburse appropriated funds, *id*. at 27; (5) Count V—equitable *ultra vires* against all Defendants, *id*. at 27–28; and (6) Count VI—violation of the First Amendment against all Defendants, *id*. at 28–29.

On April 10, 2025, Plaintiffs filed a Motion for Preliminary Injunction. ECF No. 13. Plaintiffs request a preliminary injunction "enjoining Defendants from taking further steps to dissolve IMLS" and ordering "Defendants to take all necessary steps to return IMLS and its employees, grantees, and contractors to their status prior to March 31, 2025."  ECF No. 13-1 at 45–46.  Specifically, Plaintiffs' proposed injunction mandates that Defendants (1) "reinstat[e] all employees that were placed on administrative leave or given termination notices, and take no further action to reduce IMLS's workforce"; (2) "refrain from placing any additional IMLS staff

on administrative leave or otherwise terminating the employment of any additional IMLS staff, unless such leave or termination is authorized by this Court"; (3) ensure that "IMLS personnel [] have their access to email and computer systems immediately restored"; (4) "reopen IMLS offices to staff"; (5) "rescind the termination of, and restore funding to, all IMLS grants and contracts Defendants caused to be terminated"; (6) refrain from "pausing, cancelling, or otherwise terminating IMLS grants or contracts or failing to fund such grants or contracts pursuant to Executive Order No. 14,238"; and (7) "comply with Congressional statutes that require the IMLS Director to carry out various programs and award various grants."  ECF No. 13-21 at 2–3.  Plaintiffs also request an order that Defendant Keith Sonderling be "prohibited from serving as Acting Director of IMLS because he does not meet the statutory requirements for the position."  *Id*. at 4.

Alongside their Motion, Plaintiffs submitted fourteen declarations.  ECF Nos. 13-2–20, 20-1–3.  Plaintiff ALA claims that it has been harmed because its IMLS grants were terminated on April 9, 2025.  ECF No. 13-2 ¶¶ 22–23.  Plaintiff ALA further states that it has or will likely be harmed by reduced revenues stemming from IMLS's failure to participate in ALA conferences, IMLS's probable failure to process reimbursements due to reductions in force, and its members' fears that their grants will be terminated.  *Id*. ¶¶ 27–30.  Various individuals, including ALA members, submitted supporting declarations describing the impact reduced or delayed IMLS funding would have on library services.  *See* ECF Nos. 13-8 (library director and ALA member who utilizes IMLS "Native American grant programs" and services funded by IMLS's Grants to States program); 13-9 (library director and ALA member who utilizes an IMLS grant to subsidize a librarian graduate program); 13-10 (university faculty member who receives IMLS grant funding to perform statistical studies); 13-11 (ALA executive director who

notes potential impact on the Public Libraries Survey, which ALA and its members utilize); 13-12 (library patron whose wife utilizes "Minnesota's interlibrary loan system"—"funded in part by federal funds disbursed by IMLS"—to borrow college textbooks); 13-13 (executive director of the Hartford Public Library and ALA member who utilizes an IMLS grant "to develop and implement an adaptable financial capability program"); 13-14 (former member of National Museum and Library Services Board, whose appointment was terminated on April 3, 2025); 13-15 (library director at the Talbot County Free Library and ALA member who utilizes IMLS grants); 13-16 (executive director at the Calvert Library and ALA member who utilizes IMLS grants); 20-3 (CEO of "a digital reading platform that partners with libraries" who "has worked closely" with ALA).  None of these individuals claim that their IMLS grants have been terminated.

Members of AFSCME affiliates also submitted declarations noting the potential impact of IMLS grant terminations.  *See* ECF Nos. 13-17 (AFSCME employee who utilizes IMLS data in negotiating collective bargaining agreements for library employees); 13-18 (library assistant and member of an AFSCME affiliate who utilizes IMLS grants); 13-19 (library associate and current president of an AFSCME affiliate who utilizes IMLS grants); 13-20 (president of an AFSCME affiliate who represents workers at a library that utilizes IMLS grants).  None of these individuals claim that their IMLS grants have been terminated.[1]

---

[1] Plaintiffs also filed, in a supplemental submission, a declaration from the CEO and President of the American Association of State and Local History.  *See* ECF No. 20-2.  That declaration states that discussions for cooperative projects between AASLH have "stalled," *id.* ¶ 5, and that 32 grants to its member organizations were terminated, *id.* ¶ 7, but identifies no relationship between AASLH and the plaintiffs in this case.  Additionally, Plaintiffs submitted a declaration from an IMLS employee placed on administrative leave after the issuance of the Executive Order.  ECF No. 20-1.

## **LEGAL STANDARD**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quotation omitted). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors of the analysis—harm to others and the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Any movant seeking a preliminary injunction, must demonstrate that they will suffer irreparable harm in the absence of the requested relief. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Irrespective of a party's showing as to the other three factors necessary to obtain preliminary equitable relief, "'[a] . . . failure to show any irreparable harm' constitutes grounds for denying the motion." *Sterling Com. Credit-Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 13 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). Indeed, relief that "deeply intrudes into the core concerns of the executive branch" may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

Moreover, the particular form of injunction Plaintiffs seek here—an affirmative injunction ordering the Government to, *inter alia*, change the status quo, reinstate employees who had been place on administrative leave or whose employment had been terminated, and reinstate terminated grant agreements and contracts—comprises a highly disfavored form of

relief. Mandatory preliminary injunctions, which seek to alter rather than preserve the status quo by compelling affirmative action, "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see also, e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). Plaintiffs seeking such relief "face a significantly heightened burden" of showing an entitlement to relief. *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a general rule they deny such relief unless "the facts and law clearly favor the moving party." *Shipbrokers*, 560 F. Supp. 3d at 93 (quotation marks omitted).

Plaintiffs cannot meet this high burden in this case.

## **ARGUMENT**

### I.    **Plaintiffs Cannot Establish Likelihood of Success on the Merits.**

#### A.    **Plaintiffs Do Not Have Standing to Demand the Broad Relief They Seek.**

Plaintiffs—a non-profit organization and a labor organization—challenge not only a number of existing and potential grant, employment, and programmatic terminations, but also the structural and policy changes at IMLS. While Plaintiffs claim that they "and their members face imminent and irreparable harm" through "the loss of services, funding, and data," ECF No. 13-1 at 17, they ask this Court to order complete IMLS restructuring beyond the programs and initiatives that they have identified as potentially impacting the named Plaintiffs, *see id*. at 45–46. Plaintiffs lack standing to remedy any alleged injury stemming from IMLS's re-structuring that is not otherwise linked to a concrete and particularized injury in fact to a named party.

1.    **Plaintiffs Lack Standing to Categorically Enjoin the Executive Order's Implementation.**

As a threshold matter, Plaintiffs lack the "irreducible constitutional minimum of standing" required to maintain a suit for the sweeping relief that they seek. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To meet that constitutional requirement, Plaintiffs must establish that they "[have] suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). The Supreme Court recently emphasized that "standing is not dispensed in gross." *Id.* at 61 (quotation omitted) (holding that the circuit court in that case had erred by treating the plaintiffs and defendants, respectively, "as a unified whole"). Thus, "plaintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). The Supreme Court highlighted that "[h]eeding these conditions is critically important" in a "sprawling suit" with multiple plaintiffs, defendants, and claims, where plaintiffs had alleged different impacts stemming from varying conduct by different defendants. *Id.* The same requirement for careful analysis applies here.

