## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN LIBRARY ASSOCIATION *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Case No. 25-1050 (RJL) ) ) |
| KEITH SONDERLING, Acting Director, Institute of Museum and Library Services *et al.*, | ) ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION
June ___ 6, 2025 [Dkt. #13; Dkt. #38]

This case is about President Trump's efforts to dismantle the Institute of Museum and Library Services ("IMLS"), "the only federal entity dedicated to funding libraries." Compl. [Dkt. #1] at 1. President Trump has, via Executive Order, deemed IMLS "unnecessary" and ordered that it be reduced to its "minimum presence and function required by law[.]" Exec. Order 14238, 90 Fed. Reg. 13043 (Mar. 20, 2025) (the "Order"). His Administration quickly followed through on the Order's directives; they installed new leadership, terminated grants en masse, and placed the majority of IMLS staff on administrative leave. The American Library Association ("ALA") and the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME") (together, "plaintiffs") sued to enjoin defendants' gutting of IMLS. *See generally* Compl.

1

Now before the Court is plaintiffs' motion for a preliminary injunction. Pls.' Mot. for Preliminary Injunction ("Pls.' PI Mot.") [Dkt. #13]. While the Court laments the Executive Branch's efforts to cut off this lifeline for libraries and museums, plaintiffs have not established a substantial likelihood of success on the merits. The Court must therefore **DENY** the motion for a preliminary injunction.

## I.    BACKGROUND

### A.    Statutory Background

In 1996, Congress passed the Museum and Library Services Act ("MLSA"), which established IMLS as an independent agency. *See* 20 U.S.C. § 9101 *et seq.* IMLS has statutory goals, including "facilitat[ing] access to resources in all types of libraries for the purpose of cultivating an educated and informed citizenry," *id.* § 9121(3), and "encourag[ing] and support[ing] museums in carrying out their educational role, as core providers of learning and in conjunction with schools, families, and communities," *id.* § 9171(1).

IMLS is led by a Director, appointed by the President and confirmed by the Senate, who must have "special competence with regard to library and information services" or "with regard to museum services." *Id.* § 9103(a). The Director has various responsibilities, including "primary responsibility for the development and implementation of policy to ensure the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United States." *Id.* § 9103(c). IMLS is also required to have a 23-member Board. *Id.* § 9105a.

The MLSA mandates that IMLS take various actions. For example, IMLS "shall regularly support and conduct, as appropriate, policy research, data collection, analysis and modeling, evaluation, and dissemination of information to extend and improve the Nation's museum, library, and information services." *Id.* § 9108(a). Congress outlined in detail the required objectives for this policy research and data collection. *See id.* § 9108(b). The MLSA authorizes the Director to enter into "grants, contracts, cooperative agreements, and other arrangements" to achieve those objectives. *Id.* § 9108(c).

IMLS is also required to issue certain grants. The MLSA mandates that IMLS award grants from minimum allotments to each State. *Id.* § 9131(b). IMLS must also spend a certain percentage of its appropriations on "grants to Indian tribes and to organizations that primarily serve and represent Native Hawaiians," *id.* §§ 9131(a)(1)(A), 9161, and on "national leadership grants" designed "to enhance the quality of library services nationwide and to provide coordination between libraries and museums," *id.* §§ 9131(a)(1)(B), 9162. IMLS must also establish various grant programs to support museums dedicated to African American history and culture. *Id.* § 80r-5.

Congress appropriated $294,800,000 to IMLS through September 2025 for carrying out the MLSA's mandates. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024).

B.    Factual Background

On March 14, 2025, President Trump issued the Order that led to this case. *See generally* Order. The Order describes IMLS as "unnecessary" and directs that it "shall reduce the performance of [its] statutory functions and associated personnel to the

3

minimum presence and function required by law." *Id.* § 2(a).  The Order also instructs the Director of the Office of Management and Budget to "reject funding requests for" IMLS "to the extent they are inconsistent with this order." *Id.* § 2(c).

On March 20, 2025, President Trump installed Deputy Secretary of Labor Keith Sonderling as Acting Director of IMLS.  Compl. ¶ 37.[1]  That same day, officials from the Department of Government Efficiency set up offices within IMLS and obtained access to IMLS's computer systems.  *Id.* ¶ 40.  The vast majority of IMLS staff were put on administrative leave.  *Id.* ¶¶ 41–42.  Defendants left in place "three statutorily mandated employees, a group of five lawyers and an HR specialist, the CFO, and exactly one program officer each for libraries and museums," but plaintiffs allege that "[t]here is no way for a single program officer for libraries to manage the work of dozens of employees placed on administrative leave." *Id.* ¶ 42.  Sonderling also fired all members of the Board.  *Id.* ¶ 47.