Plaintiffs request an order directing Defendants to reinstate *all* IMLS "employees and grantees to their status prior to March 31, 2025" and refrain from placing any additional IMLS staff on administrative leave," to forego "pausing, cancelling, or otherwise terminating" *any* additional grants pursuant to Executive Order 14,238, and to prohibit Defendant Sonderling from serving as IMLS's acting director. ECF No. 13-21 at 2–4. However, Plaintiffs lack standing to seek broad relief as to third-parties that are not plaintiffs before this Court—they can only assert standing, if at all, to remedy injury to themselves. It is well-established that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the

legal rights or interests of third parties." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see also United States v. Hansen*, 599 U.S. 762, 769 (2023) ("[L]itigants typically lack standing to assert the constitutional rights of third parties."). Therefore, Plaintiffs do not have standing to seek injunctive relief regarding assistance that is disbursed directly or otherwise provided via direct services to entities or persons other than the Plaintiffs in this suit.

For the reasons explained further herein, Plaintiffs are not likely to prevail on the merits of their claims, and the Court should deny relief in full. To the extent the Court is inclined to grant any relief, however, Article III—and the related requirement that the remedy sought "be limited to the inadequacy that produced the injury in fact that the plaintiff has established," *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018)—necessitates that any relief be drawn narrowly to address only demonstrated injuries to Plaintiffs in this case.

### 2. Plaintiffs Do Not Have Organizational Standing to Assert Claims on their Members' Behalf.

Plaintiffs claim that they "and their members rely on IMLS for its expertise, resources, and grant awards to provide crucial library services and programs." ECF No. 13-1 at 10. Only Plaintiff ALA has identified direct IMLS grants that have been terminated. *Id*. at 15.[2] Plaintiffs also submitted a number of ALA member declarations, which describe generally how IMLS grants are utilized and the expected impact grant terminations would have on the services and programs they currently fund. Plaintiff AFSCME did not identify any direct grants to it or its

---

[2] Plaintiffs submitted a supplemental declaration from another organization, not a plaintiff in this suit, asserting that 32 grants to *its* member organizations had been terminated. *See* ECF No. 20-2, ¶ 7. However, that organization did not identify any relationship between itself and the Plaintiffs here or their members. *See id.* Accordingly, any alleged injuries to members of that organization cannot support Plaintiffs' standing in this case.

members that have been impacted by the IMLS re-structuring efforts.  Instead, Plaintiff

AFSCME generally asserts that its employees utilize IMLS data and that its affiliate

organizations represent librarians who will potentially be impacted by grant terminations.

Beyond any injuries directly to Plaintiffs ALA and AFSCME (*i.e.*, termination of a grant held

directly by a named plaintiff), Plaintiffs lack organizational standing to assert claims on behalf of

their members.

For an organization, showing an injury-in-fact that is fairly traceable to challenged

actions requires "more than simply a setback to the organization's abstract social interests."

*Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quoting

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  The organization must establish

that the challenged conduct "'perceptibly impaired' the organization's ability to provide

services."  *Turlock Irrigation Dist. v. Fed. Energy Reg. Comm'n*, 786 F.3d 18, 24 (D.C. Cir.

2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011))

(emphasis added).

The limited scope of organizational standing is clarified in *Food & Drug Administration*

*v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).  The *Alliance* plaintiffs, four pro-life

medical associations and several individual doctors, challenged FDA actions regarding the

regulation of mifepristone, a pregnancy-termination drug, making it easier for doctors to

prescribe and for pregnant women to obtain the drug.  *Id*. at 376.  Plaintiffs did not prescribe or

use mifepristone, and FDA did not impose any requirements on plaintiffs.  The *Alliance* Court

observed that organizations may "sue on their own behalf for injuries they have sustained," *id*. at

393 (citing *Havens*, 455 U.S. at 379 n.19) (emphasis added), but made clear that an organization

cannot establish injury by asserting the right of others: "By requiring the plaintiff to show an

11

injury in fact, Article III standing screens out plaintiffs who might only have a general legal,

moral, ideological, or policy objection to a particular government action," *id*. at 381. The

Supreme Court emphasized that a plaintiff "cannot spend its way into standing simply by

expending money to gather information and advocate against the defendant's action. An

organization cannot manufacture its own standing in that way." *Id*. at 394. Indeed, if diversion

of resources could confer standing on an organization, that "would mean that all the

organizations in America would have standing to challenge almost every federal policy that they

dislike, provided they spend a single dollar opposing those policies," which take the Article III

courts far outside their properly limited role. *Id*. at 395.

Plaintiff AFSCME is neither an IMLS employee nor a direct recipient of IMLS grants.

AFSCME attempts to carve out standing by asserting reliance on data compiled and distributed

by IMLS. *See* ECF No. 13-1 at 42–43. However, AFSCME does not demonstrate that it will be

wholly incapable of substituting the IMLS data with other sources should it become unavailable.

In the immediate term, for example, it is unclear why AFSCME could not use the most-recently

available historical data from the same surveys for purposes of its work negotiating collective

bargaining agreements, *see* 13-1 at 43. *See also Alliance*, 602 U.S. at 393 ("The doctors have not

shown that FDA's actions likely will cause them any injury in fact. The asserted causal link is

simply too speculative or too attenuated to support Article III standing.").

Plaintiff AFSCME's claims that IMLS's "cuts—both the funding terminations that have

already occurred and the imminent ones that Defendants intend to execute—will cost untold

numbers of AFSCME members their jobs" and will curtail "numerous programs" provided to

"Plaintiff AFSCME's member library staff" fare no better. *See id*. at 38, 42. These claims do

not represent an injury on the *Plaintiff's* "own behalf," *Alliance*, 602 U.S. at 393, but rather

appear to assert an injury on its member's behalf.[3]  Such an assertion would flout the prudential

rule against third-party standing. In general, only the party afforded a given constitutional right

"has the appropriate incentive to challenge (or not challenge) governmental action" in a way that

genuinely furthers the right-holder's interests, "and to do so with the necessary zeal and

appropriate presentation," the third-party standing doctrine requires a plaintiff with its own

Article III injury-in-fact to "make two additional showings" before asserting the right of a

nonparty: that it has "a 'close' relationship with the person who possesses the right," and that

"there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v.*

*Tesmer*, 543 U.S. 125, 129–30 (2004).  Here, even assuming, *arguendo*, AFSCME has a

sufficiently "close" relationship with library employees and grant recipients, AFSCME identifies

no "hindrance" to those individuals proceeding with their own cases, meaning that "no obvious

barrier exists that would prevent" any such recipient "from asserting" its "own rights."  *Renne v.*

*Geary*, 501 U.S. 312, 320 (1991); *see, e.g.*, *Am. Immigr. Lawyers Ass'n v. Reno*, 199 F.3d 1352,

1362 (D.C. Cir. 2000).