On April 1, defendants started informing State grantees that their IMLS grants were terminated, effective immediately.  *Id.* ¶ 44.  Defendants have since continued to cancel grants and "contracts for work conducting research and collecting data from libraries across the country." *Id.* ¶ 48.  By April 10, defendants were "in the process of ending all or most of the remaining grants," Pl.'s PI Mot. at 1, and by April 28, they had cancelled all of plaintiff ALA's grants, Decl. of Lisa Varga [Dkt. #40-1] ¶ 3.

---

[1] Plaintiffs allege that Sonderling "fails to meet the requirements laid down by Congress for [IMLS's] Director." Compl. ¶ 37 (citing 20 U.S.C. § 9103(a)(3)).

C.     Procedural Background

Plaintiffs filed suit in this Court on April 7, 2025 and, a few days later, moved for a preliminary injunction. *See generally* Compl.; Pls.' PI Mot. Plaintiffs brought claims under the Administrative Procedure Act ("APA"), the Take Care Clause, the First Amendment, the separation of powers, and the *ultra vires* doctrine, alleging that defendants' actions to dismantle IMLS violate the agency's statutory mandates. *See generally* Compl.

The parties fully briefed the preliminary injunction motion and the Court held a hearing on April 30, 2025. Defs.' Opp'n to Pls.' PI Mot. ("Defs.' Opp'n") [Dkt. #21]; Pls.' Reply Mem. in Supp. of PI Mot. ("Pls.' Reply") [Dkt. #34]; Min. Entry (Apr. 30, 2025). During that hearing, and on plaintiffs' motion, the Court converted the preliminary injunction motion into a motion for a temporary restraining order ("TRO"). *See* Min. Entry (Apr. 30, 2025). The Court "issue[d] a narrow TRO preserving the status quo as of" May 1, 2025, and ordered the parties to submit a proposed supplemental briefing schedule for the preliminary injunction. Mem. Order ("TRO Order") [Dkt. #36]. The parties filed supplemental materials, but defendants also asked the Court to reconsider the TRO Order. *See* Defs.' Mot. for Reconsideration of the May 1, 2025 Mem. Order & Notice of Supp. Authority ("Defs.' Mot. for Reconsideration") [Dkt. #38]; Pls.' Resp. in Opp'n to Defs.' Mot. to Reconsider [Dkt. #39]; Pls.' Supplemental Br. in Supp. of Mot. for PI [Dkt. #40]; Defs.' Reply in Supp. of Mot. for Reconsideration of the May 1, 2025 Mem. Order [Dkt. #42].

5

Thus pending before the Court are two separate but substantively overlapping motions: plaintiffs' motion for a preliminary injunction and defendants' motion for reconsideration of the TRO.  The TRO expired on May 29, 2025, so the Court will deny as moot defendants' motion for reconsideration.  Nevertheless, since the parties' briefing on the motion for reconsideration offers helpful insights into recent developments in the case law, the Court will consider that briefing in ruling on the preliminary injunction motion.

## II.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 727 (D.C. Cir. 2022) (quoting *Winter*, 555 U.S. at 20).  The last two factors merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    ANALYSIS

Both the facts and the law in this case are in flux.  Plaintiffs have filed multiple motions to supplement the record as they learned more about the impact of defendants' efforts to dismantle IMLS.  *See* Pls.' Mot. for Leave to Suppl. the R. [Dkt. #20]; Pls.' Second Mot. for Leave to Suppl. the R. [Dkt. #33].  The parties have also informed the Court about recent updates in case law relevant to plaintiffs' motion for a preliminary injunction.  *See* Defs.' Mot. for Reconsideration; Defs.' Notice of Suppl. Authority [Dkt.

#41]; Defs.' Objection to an Extension of the Court's TRO [Dkt. #44]; Pls.' Mot. for Leave to Respond to Defs.' Objection to an Extension of the Court's TRO [Dkt. #45]. Specifically, the Supreme Court and some Judges on our Circuit Court have, in the last few weeks, indicated that cases seeking reinstatement of federal grants belong not in district court but in the Court of Federal Claims. These cases are still pending, but they create a substantial question as to whether plaintiffs' case properly belongs in the Court of Federal Claims. I therefore must deny the motion for a preliminary injunction.[2]

A.     Overview

A preliminary injunction is an extraordinary remedy. *Winter*, 555 U.S. at 22. A plaintiff must make a clear showing not just of a likelihood of success on the merits, but of "a *substantial* likelihood of success on the merits." *Elec. Privacy Info. Ctr. v. Dep't of Corrections*, 928 F.3d 95, 104 (D.C. Cir. 2019) (emphasis added) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)). This includes success in establishing jurisdiction. *See id.* ("[T]he 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." (alteration in original) (quoting *Food & Water Watch*, 808 F.3d at 913)).