Beyond the direct harm alleged by Plaintiff ALA, it does not have organizational

standing to lodge broad claims on behalf of its 47,000 member "librarians, libraries, and

members of the reading public."  ECF No. 13-1 at 10.  ALA claims and supporting declarations

---

[3] Plaintiffs do not appear to assert a theory of associational standing.  *See generally* ECF No. 1;
*see*, *e.g.*, *Nat'l Coal. for Students with Disabilities v. Miller*, 298 F. Supp. 2d 16, 20 (D.D.C.
2002) ("[T]o survive a motion to dismiss based on lack of associational standing, the plaintiff
must at least allege in its complaint that a specific member has suffered an injury").  Nor could
Plaintiffs do so here as adjudication of an alleged injury to any particular employee or grant
recipient would require the participation of that employee or grantee.  *See Miller*, 298 F. Supp.
2d at 20 (noting that, for an organization to proceed based on associational standing, it must
establish, *inter alia*, that "neither the claim asserted nor the relief requested requires the
participation of members in the lawsuit") (quoting *Hunt v. Washington State Apple Advertising
Comm'n*, 432 U.S. 333, 365 (1977)).

insist that libraries and organizations will be harmed if their IMLS grants are terminated. *See, e.g.*, ECF No. 13-13 ¶ 8 ("Without the remaining funds awarded under the grant, Hartford Public Library will have to lay off the staff members leading the program and likely cancel the financial literacy program altogether, causing harm to the population it serves."). These indirect claims are not sufficient to establish organizational or third-party standing, particularly where those users or states have asserted their own claims on behalf of public libraries. *See Rhode Island et al. v. Trump et al.*, No. 25-cv-00128 (D. R.I.).[4]

**B.  Plaintiffs' Claims Regarding Potential Future Injury are Not Ripe.**

Article III further requires that the Court only adjudicate those claims that are ripe for review. Ripeness requires that an alleged injury be "certainly impending"; a claim is not ripe if it is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 529 U.S. 125, 131 (2020) (citation omitted). A court lacks jurisdiction over un-ripe claims that do not satisfy the Constitution's case or controversy requirements. "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted).

Under these standards, Plaintiffs' alleged potential future injuries cannot form the basis for the Court's subject-matter jurisdiction. Plaintiffs claim that "remaining grants are *expected* to

---

[4] More broadly, Plaintiffs must also sufficiently establish that Defendants' actions caused their claimed injuries. *Alliance*, 602 U.S. at 393. In support of their request that "Defendant Sonderling [be] prohibited from serving as Acting Director of IMLS," ECF No. 13-21 at 4, Plaintiffs have not established that Defendant Sonderling's appointment as acting director has or will cause them any injury in fact. Indeed, Plaintiffs only include a cursory claim that Defendant Sonderling lacks "special competence in library and information services or museum services." ECF No. 13-1 at 19.

be terminated en masse" and that "[e]ven grants not formally terminated will *likely* go unpaid, and reimbursement requests will likely be ignored, given IMLS is now operating on a skeleton staff that will not be able to keep up with the day-to-day operations of a 75-person agency." ECF No. 13-1 at 28 (citations omitted) (emphasis added).  Plaintiffs state that, as a result, "librarians across the country will lose access to crucial resources, and libraries will be forced to end programs funded by grants and cut staff."  *Id*. at 28–29 (citations omitted).  While Plaintiffs claim that they will be irreparably harmed by future delays or failures to receive IMLS funds and services, nearly all of the harm they current assert is speculative.

Specifically, although Plaintiff ALA states that  "its IMLS grants were terminated, effective April 8," ECF No. 13-2 at 15, it speculates that "[m]ore grant terminations are certain to follow" and that "without staff to disburse grant funds or process and administer claims for reimbursement, grantees will not receive their grant funds, and grantees who have already expended funds in reliance on their awards will be unable to receive reimbursements," *id*. at 15–16.  Plaintiff AFSCME claims that IMLS's potential funding terminations "will cost untold numbers of AFSCME members their jobs" and will cause ALA and AFSCME members to "lose access" to professional resources typically sponsored disseminated by IMLS.  *Id*. at 42–43.  Such allegations fall far short of the concrete "certainly impending" harms that must be alleged for a claim to be ripe.  *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) ("[W]e have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.") (cleaned up).

So, too, with Plaintiffs' assertions that Defendants are attempting to "shut down IMLS" and "eliminate [its] Board."  ECF No. 31.  At this time, the agency is working to comply with Executive Order 14,238.  While some programs and grants have been terminated, others remain

15

in place.  For example, in over a dozen declarations submitted by ALA members in support of its

Motion, none of the declarants aver that their own grant have been terminated.  *See supra*

Background(III).  ALA itself  identifies several discrete grant terminations.  This is a reduction,

but a far cry from the wholesale "shutdown" Plaintiffs fear.

 Likewise, as to the Board, Plaintiff asserts it has been altogether eliminated, but that is

not so.  Plaintiff is correct that existing board members were terminated on April 3, but there is

no impediment to the appointment of new board members.  The statute that addresses the IMLS

Board provides that it "shall advise the Director on general policies with respect to the duties,

powers, and authority of the Institute relating to museum, library, and information services," 20

U.S.C. § 9105a(d)(1), and that it must meet at least twice each calendar year to perform that

function, *id.* at § 9105a(g)(1).  There remains ample time in the current year for new board

members to be appointed, and for them to hold two or more meetings as required under the

statute.  To be sure, the Executive Order calls for IMLS's reduction "consistent with applicable

law," 90 FR 13043, and Plaintiffs offer nothing more than their own suppositions that the

Board's re-structuring will be inconsistent with the applicable statutory provisions.

### C.  To the Extent they are Justiciable, Plaintiffs' Claims Must Be Heard by Another Court or Administrative Body.

 Although Plaintiffs argue that their "claims under the Constitution and APA" are not

within the purview of the Tucker Act, ECF No. 13-1 at 37 n.4, Plaintiffs' claims are aimed either

at grant delays or terminations and the placement of IMLS staff on administrative leave, *id*. at

36–44.  Both categories of claims, under federal law, must be heard by another body.  As

explained below, even if Plaintiffs had standing to seek the expansive relief they request, and

even if their claims were ripe, they could not be adjudicated before this Court.

**1. Insofar as Plaintiffs Challenge Defendants' Actions Concerning their Grants, the Tucker Act Vests Exclusive Jurisdiction Over Such Claims in the Court of Federal Claims.**

Grant terminations are the cornerstone of Plaintiffs' claims. Facially, four of the five categories of alleged irreparable harm involve the impact of current or expected grant terminations. *See* ECF No. 13-1 at 36 ("*First*, Plaintiff ALA has already been harmed" due to the termination of "its IMLS grants"); *id*. at 38 ("*Second*, in addition to terminating ALA's grants, Defendants have already cut off funding for programs that directly benefit Plaintiffs and their members."); *id*. at 40 ("*Third*, Plaintiffs' members are at imminent risk of losing funding themselves if Defendants' evisceration of IMLS continues."); *id*. at 42 ("*Fourth*, Defendants' cuts—both the funding terminations that have already occurred and the imminent ones that Defendants intend to execute—will cost untold numbers of AFSCME members their jobs."). The remaining category, although veiled as the potential loss of "non-monetary" services IMLS provides, equally implicates Plaintiffs' concerns regarding grant terminations. Indeed, the resources Plaintiffs and their members claim they "will lose access to" are funded by IMLS grants. *See* ECF Nos. 13-18 ¶ 22 (emphasizing reliance on IMLS grants "to maintain operations"); 13-19 ¶ 5 (noting that research in the library field is funded by IMLS grants). The remaining alleged impact of IMLS's restructuring can be traced to contracting or other IMLS funding decisions. *See* ECF Nos. 13-2 (IMLS national data collection efforts); 13-11 ¶¶ 8–9 ("ALA has learned that IMLS has cancelled its contracts with its primary subcontractors . . . who support IMLS's data collections and literacy research," and which enable IMLS "to compile, validate and host the essential statistics for the country's public libraries."). Because—as the Supreme Court recently emphasized—Congress vested the Court of Federal Claims with exclusive jurisdiction over such claims, this Court lacks jurisdiction over grant terminations,

17

whether challenged independently, or as part of Defendants' larger compliance with Executive Order 14,238.