The Court finds that plaintiffs may not be able to show that this Court has jurisdiction because the Tucker Act "confer[s] exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the

---

[2] If a plaintiff cannot establish a substantial likelihood of success on the merits, the Court need not consider the remaining factors of the preliminary injunction test. *See Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006); *Ark. Dairy Coop. Ass'n v. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009).

Court of Federal Claims." *See Hammer v. United States*, 989 F.3d 1, 2 (D.C. Cir. 2021);

28 U.S.C. §§ 1346(a), 1491(a); *see also Greenhill v. Spellings*, 482 F.3d 569, 572 (D.C.

Cir. 2007) ("Although the Little Tucker Act gives district courts jurisdiction over certain

similar claims against the federal government, the jurisdiction of the Court of Federal

Claims is exclusive when a plaintiff seeks more than $10,000 in damages.").[3]

Defendants argue that the Tucker Act applies to this case because "[g]rant

terminations are the cornerstone of Plaintiffs' claims," and these grants are essentially

contracts with the federal Government. *See* Defs.' Opp'n at 17–23. Plaintiffs resist this

framing, arguing that they "do not assert any contract claims against the government" and

that, instead, their claims "rely on rights enshrined in the Constitution and provided by

statutes." Pls.' Reply at 7–9.

Application of the Tucker Act depends on whether the case is "at its essence"

contractual. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C.

Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

"Whether a claim is 'at its essence' contractual for the Tucker Act 'depends both [1] on the

source of the rights upon which the plaintiff bases its claims, and [2] upon the type of relief

sought (or appropriate).'" *Id.* (quoting *Megapulse*, 672 F.2d at 968).

---

[3] The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105–06 (D.C. Cir. 2022) (quoting *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017)). Since the Tucker Act gives the Court of Federal Claims exclusive jurisdiction over contract claims against the federal Government seeking more than $10,000 in damages, the Tucker Act also impliedly forbids those contract claims from being brought in district courts under the APA's sovereign immunity waiver. *See id.* at 1106. Accordingly, if the Tucker Act applies to plaintiffs' claims, this Court has no jurisdiction.

This is a close question in this case, made even closer by a recent Supreme Court per curiam decision and our Circuit's treatment of similar issues in a collection of cases involving the U.S. Agency for Global Media ("USAGM"). *See Widakuswara v. Lake*, No. 25-5144 (D.C. Cir. Apr. 24, 2025); *Abramowitz v. Lake*, No. 25-5145 (D.C. Cir. Apr. 24, 2025); *Middle E. Broad. Networks, Inc. v. United States*, No. 25-5150 (D.C. Cir. Apr. 25, 2025); *Radio Free Asia v. United States*, No. 25-5151 (D.C. Cir. Apr. 25, 2025) (together, the "USAGM cases"). These cases raise significant uncertainty about plaintiffs' ability to show that this case is not "at its essence" contractual. *See Crowley*, 38 F.4th at 1106.

To parse through this complicated issue, I will first discuss the recent cases touching on this topic before walking through each prong of the Tucker Act test.

B.    Recent Cases Addressing the Tucker Act

This case is not, to say the least, the only recent case involving Executive action to dismantle an agency by cancelling grants. Some of those cases are currently up on appeal, where our Circuit and the Supreme Court are grappling with whether the Tucker Act divests district courts of jurisdiction to hear these types of cases. Unfortunately, this means that the precise metes and bounds of the Tucker Act—which were already somewhat illusory—are currently shifting. *See Woonasquatucket River Watershed Council. v. Dep't of Agric.*, 2025 U.S. Dist. LEXIS 71378, at *34 (D.R.I. Apr. 15, 2025) ("The 'jurisdictional boundary' between the Tucker Act and the APA is well-traversed by litigants seeking relief against the federal government. Still the boundary's precise contours remain elusive." (citation omitted)); *see also Bublitz v. Brownlee*, 309 F. Supp. 2d 1, 6 (D.D.C. 2004) ("The bright-line rule [for the Tucker Act], however, turns out to be rather dim . . . .").

On April 4, 2025, the Supreme Court issued a per curiam decision casting doubt on district courts' jurisdiction to hear cases involving grant terminations. *See generally Dep't of Educ. v. California*, 145 S.Ct. 966 (Apr. 4, 2025) (per curiam). In that case, the district court had temporarily enjoined the Government's termination of federal education-related grants, finding that the plaintiffs had established a substantial likelihood of success in proving that the grant terminations violated the APA. *See generally California v. Dep't of Educ.*, 2025 U.S. Dist. LEXIS 46420 (D. Mass. Mar. 10, 2025), *administratively stayed pending appeal*, 145 S.Ct. 966. The Government asked the Supreme Court to vacate the district court's TRO and issue an immediate administrative stay. *Dep't of Educ. v. California*, 145 S.Ct. at 968. Even though TROs are generally not appealable, the Supreme Court took on the matter and stayed the TRO. *Id.*

The Supreme Court found that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" because "[t]he APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court [had] ordered[.]" *Id.* at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)); *but see Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (finding that the APA's sovereign immunity provision did not bar judicial review of a suit seeking to enforce Medicaid's reimbursement provisions because it "is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money"). "Instead, the Tucker Act grants the Court of Federal

10

Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Dep't of Educ. v. California*, 145 S.Ct. at 968 (quoting 28 U.S.C. § 1491(a)(1)). The Supreme Court thus stayed the district court's TRO pending the Government's appeal. *Id.* at 969.