The Tucker Act, 28 U.S.C. § 1491(a), provides for judicial review of breach claims for express or implied contracts over $10,000 in the Court of Federal Claims (or district court for claims less than $10,000) "unless such jurisdiction was explicitly withheld or withdrawn by statute." *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*); *see Hammer v. United States,* 989 F.3d 1, 2 (D.C. Cir. 2021) ("this Court has interpreted [the Tucker Act] to confer exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims").

Here, Plaintiffs' claims are grounded in the alleged need for undisrupted funding pursuant to grant agreements they have secured with IMLS. *See* ECF No. 13-1 at 44 ("The public has a strong interest in the required execution of the MLSA enacted by Congress, and, specifically, in the IMLS's continued funding and operation of the ALA and its member public libraries."). Plaintiffs' proposed injunctive framework aims to restore terminated grants, ensure that no additional grants are terminated, and to re-instate IMLS personnel to process those grants. *See* ECF Nos. 13-21. Plaintiffs posit that as a result of Defendants' implementation of the Executive Order, IMLS will likely default on upcoming grant payments and fail to timely renew future grants to prevent lapses in funding. ECF No. 13-1 at 15–16 ("More grant terminations are certain to follow. And without staff to disburse grant funds or process and administer claims for reimbursement, grantees will not receive their grant funds, and grantees who have already expended funds in reliance on their awards will be unable to receive reimbursements."). The heart of this action, then, is a request to prevent the termination of those agreements or the enforcement of monetary obligations of the government pursuant to those agreements. Those are

18

contractual claims.

For purposes of the Tucker Act, Plaintiffs' grant agreements are contracts because they set out obligations that must be fulfilled in exchange for consideration from the government. Indeed, Congress has made clear that any funds disbursed to grantees like Plaintiffs are paid via grant agreements, *i.e.* contracts, between the subject agencies and the grantees. *See* 20 U.S.C. § 9108(c) ("The Director [of the IMLS] is authorized to enter into grants, contracts, cooperative agreements, and other arrangements with Federal agencies, public and private organizations, and other entities with expertise the Director determines appropriate . . . ."). Plaintiffs attempt to sidestep the Tucker Act's jurisdictional mandate by depicting their claims as requests stemming from Constitutional and statutory mandates. *See* ECF No. 13-1 at 17 ("Defendants' scheme to dismantle IMLS violates the Constitution, the Museum and Library Services Act, the Impoundment Control Act, and the Administrative Procedure Act. The separation of powers, the Take Care Clause, and the Spending Clause prohibit the executive branch from eliminating an agency, reducing its staff to a skeleton crew that cannot carry out statutorily mandated functions, or refusing to obligate appropriated funds."). But this misstates the record: Congress did not directly appropriate funds to the states; it authorized IMLS to issue grants. Those grants are contracts, and suits challenging their termination—and Plaintiffs' demand that the government keep paying funds out from these terminated grants—belong in the Court of Federal Claims. And even if the Court finds that Plaintiffs' claims implicate certain statutes or regulations, that does not remove their claim from the Court of Federal Claims or transform their claim into a non-contractual one. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985) (explaining that where "the essence of [a] claim is a request for specific performance of the original contract"—whether or not it is pled as a contract claim at all—the jurisdiction for that

action lies with the Court of Federal Claims).

The government acknowledges that the subject grants are funded via appropriations, but that is true for all government contracts—after all, virtually no federal funds can be paid absent appropriations. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020) (noting that most agencies rely on the annual appropriations process for funding). Nothing in the statutory framework mandates payment by methods other than grant agreements. Indeed, Plaintiffs' request to enjoin implementation of the Executive Order is premised on the notion that the Defendant agencies will be unable to distribute grant funds to Plaintiffs. *See* ECF No. 13-1 at 33 ("IMLS has terminated the bulk of its staff, including those necessary to screen grant applications and disburse IMLS funds. As a result, IMLS will be unable to continue fulfilling its statutory duties and issuing grants or disbursing grant funds, or collecting and maintaining data, as Congress mandated.") (citations omitted).

Such challenges to grant terminations belong in the Court of Federal Claims. Recently, the Supreme Court in *Department of Education v. California*, 2025 WL 1008354 (Apr. 4, 2025), considered a temporary restraining order "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id.* at *1. The Supreme Court held that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* This is so because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'"

*Id.* (quoting 28 U. S. C. § 1491(a)(1)); *see also* Electronic Order, *Mass. Fair Housing Ctr* v. *Dep't of Housing and Urban Dev.*, No. 3:25-cv-30041-RGS (D. Mass. Apr. 14, 2025), ECF No. [42] (recognizing that the Supreme Court's ruling comprises an "unmistakable directive" that challenges to grant terminations—even those purporting to be grounded in federal statutes— must be litigated in the Court of Federal Claims).

The Supreme Court's conclusion was foreshadowed in *United States Conference of Catholic Bishops v. U.S. Department of State*, which amplifies upon *California*'s reasoning. No. 1:25-CV-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025), *appeal docketed*, No. 25-5066 (D.C. Cir. Mar. 14, 2025). In that case, a grantee that had been receiving funds via cooperative agreements with the State Department sought a temporary restraining order preventing the State Department from terminating cooperative agreements with that grantee. *Id.* at *2–3. The court noted that the grantee had millions of dollars in requested reimbursements pending and that without ongoing funding the grantee claimed "thousands of refugees already in its care would soon lack enough support." *Id.* at *2. Nonetheless, the court declined to grant preliminary relief, holding the Tucker Act stripped it of jurisdiction to entertain such a claim. *See id.* at *4–8. The court explained that "the ultimate inquiry of whether a claim is 'essentially a contract action' turns on two key considerations: '[t]he source of rights upon which the plaintiff bases its claims' and the type of relief sought." *Id.* at *5 (quoting *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004)). The court found the latter factor to be dispositive, reasoning that the relief the plaintiff sought in that case "sounds in contract." *Id.* (quoting *Albrecht*, 357 F.3d at 68). There, as here, the grantee sought an order enjoining the government from taking steps to give effect to a letter terminating the plaintiff's grant. *See id.* As the Court explained, however, "[s]tripped of its equitable flair, the requested

21

relief seeks one thing: [plaintiff] wants the Court to order the Government to stop withholding the money due under [its grant agreements].  In even plainer English: [the plaintiff] wants the Government to keep paying up.  Thus [the plaintiff] seeks the classic contractual remedy of specific performance."  *Id*. at *7 (quotation omitted).  The court held that treating the remedies sought in that case as equitable "would be to distort the obvious" since plaintiffs asked the court "to reverse the Government's decision to cease a financial relationship with the [plaintiff]."  *Id*. Subsequently, the D.C. Circuit denied the plaintiffs' motion in that case for an injunction pending appeal.  *See United States Conference of Catholic Bishops v. State*, No. 25-5066 (D.C. Cir. Mar. 28, 2025).

Other courts, post-*California*, have similarly concluded that grant termination claims belong in the Court of Federal Claims.  *See Solutions in Hometown Connections v. Noem*, No. 8:25-cv-885 (D. Md. Apr. 8, 2025), ECF No. [46] (denying the plaintiffs' TRO motion challenging the termination of certain U.S. Citizenship and Immigration Services grants and concluding that the plaintiffs' APA claims were "in essence contract claims against the United States for which the . . . Court of Federal Claims has exclusive jurisdiction"); *Am. Ass'n of Colleges For Teacher Educ. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025), ECF No. [30] (staying a district court's preliminary injunction in a case involving education-related grants in light of the Supreme Court's *California* decision); Electronic Order, *Mass. Fair Housing Ctr*, No. 3:25-cv-30041-RGS (D. Mass. Apr. 14, 2025), ECF No. [42] (dissolving a temporary restraining order that had enjoined termination of federal grants in light of the Supreme Court's "unmistakable directive").