This per curiam decision in turn informed our Circuit Court panel's decision in the USAGM cases, which involve the Executive Branch's actions to dismantle USAGM by cancelling grants. *See generally Widakuswara v. Lake*, 2025 U.S. App. LEXIS 11036 (D.C. Cir. May 3, 2025) ("*USAGM Panel Decision*") (per curiam), *pets. for reconsideration en banc granted in part and denied in part*, 2025 U.S. App. LEXIS 12559 (D.C. Cir. May 22, 2025), 2025 U.S. App. LEXIS 13040 (D.C. Cir. May 28, 2025). USAGM is an agency which "oversees six federally funded broadcast networks." *Id.* at *5. Some of those networks are operated by Government employees and contractors, while other, private networks are funded by Congressional appropriations. *Id.* USAGM disburses the Congressional funding to the private networks through grants. *Id.* at *5–6.

President Trump issued an Executive Order directing USAGM be reduced to the minimum level of operations required by statute. *Id.* at *6. USAGM then placed over 1,000 employees on administrative leave and terminated the private networks' grant agreements. *Id.* USAGM employees, contractors, and grantees sued to enjoin this conduct, bringing claims under the APA, various provisions of the Constitution, and the separation of powers. *Id.* The district court issued "a preliminary injunction requiring USAGM to (1) restore its employees and contractors to their pre-March 14 status, (2) restore its FY 2025 grants with [the private networks], and (3) restore [Voice of America] as 'a

consistently reliable and authoritative sources of news.'" *Id.* (quoting *Widakuswara v. Lake*, 2025 U.S. Dist. LEXIS 76500, at *18 (D.D.C. Apr. 22, 2025)).

The Government appealed and asked our Circuit to stay the first two provisions of the preliminary injunction pending their appeal. *Id.* A three-judge panel granted a stay, finding that "[t]he government is likely to succeed on the merits because the district court likely lacked subject-matter jurisdiction to enjoin USAGM's personnel actions and to compel the agency to restore [the private networks'] FY 2025 grants." *Id.* at *7. Specifically, the panel found that the Tucker Act likely applied and vested jurisdiction on the Court of Federal Claims. *Id.* at *9–14.

In reaching that conclusion, the panel considered whether the plaintiffs' claims were "at [their] essence" contractual under the *Crowley* test and looked to the Supreme Court's decision in *Department of Education v. California* for guidance. *Id.* at *9–10 The panel reasoned that "Congress [had] created a contractual scheme for allocating funds to the grantees": Statutes authorize USAGM to fund the private networks through "grants and cooperative agreements," and USAGM then reaches grant agreements with the private networks. *Id.* at *10–11. Those agreements "constitute government contracts for Tucker Act purposes." *Id.* at *11. Since the dispute between the parties arose when USAGM terminated those agreements, the source of the plaintiffs' rights were contracts, thus supporting application of the Tucker Act. *See id.*

The panel also found that the relief ordered by the district court included "specific performance of the grant agreements—a quintessentially contractual remedy." *See id.* This was true regardless of whether the district court phrased the relief "as a declaration

that the agreements remain in force" or as "an order to pay the money committed by those agreements." *Id.* Thus the panel found that the plaintiffs' claims were "squarely contract claims under the Tucker Act." *Id.* at \*13.

Here, it is worth noting that the panel was not persuaded by the plaintiffs' arguments that they had not brought contract claims and had instead brought claims under the APA and the Constitution. *See id.* at \*13–14. These claims still belonged in the Court of Federal Claims because they "simply flow[ed] from allegations that the Executive Branch has failed to abide by governing congressional statutes, which does not suffice to trigger the distinctively strong presumptions favoring judicial review of constitutional claims." *Id.*

The panel's decision was not the last word, though. The plaintiffs quickly filed petitions for rehearing en banc. *Widakuswara Plaintiffs-Appellees' Pet. for Rehearing En Banc*, Nos. 25-5144, 25-5145 (D.C. Cir. May 5, 2025); *Emergency Pet. for Rehearing En Banc*, Nos. 25-5150, 25-5151 (D.C. Cir. May 5, 2025). Our Circuit Court denied in part and granted in part the petitions. *See Widakuswara v. Lake*, 2025 U.S. App. LEXIS 12559 (D.C. Cir. May 22, 2025); *Widakuswara v. Lake*, 2025 U.S. App. LEXIS 13040 (D.C. Cir. May 28, 2025). Relevant here is our Circuit's decision to reconsider the portion of the panel's decision which had found that the district court likely lacked jurisdiction to order reinstatement of grants. *See Widakuswara v. Lake*, 2025 U.S. App. LEXIS 13040, at \*3– 4. Thus our Circuit Court reversed the stay ordered by the panel, finding that "the government has not made the requisite 'strong showing' of a likelihood of success on the merits of its appeals in these cases." *Id.* at \*4.