Because Plaintiffs seek to ensure the government's continued compliance with the terms of their grant agreements, their claims sound in contract.  Indeed, Plaintiffs' Motion and

accompanying affidavits repeatedly emphasize that uninterrupted grant funding is necessary to ensure that continued viability of their programs.  Plaintiffs' claims rest on the need for assurances that the government will continue to comply with existing grant agreements.  In other words, Plaintiffs want the Government to keep paying up.  As such, jurisdiction for Plaintiffs' claims related to those grant agreements lies exclusively in the Court of Federal Claims.

Because Plaintiffs cannot establish jurisdiction, they cannot succeed on the merits of claims related to grant agreements, and their request for extraordinary injunctive relief should be rejected on that basis alone.

> **2. Administrative Bodies Identified in the Civil Service Reform Act of 1978 are the Exclusive Channels for Any Challenge to the Propriety of Federal Employee Removals.**

Plaintiffs' remaining claims focus on employment actions.  Specifically, Plaintiffs assert that IMLS has "put all of its approximately 75 employees on indefinite administrative leave, forbade them access to IMLS's offices, cut off their access to agency email and computer systems, and informed them that all IMLS grants would be terminated."  ECF No. 13-1 at 14. Plaintiffs, therefore, request an order directing Defendants to "reinstat[e] all employees that were placed on administrative leave or given termination notices," "refrain from placing any additional IMLS staff on administrative leave or otherwise terminating the employment of any additional IMLS staff," ensure that IMLS personnel have "access to email and computer systems immediately restored," and "reopen IMLS offices to staff."  ECF No. 13-21 2–3.  Federal law does not permit Plaintiffs to employ an APA action to challenge the removal of federal employees—much less the removal of third-party employees.

Rather, in the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978), Congress established a comprehensive framework for evaluating adverse

employment actions against federal employees and presenting an integrated scheme of both administrative and judicial review of challenged personnel practices of challenged personnel practices. In so doing, Congress balanced "the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988). With limited exceptions not relevant here, Congress explicitly sought to reduce the participation of the federal courts, preferring the use of the CSRA's grievance procedures over all other remedies.

Specifically, in passing the CSRA, Congress made the Office of Special Counsel, the Merit Systems Protection Board ("MSPB"), and the Federal Labor Relations Authority ("FLRA") the exclusive means for federal employees, applicants, labor unions and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions. *See Fausto*, 484 U.S. at 455, even when those disputes involve constitutional claims, *see Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10–15 (2012) (citation omitted); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*").

The Supreme Court has long recognized that Congress established the CSRA as a comprehensive scheme covering all matters involving federal employment. *See Fausto*, 484 U.S. at 455. Indeed, the Supreme Court has held that, even if a federal employee was raising constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction[.]" *Elgin*, 567 U.S. at 12. The CSRA thus precludes "precludes courts from providing supplemental remedies." *Lampon-Paz v. OPM*, 732 F. App'x 158, 161 (3d Cir. 2018); *Saul v. United States*, 928 F.2d 829, 835–42 (9th Cir. 1991) ("Congress is better equipped than we to strike an appropriate balance between employees' interests in remedying constitutional violations and the

interests of the government and the public in maintaining the efficiency, morale and discipline of the federal workforce."); *Veit v. Heckler*, 746 F.2d 508, 510–11 (9th Cir. 1984).

Because federal law requires channeling of all claims related to federal employment via the administrative bodies that Congress created in the CSRA, this Court lacks jurisdiction to consider Plaintiffs' claims to the extent they challenge the placement of federal employees on leave.  Indeed, such a holding is consistent with the Supreme Court's emphasis earlier this month in *California* that the APA does not allow litigants to forestall properly applicable channeling regimes that Congress established. *See California*, 2025 WL 1008354, at *1.

## D.  Plaintiffs are Unlikely to Succeed on the Merits of their APA Claims.

Even if Plaintiffs' sufficiently established subject-matter jurisdiction—which they have not—their APA claims fail on the merits.

### 1.    Plaintiffs Do Not Seek Judicial Review of a Discrete Final Agency Action.

Plaintiffs' claims fail because they do not challenge a discrete agency action, but rather a collection of grant terminations, personnel actions, and programmatic activities.  Under the APA, plaintiffs "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Consistent with these principles, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan*, 497 U.S. at 891.  "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).  "Consequently, as each case only presents the court with

a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Id*.

Plaintiffs improperly seek wholesale judicial review of IMLS's implementation of the Executive Order.  For example, Plaintiffs argue that Defendants' have violated the APA in "choosing to dismantle IMLS," and therefore, choosing "not to fulfill mandatory duties required by statute, including maintaining data collection programs and databases and awarding various grants."  ECF No. 13-1 at 35 (citations omitted); *see also id.* at 23.  Plaintiffs, therefore, challenge IMLS's entire course of conduct moving forward.  While individual final agency actions may be reviewable, the APA does not permit such wholesale challenges.

In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892–93 (footnote omitted).  Just as in *Lujan*, Plaintiffs' APA counts seek to bring a collective, programmatic, challenge to the possibility that IMLS will fail to disburse grant funds as they become due and the prospect that IMLS may be unable to comply with generalized purported statutory obligations given its current staffing decisions.  But these are grab-bag challenges to general agency operations, not discrete challenges to concrete agency actions.

Wholesale challenges like Plaintiffs' are impossible to litigate under the judicial review mechanics the APA contemplates.  "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  "Under arbitrary and capricious review, the Court does not

undertake its own fact-finding.  Instead, the Court must review the administrative record

assembled by the agency to determine whether its decision was supported by a rational basis."

*Fund For Animals v. Norton*, 295 F. Supp. 2d 1, 6 (D.D.C. 2003), *dismissed sub nom. The Fund*

*for Animals, Inc. v. Norton*, 2004 WL 1562891 (D.C. Cir. July 9, 2004); *see also Cousins v.*

*Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989)( "APA review typically

takes place on the basis of a record compiled by the agency" consisting of the materials

considered "in making the challenged decision.").  Wholesale challenges to programmatic

decision-making make it impossible for the agency to "compil[e] and organiz[e] the complete

administrative record" for the agency action, *see Preserve Endangered Areas of Cobb's History,*

*Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.2 (11th Cir. 1996), because there is no

discrete agency action, as necessary for the parties to proceed to summary judgment. Nor is it

possible for the Court to apply the applicable standard of review, *see* 5 U.S.C. § 706, to the

agency action.  Accordingly, Plaintiffs are unlikely to succeed on their APA claims because they

are sweeping programmatic challenges and thus not cognizable under the APA.

Moreover, IMLS's ongoing compliance with the Executive Order does not itself

constitute final agency action reviewable under the APA.  To constitute final agency action: (1)

"the action must mark the consummation of the agency's decisionmaking process" and (2) it

"must be one by which rights or obligations have been determined, or from which legal

consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

Plaintiffs' argument that "Defendants' decision to shut down the IMLS is a final agency action"

under *Bennett*, ECF No. 13-1 at 24, misses the mark.