Although our Circuit expressed apprehension toward the panel's conclusion that the USAGM cases belong in the Court of Federal Claims, it did note that reversing the panel's stay "of course does not constrain the ability of the panel that hears the government's appeals to reach any conclusion following full merits briefing and argument." *Id.* Additionally, Judge Katsas issued a partial dissent from the order, reasserting his belief that "[t]he district court lacked jurisdiction to order continued funding for the affiliated networks." *Id.* at *8 (Katsas, J., dissenting in part). Judge Katsas cited the Supreme Court's decision in *Department of Education v. California* to support his conclusion that orders which mandate specific performance of contracts with the federal Government "fall within the exclusive jurisdiction of the Court of Federal Claims." *See id.* at *8–9.

To date, our Circuit Court has not yet reheard the USAGM cases en banc. As such, it is undecided whether those cases belong in district court or in the Court of Federal Claims. Still, the Supreme Court's per curiam decision in *Department of Education v. California* and the panel's reasoning in the USAGM decision are informative and persuasive.[4] Together, they raise serious doubts about whether this case properly belongs

---

[4] The Court here notes that since the Supreme Court issued the *Department of Education v. California* per curiam decision, lower courts' interpretation of the breadth and applicability of that decision have varied widely. *See, e.g., Colorado ex rel. Beshear v. HHS*, 2025 U.S. Dist. LEXIS 93872, at *28 (D.R.I. May 16, 2025) ("The Court recognizes the tension between *Bowen* and *California*. But the Court is not positioned to disregard *Bowen* and its progeny, even if it appears that it is now in tension with *California*."); *State v. Trump*, 2025 U.S. Dist. LEXIS 86024, at *20–21 (D.R.I. May 6, 2025) ("*California*'s precedential value is limited, considering that the Supreme Court issued the decision on its emergency docket . . . Further, the *California* stay order does not displace governing law that guides the Court's approach to discerning whether the States' claims are essentially contract claims in order to direct jurisdiction to the Court of Claims."); *Sols. In Hometown Connections v. Noem*, 2025 U.S. Dist. LEXIS 70104, at *24 (D. Md. Apr. 14, 2025) (finding, post-*California*, that "Plaintiffs have not demonstrated a substantial likelihood of success upon the merits of their APA claims, because these claims are in essence contract claims against the United States for which the United States Court of Federal Claims has exclusive jurisdiction"); *San Francisco Unified Sch. Dist. v. AmeriCorps*, 2025 U.S. Dist. LEXIS 77652, at *31 n.4 (N.D. Cal. Apr. 23,

in the Court of Federal Claims. With this information in hand, I will now apply the Tucker

Act test to the case before me.

C.    The Source of Plaintiffs' Rights

The first prong of the Tucker Act test is whether the source of the rights upon which

plaintiffs base their claims is contractual. *See Crowley*, 38 F.4th at 1106. Here, the Court

looks to whether "the plaintiff's asserted rights and the government's purported authority

arise from statute," "whether the plaintiff's rights 'exist[] prior to and apart from rights

created under the contract,'" and whether the plaintiff 'seek[s] to enforce any duty imposed

upon' the government 'by the . . . relevant contracts to which' the government 'is a

party[.] '" *Id.* at 1107 (citations omitted).

Plaintiffs allege that defendants' conduct is ultra vires and violates the separation of

powers, the Take Care Clause, the APA, and the First Amendment. *See* Compl. ¶¶ 74–118

(Counts I–VI). The heart of these allegations is that defendants have failed to comply with

Congress's statutory mandates for IMLS. *See, e.g., id.* ¶¶ 81, 86–87, 101–03, 106, 111–

12. However, the main mechanism through which defendants allegedly violated those

mandates is by suspending and terminating grants. As our Circuit's panel compellingly

reasoned in the USAGM cases, plaintiffs' framing of their claims for relief under the APA

and the Constitution do not necessarily take this case out of the ambit of the Tucker Act.