Under *Bennett*'s first prong, IMLS's ongoing implementation of the Executive Order

marks the initiation, not the consummation, of the agency's decision-making process.  IMLS's

actions reflect decisions by agency leadership to realign their policy goals and actions consistent

with the current administration's directives.  Plaintiffs' Motion recognizes the non-final and

evolving nature of the agency's decision-making process as it aims to re-align organizational

goals with the President's policy objectives.  *See* ECF No. 13-1 at 25 ("The newly appointed

Acting Director of the IMLS" announced "the agency's new intent to steer this organization in

lockstep with this Administration," which included "recall[ing] a small number of employees"

after reductions in force were in place).  IMLS's policy re-alignment decisions are "preliminary"

in nature and "not directly reviewable[.]"  *See* 5 U.S.C. § 704.  "[They] may be a step, which if

erroneous will mature into a prejudicial result[.]"  *Chi. & S. Air Lines, Inc. v. Waterman S.S.*

*Corp.*, 333 U.S. 103, 112 (1948).  But that does not make the interim decisions themselves the

"consummation of the administrative process" reevaluating the agency's priorities. *Id*. at 113; *see*

*EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet

promulgated, the final form of which has only been hinted at, would be wholly novel.");

*Appalachian Energy Grp. v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994) (no final agency action

where agency "has not taken any action at this point triggering [the court's] power to review its

position").

      Nor do IMLS's attempts to implement the Executive Order satisfy the second *Bennett*

prong.  Prong two's language includes terms of art reflecting "a 'pragmatic' inquiry that requires

courts to examine the 'concrete consequences' of an agency action." *Racing Enthusiasts &*

*Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (citation omitted).  The court must

consider the "concrete impact the [agency action] had on [the Plaintiffs]." *Indep. Equip. Dealers*

*Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also FTC v. Standard Oil Co. of Cal.*, 449

U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate . . . effect

on the day-to-day business' of the complaining parties" (citation omitted)); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties").  Plaintiffs' claims cannot stem from the programmatic efforts of the agency writ large, but from specific challenges to specific activities stemming from programmatic plans—from a grant termination (were such terminations reviewable under the APA, which they are not), or the specific cancellation of services to which the Plaintiffs had a legal entitlement.  But they do not bring those specific challenges—and they cannot subsume concrete final agency action within the banner of a programmatic challenge more generally.

### 2.    Defendant's Re-Structuring Decisions are Committed to Agency Discretion.

Plaintiffs point to IMLS's re-structuring decisions, which they say may—though they have not yet—hinder the provision of what Plaintiffs claim are the Defendants' legally mandated obligations.  But this conflates two distinct inquires: (1) agency staffing determinations, on one hand, and (2) the agency's continued compliance with grant agreements and provision of services, on the other.  The former is committed to agency discretion, and Plaintiffs cannot use their fears about the agency's compliance with the latter to justify challenges to the former, particularly in the absence of concrete actions to terminate statutorily required obligations.  As a result, Plaintiffs are unlikely to succeed on the merits of their arbitrary and capricious claim regarding Defendants' purported decision to "dismantle" IMLS, which involves actions committed to agency discretion by law.

"Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio*

*Project*, 592 U.S. 414, 423 (2021). The Court must ensure "that the agency has acted within a zone of reasonableness." *Id*.; *see also Sissel v. Wormuth*, 77 F.4th 941, 947 (D.C. Cir. 2023) ("arbitrary-and-capricious review is "[h]ighly deferential" and "presumes the validity of agency action.") (quoting *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000)).  Assuming the Tucker Act does not foreclose APA review of Plaintiffs' grant termination claims, grant terminations are quintessential agency actions "committed to agency discretion by law," for which the APA does not provide an avenue for review.  5 U.S.C. § 701(a)(2).  The Supreme Court has long recognized that an agency's determination of how to allot appropriated funds among competing priorities and recipients—precisely what Plaintiffs challenge here—is classic discretionary agency action.  *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993).

In *Lincoln*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA. *Id*. at 185–188, 193.  The Court explained that the "allocation of funds from a lump-sum appropriation" is an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id*. at 192.  "[A]n agency's allocation of funds from a lumpsum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'"  *Id*. at 193 (quoting *Heckler*, 470 U.S. at 831).  "Of course," such

discretion is not unbounded, because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id*. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id*. As discussed below, Congress did not make specific line-item appropriations to IMLS; it made a lump-sum appropriation, and *Lincoln* applies here no differently than a lump-sum appropriation to a larger agency.

Moreover, agency action regarding reallocation of resources and reorganizing of enforcement priorities after a change in presidential administrations, if reviewable at all, must be afforded highly deferential rational basis review. *Cf. Lincoln*, 508 U.S. at 193 (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."). Courts lack the power to "dictat[e] to the agency the methods [and] procedures" the agency must use to complete its statutory obligations. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524–25 (1978) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Indeed, internal staffing decisions are traditionally left to an agency's discretion. *See id*. at 524 (explaining that the Supreme "Court has for more than four decades emphasized that" even outward facing "procedures [are] basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments"). To override these principles and enjoin agency leadership from exercising procedural control over its own staff so as to ensure that staff is carrying out statutory obligations or otherwise exercising agency leadership's policies would be an extraordinary violation of the

separation of powers. Such activities are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administration action at issue and the language and the structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that Defendants' managerial decisions are committed to agency discretion.

First, these decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191–92 (quoting 5 U.S.C. § 701). Individual staffing decisions reflect efforts to determine whether ongoing agency actions "best first the agency's overall policies" under new leadership and "whether agency resources are best spent on" current projects or whether they would be better spent differently. *Heckler v. Chaney*, 470 U.S. 821 (1985). "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32.

Second, Plaintiffs can point to no particular statute limiting the agency's inherent discretion to make independent staffing decisions. Again, agencies generally have broad discretion to fashion internal procedures for formulating policies and implementing a statute. *See Vt. Yankee*, 435 U.S. at 543. Ultimately, Plaintiffs cannot preemptively challenge staffing determinations on the fear that the agency may not be able to comply with any statutory mandates. Said differently, a person may be able to challenge a final agency action that injures them; they cannot challenge the staffing determinations that decided which line employee made that determination. But it is the latter challenge Plaintiffs bring, because they cannot bring the former.

### E. Plaintiffs Cannot Show a Likelihood of Success on their Claims Grounded in Statute.

Plaintiffs' claims grounded in the Continuing Appropriations Act, the Impoundment Control Act, and the Paperwork Reduction Act, *see* ECF No. 13-1 at 32–34, likewise cannot succeed.

**1**.  As to the Continuing Appropriations Act, Plaintiffs' arguments rest on the notion that the Continuing Appropriations Act, in which Congress appropriated funds to IMLS for the remainder of fiscal year 2025 to carry out their obligations under their respective statutes, creates a statutory obligation for IMLS to spend the money appropriated for grant funding or provision of services *for Plaintiffs*, thus transforming the discretionary funding inquiry into one of statutory assessment.  *See* Pub. L. 119-4, 139 Stat. 9 (2025).  But the Continuing Appropriations Act comprises instructions for appropriations, and *those appropriations have been made*.  When Congress demands direct expenditures, it knows how to do so.  *Compare*, *e.g.*, *Sullivan v. United States*, 395 U.S. 169, 172 (1969) (quoting statutory language providing that funds "shall be allocated to *and expended for*") (emphasis added).

Neither that statute, nor the agency-specific statutes under which Plaintiffs claim reliance, create an obligation as to specific funds owed to Plaintiffs or services to be provided to Plaintiffs, or creates a statutory prohibition on terminating any particular grant or service.  The appropriations are not to any of the Plaintiffs; rather, the appropriations are to IMLS.  And, since there is no statutory directive to the contrary, IMLS—having received its appropriation from Congress—has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Lincoln*, 508 U.S. at 193. In other words, Plaintiffs cannot challenge their access to funding via the appropriations channel.