*See USAGM Panel Decision*, 2025 U.S. App. LEXIS 11036, at *13–14; *see also Martin v.*

---

2025) (distinguishing the Supreme Court's decision because "*Department of Education* involved a different
posture in which plaintiffs challenged the government's 'purport[ed] terminat[ion] [of] grants midstream,'
and sought an order requiring the continued payment of grant moneys," while in the instant case the
"Plaintiffs' grants have not been terminated" (alterations in original)). This kaleidoscope of interpretations
further reveals that the contours of the Tucker Act are shifting.

*Donley*, 886 F. Supp. 2d 1, 8 (D.D.C. 2012) ("Because plaintiffs may try to avoid Tucker

Act jurisdiction 'by converting complaints which 'at their essence' seek money damages

from the government into complaints requesting injunctive relief or declaratory actions,'

district courts must 'look to the complaint's substance, not merely its form.'" (quoting

*Kidwell v. Dep't of the Army*, 56 F.3d 279, 284 (D.C. Cir. 1995))).  As such, I will look to

the substance of plaintiffs' claims to determine the source of their rights.

From the outset, the Complaint's Introduction focuses on defendants' efforts to

cancel IMLS grants:

> Defendants have already canceled statutorily required grants to several state
> libraries. It is only a matter of time before Defendants cancel en masse IMLS
> grants that fund activities at libraries across the country. Even if grants are
> not canceled, the severely reduced workforce will not be able to effectively
> and timely process grant payments and applications. Many IMLS grantees
> have already expended funds in reliance on grant awards and have submitted
> or will soon submit requests for reimbursement to IMLS for these
> expenditures. Without grant funding or IMLS staff to process
> reimbursements, local and state libraries will suffer an immediate and
> irreparable inability to pay vendors or staff hired in reliance on IMLS'
> promise to make these reimbursements.

Compl. at 2–3.

This focus on grants is woven into each of the claims for relief.  *See, e.g.*, *id.* ¶ 82

(Count I) ("Defendants' actions to close IMLS" by "beginning to terminate grants en masse

. . . exceed[s] presidential and executive authority and usurp[s] legislative authority . . . .");

*id.* ¶ 87 (Count II) ("President Trump's actions to dismantle IMLS violate the Take Care

Clause because they are directly contrary to the duly enacted statutes . . . appropriating

funds to IMLS and directing IMLS to use such funds to carry out its statutory duties to aid

libraries."); *id.* ¶ 94 (Count III) ("Defendants failed to account for the substantial reliance

16

interests in the continued existence of IMLS. Hundreds of libraries around the country have based their budgets and programs on the availability of grants issued by IMLS."); *id.* ¶ 106 (Count IV) ("The MLSA imposes mandatory duties on the Director of IMLS to disburse various grants."); *id.* ¶ 111 (Count V) ("No statute, constitutional provision, or other source of law authorizes Defendants . . . to suspend or cancel grants IMLS is statutorily required to disburse . . . .").[5]

Grant terminations are also the heart and soul of plaintiffs' standing and irreparable harm arguments. To establish standing, plaintiffs cite to numerous declarations from their members explaining how grant terminations caused them injury. *See* Pls.' Reply at 2–5 (citing; *e.g.,* Decl. of Rita Adams [Dkt. #13-8] ¶¶ 6–8; Decl. of John Lewis Francis [Dkt. #13-18] ¶¶ 27–29; Decl. of Yonah Bromberg Gaber [Dkt. #13-19] ¶¶ 24, 29–30; Decl. of Dana Newman [Dkt. #13-15] ¶ 9; Suppl. Decl. of Elizabeth Bradley [Dkt. #33-5] ¶¶ 5–6; Decl. of Alan S. Inouye [Dkt. #13-2] ¶¶ 23–27; Suppl. Decl. of Alan Inouye [Dkt. #33-1] ¶¶ 8–16). Similarly, plaintiffs' irreparable harm arguments are grounded in the impact of grant terminations. *See, e.g.,* Compl. ¶¶ 61–62, 65–67, 69, 71–73. *Crowley* instructs the Court to consider "whether the plaintiff's rights 'exist[] prior to and apart from rights created under the contract[s].'" 38 F.4th at 1107. Here, plaintiffs' standing and irreparable

---

[5] Plaintiffs do point to other ways in which defendants are violating Congress's mandates for IMLS, including defendants' failure to collect data and their mass termination of employees. *See, e.g.,* Compl. ¶¶ 82, 87, 93, 102, 111. This is one reason why the Court is not ruling that plaintiffs will be unable to show this Court has jurisdiction, and instead only finds that plaintiffs are not, at this early stage, able to show a *substantial* likelihood of success in establishing this Court's jurisdiction.

injury largely do not exist prior to and apart from rights created under their grant agreements. *See id.*[6]