Fundamentally, Plaintiffs are not funded through direct congressional appropriations,

rather, they are explicitly funded through grant agreements with IMLS. *See supra*

Argument(I)(C)(1). Execution of those grant agreements—and their terminations—are governed

by the applicable grant agreements. Defendants' conduct under those grant agreements may be

reviewable—as Defendants argue, in the Court of Federal Claims—but the mere fact that a grant

agreement is funded through an appropriation does not mean that the routine execution of that

grant agreement takes on statutory—let alone constitutional—dimensions.

Notably, Plaintiffs do not otherwise explain how the specific services the agencies

provide are statutorily mandated, much less that they have been terminated. That is their burden

at this stage.

**2**. Plaintiffs likewise cannot show a likelihood of success on their claims under the

Impoundment Control Act, Pub. L. No. 93-344, 88 Stat. 297, 333 (1974) (codified as amended at

2 U.S.C. §§ 682 *et seq.*). Under the Impoundment Control Act, appropriated funds "shall be

made available for obligation" unless the President transmits a special message to Congress and

Congress rescinds the appropriation. 2 U.S.C. § 683(b). But the Impoundment Control Act

enforces Congress's power over the purse in relation to the Executive. *See Dabney v. Reagan*,

542 F. Supp. 756, 760 (S.D.N.Y. 1982). It provides for enforcement by the Comptroller General

(an official in the Legislative Branch), not for private enforcement. Thus, that statute is

generally not enforceable through an APA suit. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d

710, 734–35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C.

1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019).

Moreover, as the D.C. Circuit has explained, a pause does not qualify as an impoundment

or a failure to make funds "available for obligation" under the statute. *See City of New Haven v.

United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously

"acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'") (quoting H.R. Rep. No. 93-658, 93d Cong., 1st Sess. 41 (1971)). Plaintiffs speculate that the agency will be "unable to continue fulfilling its statutory duties," ECF No. 13-1 at 33, and will not issue statutorily mandated grants. Such speculation as to what the agency may do going forward falls far short of the showing that would be necessary, even if the Impoundment Control Act were enforceable by Plaintiffs.

**3**. Finally, Plaintiffs likewise cannot show a likelihood of success under the Paperwork Reduction Act because their claim—that approval by OMB is necessary to allow an agency *not to* undertake collection—is contrary to the very purpose of that statute. Plaintiffs assert that Defendants have violated the statutory provision that states: "An agency may not make a substantive or material modification to a collection of information after such collection has been approved by the Director, unless the modification has been submitted to the Director for review and approval under this subchapter." 44 U.S.C. § 3507(h)(3); *see* ECF No. 13-1 at 34 (quoting same). Plaintiffs note that the Public Libraries Survey was previously approved by OMB under the Paperwork Reduction Act, and argue that "[f]ailing to collect the data necessary to the survey constitutes, at minimum, a 'substantive or material modification' to the approved collection plan." ECF No. 13-1 at 34. Essentially, Plaintiffs contend that IMLS must obtain OMB approval if it intends not to undertake a collection. Plaintiffs are mistaken.

"In the Paperwork Reduction Act, 44 U.S.C. § 3501 et seq. (1988), Congress sought 'to minimize the Federal paperwork burden for individuals, small businesses, State and local governments, and other persons.'" *Action All. of Senior Citizens of Greater Philadelphia v. Sullivan*, 930 F.2d 77, 78 (D.C. Cir. 1991) (quoting 44 U.S.C. § 3501(1)). Thus, the D.C. Circuit

explained, "[t]he act requires federal agencies to forward to the Office of Management and Budget 'a copy of any proposed rule which contains a collection of information requirement.'" *Id.* (quoting 44 U.S.C. § 3504(h)(1)). And, if OMB determines "that the collection of information by an agency is unnecessary, for any reason, the agency may not engage in the collection of the information." *Id.* (quoting 44 U.S.C. § 3508).

Plaintiffs' claim exists within this statutory framework; any "substantive or material modification," like the initial collection, must be approved by OMB. Implicit in this framework, is that the reason for the review and approval is to ensure that no unnecessary burden is created by the collection as modified. Plaintiffs cite no case in which a court found such approval to be required even where an agency determined not to undertake a collection at all. Defendants are not aware of such a case, and respectfully submit that such an interpretation would be contrary to the very purpose of the statute, which is to ensure that information collected by the public is minimally burdensome.

### F.  Plaintiffs Cannot Show a Likelihood of Success on their Constitutional Claims.

Plaintiffs' constitutional claims alleging violations of the Separation of Powers and the Take Care Clause, *see* ECF No. 13-1 at 17–24, are meritless.[5] As a threshold matter, Plaintiffs' asserted constitutional claims are the same claims discussed above, dressed up in constitutional language—as the Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts

---

[5] Plaintiffs' Complaint also includes a First Amendment claim, *see* Compl., ECF No. 1, Count VI, but Plaintiffs do not rely on that claim as a basis for their Motion. *See* ECF 13-1. Accordingly, although this claim also lacks merit, Defendants do not address it herein.

in excess of his statutory authority, he also violates the constitutional separation of powers doctrine." *Id.* at 471. Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id*. at 472. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute. *Id.* at 473 & n.5. Because Plaintiffs' claims focus entirely on their contentions that the Defendant agencies have not acted consistent with statutory obligations, ECF No. 13-1 at 18–17, such claims are untenable under *Dalton*.

And Plaintiffs do not allege viable constitutional claims merely by invoking the Spending Clause and the Appropriations Clause. *See* ECF No. 13-1 at 20. Neither of these constitutional provisions—or even the appropriations statutes that Congress passed pursuant to its Article I powers—requires that IMLS continue to fund Plaintiffs through now-terminated grant agreements. That is because Plaintiffs are not funded through direct congressional appropriations; rather, they are funded through specific grant agreements. As discussed above, while IMLS's conduct under those grant agreements may be reviewable in the Court of Federal Claims, the mere fact that IMLS is funded through Congressional appropriations does not mean that the routine execution or termination of those grant agreements takes on statutory, let alone constitutional, dimensions.

Indeed, it is the relief that Plaintiffs seek that threatens the separation of powers and would undermine the President's authority. Consistent with the President's directive, IMLS determined that the grants were "no longer consistent with the agency's priorities and no longer

serves the interest of the United States and the IMLS Program." *See* ECF No. 13-2 ¶ 23. It is axiomatic that the President may take such decisions as to Executive Branch agencies. *See*, *e.g.*, *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 25 (D.D.C. 2018) (instructing that "[t]he Court must, of course, avoid any undue intrusion on the discretion of the Executive Branch to set policy priorities") (citing *Allen v. Wright*, 468 U.S. 737, 759–61 (1984)). And government-wide regulations promulgated by the Office of Management and Budget recognize that an agency may terminate a grant if it "no longer effectuates the program goals or agency priorities." *See* 2 C.F.R. § 200.340(a)(4). Plaintiffs' arguments to the contrary ignore this regulatory framework— and the underlying constitutional principle—giving the President the authority to set agency policy.

In addition, Plaintiffs' claim under the Take Care Clause, *see* ECF No. 13-1 at 22–24, also fails on its own merits. It should be noted at the outset that the Government is not aware of any case that has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief. In reality, that claim comprises a broad programmatic attack against the President as well as the agency Defendants in an attempt to circumvent the limitations of the APA. Plaintiffs cannot prevail on their Take Care Clause claim because the Take Care Clause does not provide a cause of action against the President or any other Defendant, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims. *See Dalton*, 511 U.S. at 473. Moreover, even if the Clause could furnish a basis for affirmative relief, Plaintiffs seek to rely on violations of purported duties that are found nowhere in the statutes establishing the Defendant agencies, but rather, are based on Plaintiffs' subjective views about how to best implement and administer those agencies.