Accordingly, I find that plaintiffs' claims for relief, standing arguments, and irreparable harm allegations are all keyed to defendants' termination of grants. I further find that these grants are essentially contracts with the Government. *See USAGM Panel Decision*, 2025 U.S. App. LEXIS 11036, at *9–10 ("The [Tucker Act] rule applies to claims for breach of grant agreements executed through binding government contracts."). As with the grants in the USAGM cases, the IMLS grants are part of a Congressional "contractual scheme for allocating funds to the grantees." *See id.* at *10–11. Congress authorizes IMLS to enter into "grants, contracts, cooperative agreements," and other arrangements to further its objectives, *see* 20 U.S.C. §§ 9108(c), 9165, 9173, and mandates that IMLS issue certain grants, *see id.* §§ 9131, 9161, 9162. IMLS then reaches grant agreements with various entities, including plaintiffs and their members. This arrangement, like the one at issue in the USAGM cases, creates contracts between the grant recipients and the federal Government. *See USAGM Panel Decision*, 2025 U.S. App.

---

[6] This is true even with respect to AFSCME. To establish standing for AFSCME's members, plaintiffs point to the declaration of Robert Lewis Francis, a member of AFSCME's local union representing 1,500 University of Minnesota Clerical Workers. *See* Pl.'s Reply at 3 (citing Francis Decl. ¶¶ 27–29). Plaintiffs' cited paragraphs of the Francis declaration are about the loss of grant funding:

> Based on . . . the fact that Minitex management has been clear that IMLS funding cuts will be made up through service and staffing reductions—I estimate that ten (10) of my Minitex colleagues will be laid off, including possibly myself. In no uncertain terms, without the IMLS funding, my job is on the line. Losing roughly ten Minitex Resource Sharing unit jobs, out of 30 existing positions, would be a major blow to our library system and, by extension, the library services Minnesotans depend on. . . . With the loss of IMLS funding, we do not know if we will keep our jobs, let alone receive expected wage increases.

Francis Decl. ¶¶ 27–29.

LEXIS 11036, at *10–11.  The core dispute between plaintiffs and defendants arose when defendants terminated those contracts.  *See id.* at *11.  Therefore, it appears that plaintiffs' claims may indeed be contract claims under the Tucker Act.

        D.     <u>The Relief Sought</u>

I will now turn to the second prong of the Tucker Act test: the relief sought.  *See Crowley*, 38 F.4th at 1107.  This inquiry "boils down to whether the plaintiff effectively seeks to attain monetary damages in the suit."  *Id.*

Plaintiffs here seek broad injunctive relief.  *See* Compl. at 28–29 (Prayer for Relief). They ask the Court to issue an injunction "barring Defendants from taking any action to dissolve IMLS absent the authorization of Congress" and instructing defendants to unwind the actions they have already taken to shut down IMLS.  *See id.*  Still, the relief sought repeatedly references reinstating grants.  Plaintiffs want defendants "to return IMLS and its . . . grantees to their status prior to March 31, 2025"; to "[r]estore funding pursuant to the terms of all grants, cooperative agreements, and contracts, consistent with the terms of the agreements"; and to "[c]omply with Congressional statutes that require the IMLS Director to carry out various programs and award various grants."  *Id.*

Here, I find compelling the Supreme Court's and the USAGM panel's reservations about a district court ordering enforcement of a contractual obligation against the Government.  *See Dep't of Educ. v. California*, 145 S.Ct. at 968 ("[A]s we have recognized, the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court did here."); *USAGM Panel Decision*, 2025 U.S. App. LEXIS 11036, at *11 ("[T]he injunction in substance

orders specific performance of the grant agreements—a quintessentially contractual remedy. And it is the inherently contractual nature of the relief afforded . . . that makes the [Court of Federal Claims] the exclusive forum for this suit." (citations omitted)).

Plaintiffs ask the Court to order defendants to "[r]estore funding pursuant to the terms of all grants, cooperative agreements, and contracts, consistent with the terms of the agreements." Compl. at 29. The practical effect of such relief would be to order specific performance of these grant agreements; this, of course, is the "quintessential contract remedy" which made the panel in the USAGM cases uncertain of the district court's jurisdiction. *See USAGM Panel Decision*, 2025 U.S. App. LEXIS 11036, at *11–12; *but see Rhode Island v. Trump*, 2025 U.S. Dist. LEXIS 86024, at *23 (D.R.I. May 6, 2025), *appeal filed*, No. 25-1477 (1st Cir. May 20, 2025) (finding, in a similar challenge to the dismantling of IMLS, that the Tucker Act did not apply to the plaintiffs' claims because "[t]he States seek equitable relief to enjoin the Defendants' actions implementing the [Executive Order]—not specific performance of any grant agreements"). Should the Court mandate that IMLS reinstate all of its grants, the Court would be ordering IMLS to pay out almost $2.5 million in grants to plaintiff ALA alone. *See* Compl. ¶ 61; *see also id.* ¶ 33 (stating that "IMLS currently has over 650 open awards under the grant programs it administers to libraries, totaling over $450 million").[7]

---

[7] The Supreme Court in *Department of Education v. California* noted that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." 145 S.Ct. at 968 (quoting *Bowen*, 487 U.S. at 910). Here, there is more than a "possibility" that injunctive relief would result in the disbursement of funds; it is the explicit relief sought by plaintiffs. *See* Compl. at 29 (asking the Court to "[r]estore funding pursuant to the terms of all grants, cooperative agreements, and contracts").