Through the Take Care Clause, the Constitution vests the President with broad, discretionary authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Inevitably, the laws that the President executes are those enacted by Congress. But no court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the way the President executes Congress's laws. Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."). To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *Baker v. Carr*, 369 U.S. 186, 217 (1962) (Courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan*, 504 U.S. at 577 (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that

"embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. (4 Wall.) at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws. To the extent Plaintiffs seek to challenge the other Defendants' alleged attempt to undermine the statutes recognizing IMLS, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs.

### G. Plaintiffs' *Ultra Vires* Claims Lack Merit.

Plaintiffs claim that "[b]ecause Defendants have violated applicable statutes and acted beyond their statutory authority in dismantling IMLS, their actions are ultra vires and should be enjoined by this Court." ECF No. 13-1 at 35. Courts have recognized that an equitable cause of action for *ultra vires* review may be available in instances where, because Congress has failed to provide a cause of action, "the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902); *see also Leedom v. Kyne*, 358 U.S. 184, 189 (1958). That cause of action is not

available, however, where there is some other "meaningful and adequate opportunity for judicial review," or "clear and convincing evidence that Congress intended to deny . . . District Court jurisdiction."  *Bd. of Govs. of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991).

Plaintiffs' asserted ultra vires cause of action is foreclosed because there are other channels for review of Plaintiffs' claims.  *See supra* Argument(I)(C)(discussing that this Court lacks jurisdiction over Plaintiffs' claims, but, to the extent they are justiciable, those claims should be before the Court of Federal Claims and administrative bodies Congress created to address disputes related to federal employment).  Plaintiffs also seek review under the APA in this case.  Plainly, then, even on Plaintiffs' own view, the ultra vires cause of action is not the only one available to Plaintiffs.

\* \* \* \* \* \* \*

In sum, for all the reasons discussed above, Plaintiffs cannot show a likelihood of success on their claims.

## II.    Plaintiffs Have Failed to Demonstrate that They Will Suffer Irreparable Harm Unless the Court Grants the Requested Relief.

Apart from the lack of any likelihood of success, Plaintiffs also have failed to demonstrate that they will suffer irreparable harm if the Court does not enter the requested preliminary injunction.  To demonstrate irreparable harm, Plaintiffs must meet a "high standard"—Plaintiffs must show that they face injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation omitted), and that are "beyond remediation."  *Chaplaincy of Full Gospel Churches*, 454 F.3d at

297.  Making that showing requires "proof" that the harm they identify "is certain to occur in the near future."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Furthermore, the irreparable harms pled must be harms *to the Plaintiffs*; Plaintiffs may not rely on alleged harms to third parties in requesting a preliminary injunction.  "[H]arm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court."  *State v. Musk.*, ---F. Supp. 3d ---, 2025 WL 520583, at *4 (D.D.C. 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)).  Thus, in *State v. Musk*, although the Court noted that "[t]erminating thousands of federal employees may cause extreme harm to the individual employees, and potentially the institution writ large," *id.* at *4, the Court held that it could not consider alleged harm to parties not before the Court on a request for emergency injunctive relief.  *See id.*

Finally, as relevant here:  "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough."  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  Rather, it is black-letter law that economic harm is generally not irreparable.  *Wis. Gas Co.*, 758 F.2d at 674.   The only exceptions are "where the loss threatens the very existence of the movant's business," *id.* (citation omitted), or "where the claimed economic loss is unrecoverable."  *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014).

None of the alleged injuries Plaintiffs plead can support the entry of the requested preliminary injunction preventing IMLS from taking any steps to implement Executive Order 14,238.  The harms pled all are economic, speculative, or affect third parties rather than the Plaintiffs seeking relief.  Plaintiffs' allegations illustrate why economic harms generally are not cognizable as "irreparable harm" for purposes of preliminary equitable relief; money is generally

fungible, and, unless the very existence of an enterprise is threatened, *see Wis. Gas Co.*, 758 F.2d at 674, a litigant suffering financial loss may be made whole through money damages.  Plaintiffs broadly state that "[t]hey face the imminent threat of being forced to shutter programs and lay off staff if their own funding access is impeded."  ECF No. 13-1 at 38.

In *California*, the Supreme Court considering an analogous suit found it "compelling" that grantees—that had been granted a temporary restraining order enjoining the Government from terminating various education-related grants—"[had] the financial wherewithal to keep their programs running."  2025 WL 1008354, *2.  Against that backdrop, the Supreme Court held it was appropriate to stay the temporary restraining order, reasoning that "if [the grantees] ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum."  *Id.*  Just so in this case.

Moreover, even if economic injuries were cognizable as irreparable harm: Plaintiff ALA has identified only five grants.  ECF No. 13-1 at 15.  Plaintiffs cannot bootstrap onto this alleged injury claims of potential future injury on behalf of hundreds of thousands of organizational members.  And to the extent Plaintiffs' members identify any additional grant terminations or disbursement delays, those members could assert individual actions in the appropriate forums to address those concrete harms.  The expansive reach of the relief Plaintiffs seek—rather than targeting relief to any concrete injuries identified in Plaintiffs' Motion—just underscores the overbreadth of the requested preliminary injunction.

## III.    The Balance of the Equities and the Public Interest Support Rejection of Plaintiffs' Motion.

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor.  *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party").  In this setting, granting the

preliminary injunction that Plaintiffs seek would disrupt the agencies' efforts to comply with Executive Order 14,238, and act as responsible stewards of public funds. In another case seeking preliminary equitable relief against a federal agency, the Court recognized that "thwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020).

As Plaintiffs recognize, "the public has a strong interest in Defendants abiding by the law." ECF No. 13-1 at 45. Plaintiffs' requested injunctive relief would effectively disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted).

Additionally, where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funding, such funds may not be retrievable afterwards. *See California*, 2025 WL 1008354, at *2 (noting "the Government's representation that it is unlikely to recover the grant funds once they are disbursed" as among the reasons supporting a stay of a temporary restraining order enjoining the Government from terminating various education-related grants).

## IV.    Plaintiffs Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief And Any Preliminary Relief Should Be Stayed To Allow Consideration of Whether to Appeal

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' Motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post security. Under Federal Rule of Civil

Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues a preliminary injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such order. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond"). As Plaintiffs are, in part, seeking the disbursement of grant funds, the Court should order the posting of a bond equal to the size of any payment that the Court orders on a preliminary basis here. Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c); *cf. California*, 2025 WL 1008354, at *2 ("respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee promised to return withdrawn funds should its grant termination be reinstated, and the District Court declined to impose bond") (quotation omitted).

Finally, Defendants respectfully request that if this Court does enter injunctive relief, that relief be stayed for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal.

## CONCLUSION

For all the reasons discussed herein, the Court should deny Plaintiffs' Motion.

Dated:  April 21, 2025                    Respectfully submitted,

                                          YAAKOV M. ROTH
                                          Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ *Abigail Stout*
ABIGAIL STOUT (DC Bar No. 90009415)
*Counsel*
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

/s/ *Heidy L. Gonzalez*
JULIA A. HEIMAN (D.C. Bar No. 986228)
HEIDY L. GONZALEZ (FL Bar No. 1025003)
*Trial Attorneys*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel. (202) 598-7409
heidy.gonzalez@usdoj.gov

*Attorneys for Defendants*