This is not the only relief plaintiffs seek, though! Plaintiffs also seek an injunction reinstating all IMLS employees and otherwise mandating defendants comply with IMLS's statutory obligations. *See id.* at 28–29. Here, the Court looks to whether this non-monetary relief has "considerable value" independent of any potential monetary relief. *See Crowley*, 38 F.4th at 1107–08 (citing *Kidwell*, 56 F.3d at 284). I find that this additional relief is neither independent from nor considerable compared to the contractual relief sought.

First, plaintiffs seek reinstatement of IMLS staff. Compl. at 29. The value of this relief is intertwined with the value of reinstating grants. Plaintiffs allege that the "significant reduction in staff will dramatically slow the processing of reimbursements due to libraries for awards already granted . . . as well as processing of applications for important grant award submissions by states and libraries." *Id.* ¶ 42; *see also id.* ¶ 67 ("In many cases, libraries have already spent approved funds and have or will seek reimbursement by IMLS for those expenditures. Because there are no employees to process these claims, the libraries will suffer direct and immediate financial harm."); *id.* ¶ 71 ("[A] foreseeable consequence of Defendants' actions to shutter IMLS is that AFSCME members will lose their jobs *as a result of Defendants' funding cuts*. The union stands to be financially harmed by the resultant loss of member dues." (emphasis added)). These allegations suggest that the benefit of reinstating the staff is tied to the benefit of reinstating the grants.

Yet plaintiffs do allege *some* independent harm from the mass terminations: "IMLS staff includes library professionals who advise librarians around the country on a daily basis. These professionals are an invaluable resource that would be diminished or lost

entirely in the event of staff reductions." *Id.* ¶ 50. The value of remedying this harm, though, is ancillary to the value of reinstating grants. If the Court were to reinstate the staff but not the grants, how much would plaintiffs and their members benefit from IMLS being fully staffed? There would be no grants for the staff to issue and manage, and—taking plaintiffs' allegations as true—there would be substantially fewer programs and libraries left for IMLS staff to advise.

Second, plaintiffs ask the Court to order IMLS to continue its data collection. Here again the harm is related to contract terminations: "Defendants have been terminating contracts for work conducting research and collecting data from libraries across the country." Compl. ¶ 48. Even though this allegation is light on specifics, it appears that to order IMLS to continue collecting data, the Court would have to require IMLS to reinstate its data collection contracts—a form of relief which raises Tucker Act questions. Additionally, IMLS apparently collects this data from libraries as a condition of grant funding. *See* Decl. of Jane Billinger [Dkt. #13-17] ¶ 6 ("As a condition of IMLS funding, IMLS requires that participant public libraries fill out a survey—the IMLS Public Libraries Survey (PLS)—that includes data critical to effective bargaining . . . ."). Thus remedying the data collection failures is at least partially derivative of remedying the grant terminations.

As with the mass layoffs, plaintiffs do point to some independent value of ordering IMLS to continue collecting data. Without such an order, plaintiffs and their members will lose access to "an irreplaceable longitudinal source of data about American public libraries," Compl. ¶ 59, and plaintiff AFSCME uses IMLS data in collective bargaining

negotiations, *id.* ¶ 70. Nevertheless, the Court looks to plaintiffs' pleadings and finds that discussion of the importance of reinstating grants predominates.

In the final analysis, the Court finds that the relief sought is largely contractual. This factor thus supports finding that the Tucker Act may indeed divest this Court of jurisdiction.

## IV.    CONCLUSION

Having considered the source of plaintiffs' rights and the relief sought, I have concluded that the Tucker Act may indeed require that plaintiffs bring their case in the Court of Federal Claims. As such, plaintiffs have not shown a substantial likelihood of success in establishing this Court's jurisdiction. I will therefore **DENY WITHOUT PREJUDICE** plaintiffs' motion for a preliminary injunction. I emphasize, though, that my decision reflects the high bar for and extraordinary nature of a preliminary injunction. My decision does not prohibit plaintiffs from renewing their motion or succeeding on a dispositive motion depending on further developments in the facts and the law.

Finally, the Court will **DENY AS MOOT** defendants' motion for reconsideration of the TRO issued on May 1, 2025. That TRO expired on May 29, 2025. An Order consistent with the above accompanies this Memorandum Opinion.


RICHARD J. LEON
United States District Judge

23