**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| American Library Association, et al., | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-01050 |
| Keith Sonderling, et al., | |
| *Defendants*. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

   I.    Statutory Background .........................................................................................2

   II.   Factual Background ............................................................................................5

   III.  Procedural Background.....................................................................................15

ARGUMENT ......................................................................................................................15

   I.    This Court Has Jurisdiction Over Plaintiffs' Claims. ......................................16

      A.   Plaintiffs have both associational and organizational standing. ...................16

      B.   The Tucker Act does not divest this Court of jurisdiction. ...........................18

      C.   The Court has jurisdiction over the Plaintiffs' constitutional and ultra vires
          claims for which sovereign immunity never attached...................................25

      D.   The Civil Service Reform Act does not divest this Court of jurisdiction. ....................25

   II.   Plaintiffs' Claims are Reviewable. ..................................................................27

      A.   Plaintiffs' APA claims are reviewable because Plaintiffs challenge discrete,
          final agency action..........................................................................................27

      B.   Plaintiffs' causes of action are reviewable notwithstanding *Global Health
          Council v. Trump*. ..........................................................................................30

   III.  Defendants' Decision to Dismantle IMLS Is Unlawful. ..................................33

      A.   Defendants' actions are not in accordance with law and in excess of statutory
          authority.........................................................................................................33

      B.   Defendants' actions are arbitrary and capricious. .........................................35

      C.   Defendants' actions are unconstitutional and ultra vires. .............................39

   IV.  This Court Should Vacate Defendants' Unlawful Actions in Full. ..................43

      A.   The APA authorizes courts to set aside agency actions in their entirety. ......................43

      B.   In the alternative, a broad injunction is necessary to afford Plaintiffs and their
          members complete relief. ...............................................................................44

CONCLUSION...................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ...................................................29

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586 (D.C. Cir. 2022) ...................................................17

*AIDS Vaccine Advoc. Coal. v. Trump*, No. 25-cv-400, 2025 WL 2537200 (D.D.C. Sept. 3, 2025) ...................................................31

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ...................................................43

*Am. Fed'n of Gov't Emps. v. OPM*, No. 25-cv-1780, 2025 WL 660053 (N.D. Cal. Feb. 28, 2025) ...................................................26

*Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615 (D.C. Cir. 2020) ...................................................18

*Am. Bar Ass'n v. DOJ*, No. 25-cv-1263, 2025 WL 1388891 (D.D.C. May 14, 2025), ...................................................20

*Am. Libr. Ass'n, Inc. v. United States*, 201 F. Supp. 2d 401 (E.D. Pa. 2002) ...................................................17

*Am. Pub. Health Ass'n v. NIH*, No. 1:25-cv-10787, 2025 WL 1747128 (D. Mass. June 23, 2025) ...................................................23, 24

*Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) ...................................................31

*Axon Enter. v. FTC*, 598 U.S. 175 (2023) ...................................................26, 27

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................28

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83 (D.C. Cir. 2020) ...................................................21

*Biden v. Texas*, 597 U.S. 785 (2022) ...................................................29

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ...................................................19, 21, 22, 23

*Bridgeport Hosp. v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024) ...................................................43

*Cal. Communities Against Toxics v. EPA*, 934 F.3d 627 (2019) ...................................................29

*Chamber of Com. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ...................................................25

*Ciba-Geigy Corp. v. Alza Corp.*, 801 F.2d 430 (Fed. Cir. 1986) ...................................................29, 30

*Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998) ...................................................20

*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ....................................................41

*Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) ............................................................................................................42, 43

*Clinton v. City of New York*, 524 U.S. 417 (1998)........................................................................40

*Corner Post, Inc. v. Bd. of Govs. of the Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) .......................43, 45

*Crowley Gov't Servs. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022).....................................18, 19, 20, 23

*Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015) .............................................17

*Dep't of Educ. v. California*, 145 S. Ct. 966 (2025)............................................................15, 24, 25

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ...............................38

*Dep't of State v. AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753 (2025) ......................................24

*Doe v. United States*, 463 F.3d 1314 (Fed. Cir. 2006) ..................................................................23

*Drs. for Am. v. OPM*, No. 25-cv-322, 2025 WL 1836009 (D.D.C. July 3, 2025) ........................44

*FCC v. Fox Television Stations*, 556 U.S. 502 (2009)....................................................................36

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)................................................................17

*FEC v. Cruz*, 596 U.S. 289 (2022)..................................................................................................35

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)......................................26

*Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 13, 2025) *as amended* Aug. 28, 2025 ...............................................................30, 31, 32

*Glob. Health Council v. Trump*, Nos. 25-5097, 25-5098, 2025 U.S. App. LEXIS 22294 (D.C. Cir. Aug. 28, 2025) ........................................................................... 31, 32

*Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ............................................22

*Harlem Globetrotters Int'l, Inc. v. United States*, 168 Fed. Cl. 31 (2023)....................................23

*Harris Cnty., Texas v. Kennedy*, No. 25-cv-1275, 2025 WL 1707665 (D.D.C. June 17, 2025) ...............................................................................................................17, 20

*Heckler v. Ringer*, 466 U.S. 602 (1984)........................................................................................27

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ...............................................18

*In re Aiken Cnty.*, 725 F.3d 255 (D.D.C. 2013) .......................................................................41, 42

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545 (D.C. Cir. 1999) ...................40, 42

*INS v. Chadha*, 462 U.S. 919 (1983) ............................................................40

*Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838) ...............................40, 42

*Kingdomware Tech., Inc. v. United States*, 579 U.S. 162 (2016)....................................34

*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949) ...............................25

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995).........................................23

*Local 2677, Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60 (D.D.C. 1973) ...........25

*Loving v. United States*, 517 U.S. 748 (1996) ........................................................39, 40

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)..................................................28

*Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313 (Fed. Cir. 2017) ........22

*Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015) ................................................22

*Maine Cmty. Health Options v. United States*, 590 U.S. 296 (2020)............................23

*Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441 (D.D.C. 1985)................................22

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ...............................19, 20, 21

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) .............................................................25

*Morrison v. Olson*, 487 U.S. 654 (1988) ..............................................................41

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...............................................................................................36, 37

*Myers v. United States*, 272 U.S. 52 (1926)............................................................39

*N.J. Conservation Found. v. FERC*, 111 F. 4th 42 (D.C. Cir. 2024)............................21

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960 (D.C. Cir. 2022)................31

*Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100 (D.D.C. Feb. 25, 2025) ......................29

*Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196 (Fed. Cir. 1997).......................23

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) ........................................35

*New York v. Trump*, 767 F. Supp. 3d. 44 (S.D.N.Y. 2025).........................................42

*NIH v. Am. Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669 (Aug. 21, 2025) .................................................................................... 19, 20, 21, 22, 23, 24, 25

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ................................................ 28

*NTEU v. Vought*, No. 25-5091, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ................. 26, 29, 30

*Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762 (2025) ................................ 31, 32, 43

*Ohio v. EPA*, 603 U.S. 279 (2024) .............................................................................. 35

*Pollack v. Hogan*, 703 F.3d 117 (D.C. Cir. 2012) ..................................................... 25

*Ransom v. United States*, 900 F.2d 242 (Fed. Cir. 1990) ........................................... 20

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306, 2025 WL 1825431 (D.D.C. July 2, 2025) ........................................................................ 44

*Rhode Island v. Trump*, 1:25-cv-00128 (D.R.I. Aug. 11, 2025) ................................. 10

*Rhode Island v. Trump*, 1:25-cv-128, 2025 WL 1303868 (D.R.I. May 6, 2025) ........... 10

*Rhode Island v. Trump*, No. 25-1477 (1st Cir. 2025) ................................................. 45

*Richardson v. Morris*, 409 U.S. 464 (1973) .............................................................. 23

*Rural Dev. Innovations Ltd. v. Marocco*, No. 25-cv-1631, 2025 WL 1807818 (D.D.C. July 1, 2025) ............................................................................................ 26

*Seila L. LLC v. CFPB*, 591 U.S. 197 (2020) ............................................................. 39

*Summers v. Earth Island Inst.*, 555 U.S. 498 (2009) .................................................. 17

*Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270 (D.C. Cir. 2016) ................... 29

*Telemaque v. United States*, 82 Fed. Cl. 624 (2008) .................................................. 23

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ....................................... 25, 26, 27

*Tootle v. Sec'y of Navy*, 446 F.3d 167 (D.D.C. 2006) ................................................ 22

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .................................................... 20

*Trump v. Boyle*, No. 25A11, 2025 WL 2056889 (July 23, 2025) ................................. 25

*Trump v. CASA*, Nos. 24A884, 24A885, 24A886, 2025 WL 1773631 (June 27, 2025) .......... 43, 44

*Trump v. United States*, 603 U.S. 593 (2024) ............................................................ 39

*U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir. 2012) ....................................................41

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544 (1996)................................................................................................................................17

*United States v. Am. Libr. Ass'n, Inc*, 539 U.S. 194 (2003) ........................................................17

*United States v. Fausto*, 484 U.S. 439 (1988)..............................................................................26

*United States v. Mitchell*, 463 U.S. 206 (1983) ...........................................................................22

*Util. Air Reg. Grp. v. EPA*, 573 U.S. 302 (2014)........................................................................42

*Vaca v. Sipes*, 386 U.S. 171 (1967) ............................................................................................18

*Vasquez v. District of Columbia*, 110 F.4th 282 (D.C. Cir. 2024)...............................................15

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025)15, 21, 22, 23, 26

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.D.C. May 28, 2025)........................21

*Widakuswara v. Lake*, No. 25--2390 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ......................42

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .........................................32, 40, 42

## Statutes

5 U.S.C. § 551..............................................................................................................................28

5 U.S.C. § 702..............................................................................................................................18

5 U.S.C. § 704..............................................................................................................................22

5 U.S.C. § 706.........................................................................................................31, 33, 35, 43, 44

20 U.S.C. § 9101.............................................................................................................................2

20 U.S.C. § 9102.............................................................................................................................2

20 U.S.C. § 9103.............................................................................................2, 3, 7, 32, 34, 43

20 U.S.C. § 9104....................................................................................................................3, 34

20 U.S.C. § 9105.............................................................................................................................3

20 U.S.C. § 9105a...............................................................................................19, 32, 33, 43

20 U.S.C. § 9108.............................................................................2, 3, 4, 13, 32, 34, 35, 43

20 U.S.C. § 9121 ...................................................................................................1, 2

20 U.S.C. § 9123 ......................................................................................................2

20 U.S.C. § 9131 ................................................................................................4, 34

20 U.S.C. § 9141 ..........................................................................................4, 32, 43

20 U.S.C. § 9161 ....................................................................................4, 32, 34, 43

20 U.S.C. § 9162 ......................................................................4, 12, 32, 34, 41, 43

20 U.S.C. § 9165 ......................................................................................................4

20 U.S.C. § 9171 ......................................................................................................1

20 U.S.C. § 9173 ......................................................................................................4

20 U.S.C. § 9175 ......................................................................................................4

28 U.S.C. § 1491 ..............................................................................................18, 24

44 U.S.C. 3507 ......................................................................................................35

47 U.S.C. § 254 ......................................................................................................38

54 U.S.C. § 308902 ................................................................................................38

Arts, Humanities, and Cultural Affairs Act, Pub. L. No. 94-462, Title II, § 203(a), 90
    Stat. 1971 (1976) ..............................................................................................33

Full-Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, 139 Stat.
    9 (2025) ...........................................................................................2, 4, 34, 41

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460
    (2024) ...................................................................................1, 2, 4, 5, 34, 41

Library Services Act, Pub. L. No. 84-597, 70 Stat. 293 (1956) ........................................2

Museum and Library Service Act, Pub. L. No. 115-410, 132 Stat. 5412 (2018) ...........................2

Museum and Library Services Act, 20 U.S.C. §§ 9101-9176 (1996) .............................................1

S. Rep. No. 86-1412 (1960) .................................................................................2

**Regulations**

2 C.F.R. § 200.204 ...........................................................................................................12

2 C.F.R. § 200.205 ...........................................................................................................12

47 C.F.R. § 54.501 ...........................................................................................................38

47 C.F.R. § 54.502 ...........................................................................................................38

Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025)....................................1, 6, 28

OIRA, OMB Control No: 3137-0074, https://perma.cc/A5WX-625R...........................35

**Constitutional Provisions**

U.S. Const. art. I .........................................................................................................39, 41

U.S. Const. art. II ............................................................................................................41

**Legislative Materials**

H.R. ___, Fiscal Year 2026 Labor, HHS, Educ., and Related Agencies Bill, 119th
    Cong. (1st Sess. 2025) https://perma.cc/TMU5-4MJT ...............................................13

H.R. Rep. No. 118-2882 (2024)..........................................................................................4

S. 2587, Dept's of Labor, HHS, and Educ., & Related Agencies Appropriations Act,
    2026, 119th Cong. (1st Sess. 2025) https://perma.cc/BLN5-STYX .........................13

**Other Authorities**

FCC, *E-Rate: Universal Service Program for Schools and Libraries*,
    https://perma.cc/F6NF-FC5G ...................................................................................38

Henry B. Hogue, Cong. Rsch. Serv., R42852, Presidential Reorganization Authority:
    History, Recent Initiatives, and Options for Congress (Dec. 11, 2012) ...................40

IMLS, *Evaluation of IMLS's Native Communities Grant Programs* (2024) https://
    perma.cc/63AY-A33L ................................................................................................36

IMLS, *Fiscal Year 2025: Congressional Justification* (Mar. 2024),
    https://perma.cc/C36H-YQ7H ...................................................................................36

*Limitations on Presidential Power to Create a New Exec. Branch Entity to Receive &
Administer Funds Under Foreign Aid Legis.*, 9 Op. O.L.C. 76 (1985) .......................40

## INTRODUCTION

For decades, Congress has recognized the importance of libraries and museums and, through these institutions, has sought to improve literacy, access to information, and innovation. 20 U.S.C. §§ 9121, 9171. Congress created a federal agency, the Institute of Museum and Library Services (IMLS), to preserve and strengthen the work of these institutions. *See* Museum and Library Services Act, 20 U.S.C. §§ 9101-9176 (1996). Congress imposed specific and mandatory duties on IMLS and annually appropriated funds for the agency to carry out those duties. *See id.*; Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 697 (2024) (2024 Appropriations Act).

Then, in a matter of weeks after President Trump took office, and without Congressional authorization, Defendants dismantled the agency. President Trump unilaterally decided that IMLS was "unnecessary," and ordered the elimination of IMLS "to the maximum extent consistent with applicable law." Exec. Order No. 14238, 90 Fed. Reg. 13043 §§ 1, 2(a) (Mar. 14, 2025). Defendants went well beyond that, placing nearly all staff on administrative leave, firing all members of the mandated National Museum and Library Services Board, cancelling grants en masse, and halting all statutorily required IMLS operations. As a result, libraries and museums across the country were forced to lay off staff and cancel programs, including summer reading programs, efforts to improve broadband access, interlibrary loan programs, initiatives increasing access to literary materials for blind and disabled persons, and more, harming Plaintiffs, their members, and the millions of Americans who rely on library and museum services.

Neither the Constitution nor applicable statutes permit such a result. By failing to explain or consider important aspects of their actions, Defendants acted in an arbitrary-and-capricious manner. By repudiating statutory mandates and refusing to spend money that Congress

appropriated, Defendants acted contrary to substantive and appropriative statutes. And by unilaterally dismantling the agency, thereby taking Congress's power for themselves, Defendants acted ultra vires and violated the Separation of Powers and Take Care Clause of the Constitution.

## BACKGROUND

### I.    <u>Statutory Background</u>

In 1996, Congress enacted the Museum and Library Services Act (MLSA), 20 U.S.C. § 9101 *et seq*, which mandates a specifically reticulated design for IMLS. The MLSA created IMLS as an independent agency within the National Foundation on the Arts and the Humanities, 20 U.S.C. § 9102, to increase access to information, promote literacy, preserve knowledge and collections, and enhance the role of libraries, 20 U.S.C. § 9121. MSLA's precursors date back to the Library Services Act, ch. 407, Pub. L. No. 84-597, 70 Stat. 293 (1956), when Congress first designed an administrative infrastructure to address the lack of library services in non-urban areas. S. Rep. No. 86-1412, at 1-2 (1960). IMLS's current role in American society is multifaceted—IMLS serves as a crucial supplier and coordinator of data, expertise, and oversight for libraries and museums across the country. Congress has repeatedly reauthorized the MLSA on a bipartisan basis, *see, e.g.*, Museum and Library Services Act, Pub. L. No. 115-410, 132 Stat. 5412 (2018), and authorized and appropriated funding to carry out IMLS's functions, 20 U.S.C. §§ 9108(g), 9123(a); Full-Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, 139 Stat. 9 (2025) (2025 Appropriations Act); 2024 Appropriations Act at 697.

Congress mandated a certain structure for IMLS and specified qualifications for its officers. IMLS "shall be headed by a Director," who serves a four-year term and must have special competence in library and information services or museum services. 20 U.S.C. § 9103(a)(2)-(3). In addition, the Offices of Library and Museum Services each must be headed by a Deputy

Director, with mandated professional experience. 20 U.S.C. § 9104. And the National Museum and Library Services Board (the Board), "shall be composed of" specified IMLS officials and twenty members with relevant expertise appointed by the President. 20 U.S.C. § 9105a(a)-(b). The Board "shall advise the Director on general policies with respect to the duties, powers, and authority of the Institute relating to museum, library, and information services." *Id.* § 9105a(d).

The MLSA also imposes on IMLS's Director delineated, mandatory, and non-delegable duties. The Director "shall have primary responsibility for the development and implementation of policy to ensure the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United States." 20 U.S.C. § 9103(c)(1). Among other  specified duties, the Director must: advise government entities and agencies on library, museum, and information services; work with governmental and private entities to both assess Americans' information services needs and develop plans to meet them; and carry out research, data collection, and financial assistance to support our nation's cultural institutions. 20 U.S.C. § 9103(c)(2). The Director shall also coordinate with other statutorily specified agencies to strengthen literacy, enhance health awareness, and support economic and workforce development. *Id.* § 9103(f)-(g). These mandates cannot be delegated to any non-IMLS officer or employee. *Id.* § 9103(d).

Congress mandated that the Director conduct certain research to support the improvement of museum, library, and information services. 20 U.S.C. § 9108(a). In carrying out this research, the Director "shall" collaborate and consult with museums, libraries, and state library agencies. *Id.* § 9108(d)(1). The Director also "shall widely disseminate" its research, *id.* § 9108(f)(1). In each of fiscal years 2024 and 2025, Congress appropriated $5,650,000 towards this research work.

H.R. Rep. No. 118-2882, at 92 (2024) (Explanatory Stmt.); *see* 2024 Appropriations Act, at 461; *see also* 20 U.S.C. § 9108(g)(1) (authorizing appropriations).

IMLS also has mandatory duties to expend funds to assist libraries and museums. Through the Grants to States program, the Director "shall award grants from minimum allotments . . . to each State." 20 U.S.C. § 9131(b)(1). The statute establishes a formula that determines how much money each state gets, *id.* § 9131(b)(2)-(3), and states must spend those funds on delineated functions such as expanding information access, improving coordination between libraries, and providing training to the library workforce. 20 U.S.C. § 9141. The MLSA specifies additional mandatory grant programs, including grants to Indian tribes and Native Hawaiian organizations. 20 U.S.C. § 9161. The statute also mandates "National Leadership Grants" which "shall . . . enhance the quality of library services nationwide and to provide coordination between libraries and museums." 20 U.S.C. § 9162. Those grants "shall be awarded on a competitive basis," and the Director "shall make every effort to ensure" that activities supported by the National Leadership Grants "are administered by appropriate library and museum professionals," "reflect and serve a range of library types and geographically diverse areas," and, "to the extent practicable, actively involve, have direct impact on, or provide future application in, libraries."[1] *Id.* § 9162(c). For fiscal year 2025, Congress appropriated to IMLS $294,800,000 to carry out the mandated functions, to remain available for obligation until September 30, 2025. *See* 2025 Appropriations Act at 10. Congress directed that specific amounts be spent on specific programs, including the "Grants to States," "Native American Library Services," "National Leadership," and "Laura Bush 21st Century Librarian," programs. *See id.* (appropriating funds to federal agencies, including IMLS,

---

[1] The MLSA also authorizes IMLS to carry out other grant programs, including the Laura Bush 21st Century Librarian Program to develop the librarian workforce, 20 U.S.C. § 9165, and various museum grant programs, *id.* §§ 9173, 9175.

"at the level" specified in agencies' FY 2024 appropriations, and "under the authority and conditions" specified in such prior appropriations); 2024 Appropriations Act at 697.

## II.   Factual Background

### A.  IMLS and Its Work

Prior to the events that gave rise to this lawsuit, IMLS operated as an efficient agency. With around 77 employees and the statutorily mandated 23-member Board, the agency conducted annual research for the advancement of museums and libraries; fostered relationships among cultural institutions across the country; administered hundreds of grants and cooperative agreements; coordinated with other federal agencies; and provided technical expertise to libraries and museums. SOMF ¶¶ 14-69. Libraries and museums relied on IMLS for resources such as training; technical assistance in developing advanced computer labs; coordination of their interlibrary loan programs; help in recovering from natural disasters; and comprehensive data to evaluate how they compared with similarly situated entities. SOMF ¶¶ 20-23, 64, 133, 134, 211-213.

IMLS supports libraries and museums through its statutorily mandated research functions in three areas. SOMF ¶ 18. The first research area is IMLS's statistical surveys. IMLS has historically conducted two major statistical surveys: (1) the annual Public Libraries Survey (PLS), which is the only comprehensive national data set about the country's 9,000 plus public libraries, including data regarding their collections, staffing, infrastructure, visits, circulation, revenue, and expenditures, SOMF ¶¶ 19-20; and (2) the biannual State Library Administrative Agency survey, which collects information about how states administer their respective library systems. SOMF ¶ 19, 28. IMLS was also in the process of instituting a statistical survey specific to museums, for which it completed its first data collection in January 2025. SOMF ¶ 28. Second, IMLS conducts

research to evaluate its grantmaking, including to assess recipient organizations' efficacy. SOMF ¶ 18. Third, IMLS conducts policy research related to the library and museum sectors to maximize credible evidence related to issue areas in these sectors, such as improving child literacy. SOMF ¶¶ 32-33. Neither the surveys nor the policy research is connected to grantmaking; in fact, participants in IMLS research are explicitly told that their participation has no effect on IMLS's grantmaking decisions. SOMF ¶¶ 31, 34.

Libraries and museums across the country rely on IMLS grants to meet their communities' needs. SOMF ¶ 44-46, 131-139. IMLS provides this support through its formula-based and competitive grant programs and cooperative agreements. The formula-based Grants to States program is the largest source of federal funding for U.S. libraries. SOMF ¶ 40. And IMLS competitive grants go through a rigorous peer-review process to ensure that recipients will be able to use IMLS's support to productively respond to community and national needs. SOMF ¶¶ 49-63.

**B. Executive Order and Immediate Aftermath**

IMLS's long and successful record of supporting the libraries and museums in this country came to an abrupt halt this spring. On March 14, 2025, Defendant Trump issued an Executive Order declaring that IMLS, along with a slate of other government entities, was "unnecessary." Executive Order § 1. The Order sought to "eliminate [IMLS] to the maximum extent consistent with applicable law," directed IMLS and other listed entities to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law," *id.* § 2(a), and gave IMLS a seven-day deadline to "submit a report to the Director of the Office of Management and Budget confirming full compliance with this order." *Id.* § 2(b). It further ordered the OMB Director to "reject funding requests for such governmental entities to the extent they are inconsistent with this order," *id.* § 2(c).

IMLS staff was left in the lurch, not knowing whether they could proceed with their work or had to halt operations immediately. SOMF ¶¶ 80-97. Still, on March 18, 2025, IMLS notified state officers responsible for the Grants to States programs that, by April 22, 2025, it expected to issue awards to states as usual in amounts similar to the previous year's awards. SOMF ¶ 74.

### C.  Sonderling's Decision to Dismantle IMLS

On March 20, 2025, Defendant Trump installed Defendant Keith Sonderling, also the Deputy Secretary of the Department of Labor, as Acting Director of IMLS. SOMF ¶ 8. Sonderling has no special competence in library or museum services—experience that is mandated by statute. SOMF ¶ 10; 20 U.S.C. § 9103(a)(3). But perhaps that experience was not required for the work Sonderling was appointed to do: deliberately dismantle IMLS.

**Decision to slash staff.** On March 21, 2025, in its initial response to the Executive Order, IMLS stated that at least 35 employees were needed to fulfill its statutory functions. SOMF ¶¶ 75-76. IMLS quickly cut the staff much further. SOMF ¶¶ 81-86. On March 31, 2025, Defendants announced that all but twelve IMLS employees would immediately stop working and be placed on administrative leave. *Id.* Staff email accounts were suspended, and they were not allowed on IMLS premises. SOMF ¶¶ 83, 97. Defendants then announced that all employees on administrative leave would be terminated by May 4. SOMF ¶ 85. In the following days, human resources staff held a virtual meeting instructing all staff on leave about separating from federal employment, and staff received a follow-up email about the end of their employment. SOMF ¶¶ 90-91. During this time, Defendants also eliminated statutorily required positions, firing all members of the Board and placing the Museum Deputy Director on leave. SOMF ¶¶ 89, 93, 181.

The twelve staff members that remained at IMLS were not enough to carry out the agency's statutory duties. SOMF ¶¶ 86-87. In the weeks that followed, IMLS stopped posting future funding

opportunities, engaged in no research, communicated with no libraries, museums, or state agencies, and issued none of its usual awards. SOMF ¶¶ 98, 144-145, 160-166, 185-186, 188.

**Total halt to research.** By placing staff on leave, Sonderling's directives halted all IMLS research, full stop. SOMF ¶ 98. PLS data for Fiscal Year 2023 had been compiled before Sonderling took over the agency. SOMF ¶¶ 99-100. Ordinarily, this data is released in May or June, but the agency halted the publication of the data. SOMF ¶ 100. IMLS also ended all efforts to collect PLS data for Fiscal Year 2024, endangering timely production of next year's survey. SOMF ¶ 101. It similarly stopped all efforts to move forward with the State library survey and let the preliminary results of its first-ever museum survey gather dust. SOMF ¶ 102.

IMLS's other two areas of research—evaluating its grantmaking functions and conducting policy research—were likewise halted entirely. SOMF ¶¶ 98, 188. All existing research projects were shut down, including a groundbreaking two-and-a-half-year study examining the role that libraries can play in improving child literacy outcomes. SOMF ¶ 102. IMLS also cancelled its contracts with the subcontractors who support its data collection and research. SOMF ¶ 103.

**Debilitating cuts to grant programs.** Defendants also authorized en masse cancellation of nearly all IMLS grants by immediately halting reimbursements. SOMF ¶¶ 105-107, 109, 111-119. On March 25, 2025, without consulting, or even informing, IMLS staff, employees from the Department of Government Efficiency (DOGE), acting under Defendant Sonderling's authority, instructed IMLS's payment processor to freeze all grant reimbursements indefinitely, stopping all grant disbursements immediately. SOMF ¶¶ 105-106. On March 31 and April 1, 2025, Sonderling issued two memoranda authorizing mass grant terminations and sent grant termination letters to several grantees, including some States and tribal entities. SOMF ¶¶ 109-116. According to the identical memoranda, the stated purpose of the termination was to align with the agency's new

priorities and comply with the March 20 Executive Order. SOMF ¶¶ 110, 113-114. The termination letters that went to grantees on March 31 and April 1 informing them of the termination, all of which were identical, cited these same two reasons. SOMF ¶¶ 112, 116.

Then, on April 8, 2025, Sonderling authorized the termination of more than 1,000 additional grants. SOMF ¶¶ 117-118. The termination letters to grantees that followed were identical and stated that the grant was "no longer consistent with the agency's priorities and no longer serves the interest of the United States." SOMF ¶ 118. As with the others, these letters cited the President's Executive Order. *Id.* A week later, Sonderling sent a letter directing grantees to submit specified information and notifying them that they may request an IMLS review of the termination decision no later than May 12, 2025. SOMF ¶¶ 120-123. Some of the grantees who received this letter had not previously been notified that their grants were terminated. SOMF ¶ 121. These grantees finally received that notice when Sonderling issued a third memorandum authorizing 300 additional grant terminations on April 28, 2025. SOMF ¶¶ 125-129. The grant termination letters that followed were supposed to have gone out with the earlier batch on April 8, 2025, but had been misprocessed. SOMF ¶ 128. The same day the final 300 termination letters were sent out, Sonderling reinstated 14 grant awards but otherwise kept all grant functions shut down. SOMF ¶ 130. By May 12, hundreds of recipients had requested IMLS review of their termination, but IMLS did not respond to these requests. SOMF ¶¶ 140-142. Nor could IMLS conduct any review given that it was down to a skeleton staff of twelve. SOMF ¶ 141.

**Hollowing out of other IMLS functions.** Sonderling's decision to decimate staff impacted all of IMLS's other functions as well. Staff at libraries across the country are no longer able to access the IMLS library professionals who serve as an informational resource, and IMLS stopped all dissemination activities such as outreach and participation in conferences. SOMF ¶¶ 162-163.

It also stopped engaging in its previous interagency collaborations. SOMF ¶¶ 165-166. Simply put, after the March 31, 2025 actions dismantling IMLS, including placing all staff on administrative leave, nearly all of IMLS's statutorily required functions stopped.

### D. *Rhode Island* Injunction and IMLS's Response to the Injunction

Three days before this lawsuit was filed, state attorneys general from twenty-one states sued to enjoin the dismantling of IMLS and other agencies targeted in President Trump's March 14, 2025, Executive Order. *See Rhode Island v. Trump*, 1:25-cv-128, 2025 WL 1303868, at *5-7 (D.R.I. May 6, 2025), *appeal filed*, No. 25-1477 (1st Cir. May 21, 2025). On May 13, 2025, the U.S. District Court for the District of Rhode Island issued a preliminary injunction enjoining Defendants from dismantling those agencies or implementing Section 2 of the Executive Order. SOMF ¶¶ 169-170. The injunction also directed IMLS and Sonderling to reverse the actions taken to carry out the Executive Order, restore IMLS, and reinstitute grants.[2] SOMF ¶¶ 171-173.

Mandated by the *Rhode Island* court to reverse the actions that they took to dismantle IMLS, Defendants brought back the employees that they had placed on administrative leave, but only some of those employees chose to return. SOMF ¶¶ 176, 179-180. Approximately 35 employees remain at IMLS, SOMF ¶ 180—less than half of the agency's headcount prior to Defendants' actions. While the Deputy Director position on the museums side recently was filled, (immediately before IMLS had to file a status update with the *Rhode Island* court, *see Rhode Island v. Trump*, 1:25-cv-00128, ECF 74 Status Report (D.R.I. Aug. 11, 2025)), SOMF ¶ 181, the Board remains disbanded. SOMF ¶ 187. Sonderling is largely absent from the agency, so nobody is authorizing agency work, leaving agency staff unable to carry out their regular duties.

---

[2] On June 16, 2025, the U.S. Government Accountability Office also found that Defendants' conduct unlawful and violated the Impoundment Control Act by refusing to spend funds that Congress had appropriated for IMLS's grants programs. SOMF ¶¶ 206-210.

SOMF ¶¶ 182-185. To the extent that there have been directives, they have come from either DOGE employees or employees at the Department of Labor. SOMF ¶¶ 80-81, 105-106, 184.

Even though Congress has appropriated nearly $300 million to IMLS in FY 2025, *see* 2025 Appropriations Act, Defendants informed IMLS staff that IMLS would only spend a fraction of the budget and that Defendants had returned the remaining funds to OMB, SOMF ¶ 152. As a result, IMLS has been funding FY 2025 with an arbitrarily decreased budget. *Id.* Then, on August 29, 2025, IMLS staff learned that OMB had notified IMLS that it would be releasing approximately $65 million of appropriated funds that OMB had withheld in an unallocated account. SOMF ¶ 203. As a result of this delayed apportionment, IMLS has less than four weeks to obligate funds before they expire for the year. SOMF ¶ 204. The simplest path forward would be to make grant awards to organizations that have had their applications pending during the past year, but instead, Sonderling wants the grant money to go to America250, or else only to other, cherry-picked applicants. SOMF ¶ 205; Fourth Albright Decl. ¶ 14.

After the injunction, Defendants also reinstated grants to recipients located in States that were among the *Rhode Island* plaintiffs. SOMF ¶ 177. But IMLS informed grantees that the reinstatements were subject to future court decisions. SOMF ¶ 193. Moreover, grantees whose grants were restored after the injunction still face delays in funding. SOMF ¶ 200. Grants and contracts outside of *Rhode Island* plaintiff states overwhelmingly remain cancelled. SOMF ¶ 194.

Additionally, due to IMLS's decision to decrease staff to debilitating levels, IMLS has not been conducting vital aspects of its mandatory grantmaking functions related to both existing and new grants. SOMF ¶ 201. It failed to conduct reviews of grant terminations, and it is not processing grant applications. SOMF ¶¶ 196-197. It also is not issuing new competitive grants, other than a few Grants to States and Native American Basic Grants. SOMF ¶¶ 198-199. And although IMLS

usually begins finalizing Notices of Funding Opportunities (NOFOs) in May to start the grant process for the following year, IMLS has not yet issued any such NOFOs for the FY 2026 cycle. SOMF ¶¶ 160-161. IMLS typically issues grant awards in June, but it has not yet issued FY 2025 grant awards, with limited exceptions. SOMF ¶¶ 144-145.

To the extent that IMLS is processing grants, it is acting unlawfully, using money appropriated by Congress to IMLS for specific programs to instead fund personal projects of the President. IMLS staff has been told to cherry pick a few applications for FY 2025 funding that align with the administration's political agenda, regardless of whether the applications meet the requirements listed in the NOFO or IMLS's merit review criteria. SOMF ¶¶ 150-151. Recently, in a departure from IMLS's grantmaking processes, SOMF ¶¶ 49-60, staff from the Department of Labor have instructed IMLS leadership not to consider applicants that submitted grant applications through the mandated NOFO process at all, but instead to award funds to hand-picked organizations outside of the competitive process. SOMF ¶¶ 150-151. Through this unlawful process, IMLS's new leadership has decided that nearly all of the $14.1 million allocated to the National Leadership Grants for Libraries program is going to a single recipient, the U.S. Semiquincentennial Commission for its America250 project, even though the America250 project has nothing to do with the Leadership Grant's requirement that the grant recipient's work "involve or directly impact libraries." 20 U.S.C. § 9162(c); SOMF ¶¶ 153-155, 158. Indeed, IMLS is bypassing (1) statutory requirements that National Leadership Grants be "awarded on a competitive basis," and for specified purposes, 20 U.S.C. § 9162(a), (b)(2), as well as the internal controls set forth in the NOFO, including required cost sharing, *see* 2 C.F.R. §§ 200.204, 200.205. IMLS has never issued anything close to this size for a National Leadership Grants award. SOMF ¶ 156. Sonderling is on the Semiquincentennial Commission. SOMF ¶ 157.

IMLS's statutorily mandated research functions also remain largely terminated. SOMF ¶ 98; *see* 20 U.S.C. § 9108. The 2023 Public Libraries Survey data, which normally would have been published in May or June, and which was ready in April 2025, was withheld until August 22, 2025. SOMF ¶¶ 99-100. The remainder of IMLS's research is largely defunct: IMLS still has not taken steps to roll out Fiscal Year 2024 statistical surveys, something that would have ordinarily already happened, and its policy research projects remain halted. SOMF ¶¶ 101-103, 188, 190.

IMLS continuation of its efforts to dissolve the agency after the *Rhode Island* injunction is reflected in the fact that IMLS recently asked Congress for a sunset budget for the next fiscal year to shut IMLS down entirely, and end the issuance of any grants in 2026. SOMF ¶ 202. Notwithstanding Defendants' request, however, both the House and Senate Appropriations Committees have proposed continued funding for IMLS in 2026 at the same levels. *See* S. 2587, Dept's of Labor, HHS, and Educ., & Related Agencies Appropriations Act, 2026, 119th Cong. (1st Sess. 2025) at 184, https://perma.cc/BLN5-STYX (appropriating $291,800,000 to IMLS); H.R. ___, Fiscal Year 2026 Labor, HHS, Educ., and Related Agencies Bill, 119th Cong. (1st Sess. 2025) at 163, https://perma.cc/TMU5-4MJT (same).

### E.  Harms to Libraries, Museums, and Communities

Libraries and communities are suffering devastating consequences as a result of Defendants' actions. Plaintiffs' members have suffered those harms acutely: Plaintiff the American Library Association (ALA)'s more-than-47,000 members include libraries, librarians, library patrons, and organizations in all 50 states, the District of Columbia, and in other U.S. territories, each of whom rely on the library ecosystem that a functional IMLS facilitates. SOMF ¶¶ 2-3. And Plaintiff the American Federation of State, County and Municipal Employees (AFSCME)'s members include more than 50,000 cultural workers at museums, libraries, zoos, and other

institutions that depend on IMLS, and many of these workers' jobs were terminated or negatively affected as a result of Defendants' actions. SOMF ¶¶ 6, 214-215.

Without access to IMLS's research and other services, Plaintiffs and their members have lost invaluable support. Without access to IMLS professionals, library and museum staff, especially those in low-income, rural, and Native communities, lose an important resource they rely on to help improve their services, build capacity like improving broadband access, and prepare for emergencies. SOMF ¶¶ 162, 201, 213. Without timely PLS data, it has been harder for libraries and policymakers to undertake data-informed planning, programming, or peer comparisons. SOMF ¶¶ 20-22, 25, 228-231. In Plaintiff AFSCME's case, this missing data deprives the union from factually supporting their collective bargaining, which AFSCME has a statutory duty to undertake once certified as the exclusive representative of a bargaining unit; without data to identify comparable institutions, the union is at a disadvantage when negotiating members' salary and benefits with employers. SOMF ¶¶ 23-24, 211-212. Plaintiff ALA relies on PLS as its primary source of data for its Benchmark service, a critical data analysis resource for libraries. SOMF ¶¶ 26, 212. Plaintiff ALA also relies on IMLS research and data to inform initiatives like child literacy programs. SOMF ¶ 232. Without that data, for example, ALA is unable to offer evidence-based support to libraries and communities to foster literacy programs for children. *Id.*

Without access to grant funding, ALA-member libraries and museums have had to abruptly lay off staff, including AFSCME members, and cancel programs. SOMF ¶¶ 214-226. The impacts are nationwide and far-reaching. States have been forced to substantially cut interlibrary loan programs, so patrons, especially those in rural areas, have access to fewer reading materials. SOMF ¶¶ 42, 133, 134, 220, 221. The loss of IMLS funding has forced libraries to reduce programs like audiobooks for visually impaired individuals, summer reading programs, afterschool career-

readiness programs, projects to preserve Native American history, and more. SOMF ¶¶ 133-134, 139, 223. Museums and historical institutions have halted time-sensitive efforts to preserve their delicate collections, delay rehousing catalogs to improve access and process new additions, and stop urgent repairs to a national historic landmark. SOMF ¶¶ 138, 217-219, 223. Some institutions will be forced to altogether close their doors; one library already has done so. SOMF ¶ 135.

### III.    Procedural Background

Plaintiffs filed this suit on April 7, 2025, (ECF 1), and moved for a preliminary injunction (ECF 13), which was later converted into a request for a temporary restraining order. Following a hearing, the Court issued a narrow TRO to preserve the status quo as of May 1, 2025 (ECF 36). The TRO expired on May 29, and on June 6, this Court denied Plaintiffs' request for a preliminary injunction (ECF 48), finding that the contours of the Tucker Act are "currently shifting," and that the Supreme Court's decision in *Department of Education v. California*, 145 S. Ct. 966 (2025), and a vacated stay order by the D.C. Circuit in *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) (*Widakuswara I*) "raise serious doubts about whether this case properly belongs in the Court of Federal Claims." (ECF 48 at 9, 14-15).

### STANDARD OF REVIEW

A party is entitled to summary judgment if there is no genuine issue of material fact and the party is entitled to judgment as a matter of law. *Vasquez v. District of Columbia*, 110 F.4th 282, 287 (D.C. Cir. 2024).

### ARGUMENT

Defendants' decision to dismantle IMLS and the actions taken to implement it are unlawful. To start, Plaintiffs have standing because they are directly impacted by Defendants' actions, and their members are also directly affected. This Court has jurisdiction. Plaintiffs challenge the

dismantling of an agency and seek vacatur of that agency action, so the Tucker Act, which applies only to contract actions, does not channel this case to the Court of Federal Claims (CFC). Similarly, the Civil Service Reform Act does not apply to Plaintiffs' claims, as Plaintiffs are not federal employees challenging personnel actions taken against them. Separately, this Court has jurisdiction over Plaintiffs' constitutional and ultra vires claims, for which sovereign immunity never attached.

Plaintiffs also properly assert causes of action under the Administrative Procedure Act (APA) and the Constitution, and based on Defendants' ultra vires actions. Plaintiffs challenge multiple discrete and final agency actions, and the APA provides a cause of action for each of Plaintiffs' challenges. Alternatively, Plaintiffs have an independent constitutional cause of action for their separation-of-powers claim, and ultra vires review is available for all of Plaintiffs' claims because Defendants unlawfully ignored specific statutory directives and proscriptions.

Defendants' actions are both substantively and procedurally unlawful. Substantively, Defendants' actions violate the Constitution, the MLSA, and the relevant Appropriations Acts. Congress assigned to IMLS certain responsibilities and appropriated funds for the agency, so the agency cannot unilaterally refuse to carry out those functions or expend those funds. Procedurally, Defendants failed to offer reasoned explanations or consider important aspects of the problem in violation of the APA. This Court should vacate Defendants' unlawful actions.

## I.    **This Court Has Jurisdiction Over Plaintiffs' Claims.**

### A.    **Plaintiffs have both associational and organizational standing.**

**1.** Each Plaintiff has associational standing because "(1) at least one of its members would have standing to sue in [the member's] own right; (2) the interest [the association] seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the

member to participate in the lawsuit." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 592 (D.C. Cir. 2022) (*AHAS*).

ALA's and AFSCME's members plainly have "standing to sue in [their] own right." *AHAS*, 41 F.4th at 592 (quotation omitted). "[S]pecific facts" show "that one or more of [their] members would be directly affected," *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009), for instance by losing access to IMLS services, research, and funding. SOMF ¶¶ 131-143, 162-166, 211-232. The interests ALA and AFSCME seek to protect in this case are "germane to [their] purpose," *AHAS*, 41 F.4th at 592. ALA seeks to "promote library services and librarianship," SOMF ¶ 1, an interest adversely affected by the dissolution of IMLS's support of libraries. *See ALA v. United States*, 201 F. Supp. 2d 401, 414 (E.D. Pa. 2002) (public library "interests that these organizations seek to protect … are central to their *raison d'être*"), *rev'd on other grounds*, 539 U.S. 194 (2003). AFSCME is a national labor organization that represents library and museum workers, SOMF ¶ 6, and its members' work is "plainly germane to AFSCME's purpose as a labor union advocating on its members' behalf." *Harris Cnty., Texas v. Kennedy*, No. 25-cv-1275, 2025 WL 1707665, at *3 (D.D.C. June 17, 2025). Because Plaintiffs seek vacatur and injunctive relief, no individual member or employee must participate in this suit. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996); *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015).

**2.** Each Plaintiff also has organizational standing because Defendants' actions "perceptibly impair[]" their ability to provide services, thereby "interfer[ing] with [their] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (quotation omitted).

The termination of ALA's grants is cognizable, as is the loss of contracts and subgrants that will result from cuts of grants to others. SOMF ¶¶ 4, 5. ALA's inability to continue vital services

17

it provides to its members is undisputed. SOMF ¶ 216. ALA is separately harmed by the loss of PLS data that it utilizes for its library data and metrics analysis service called "Benchmark"; this subscription-based service generates significant revenue for ALA. When the PLS data publication was disrupted, ALA's Benchmark service also was disrupted. SOMF ¶¶ 26, 212; *see Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619 (D.C. Cir. 2020).

AFSCME is also harmed. As a result of Defendants' actions, AFSCME members have lost their jobs or seen worsened working conditions, and AFSCME both lost dues and now must focus on providing material support to its impacted members, including engaging in bargaining with employers for impacted members, which it is required to do per its statutory duty. SOMF ¶¶ 215, 220, 222, 226; *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). That work drains resources from AFSCME's responsibilities to other members. SOMF ¶ 215. AFSCME relies on PLS data to craft and respond to proposals in collective bargaining, so losing it harms the union's ability to negotiate contracts. SOMF ¶¶ 23, 204, 221. These harms weaken AFSCME's bargaining power and constitute an injury in fact. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977).

## B. The Tucker Act does not divest this Court of jurisdiction.

This Court has jurisdiction over Plaintiffs' constitutional and statutory claims. *See* Compl. ¶¶ 74-118. The APA generally waives immunity for challenges to agency action, providing that judicial review is unavailable where a claim is "expressly or impliedly forbid[den]" by another statute, 5 U.S.C. § 702. The Tucker Act provides that the CFC "shall have jurisdiction" over contract claims, 28 U.S.C. § 1491(a). Reading these provisions together, the D.C. Circuit has "interpreted the Tucker Act to . . . 'impliedly forbid[]' contract claims . . . from being brought in district court under the waiver in the APA." *Crowley Gov't Servs. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (citations omitted). The Tucker Act, however, divests a federal district court of

jurisdiction only when a claim is "at its essence a contract claim." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). Whether claims are contract claims requires examination of "'the source of the rights upon which the plaintiff bases its claims' and 'the type of relief sought.'" *Crowley*, 38 F.4th at 1106; *Megapulse*, 672 F.2d at 969. And although Plaintiffs may not challenge individual grant terminations in federal court, they may challenge other agency actions, even when those actions directly impact grants. *NIH v. Am. Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669, at *2 (Aug. 21, 2025) (Barrett, J., concurring). Here, Plaintiffs' claims are not contract claims, so jurisdiction properly belongs in this court.

**1.** To start, the source of rights upon which Plaintiffs base their claims is not contractual. Instead, they are "the statutes [and constitutional provisions] identified in [their] complaint," *Crowley*, 38 F.4th at 1108, namely the separation of powers, the Take Care Clause, numerous substantive and appropriations statutes, as well as the APA. Compl. ¶¶ 74-107. "It would be nothing less than remarkable to conclude that Congress intended judicial review of these complex questions of [constitutional and federal statutory law] to be reviewed in a specialized forum such as the Court of Claims." *Bowen v. Massachusetts*, 487 U.S. 879, 908 (1988).

Plaintiffs' claims stem from Defendants' decisions and actions to shut down the agency. True, the agency administers federal grant programs, but Plaintiffs are not seeking to vindicate any rights relating to individual grants. Moreover, IMLS's other statutorily mandated responsibilities— like research and interagency consultations and collaboration—have nothing to do with grants at all. *See supra* at 6. And IMLS must compose itself in certain ways, including by having a Board with statutorily mandated roles for its members. 20 U.S.C. § 9105a. Plaintiffs' challenge to the dismantling of IMLS applies equally to placing all staff on indefinite leave, ending all research, and ceasing all of IMLS's other functions—all of which harm Plaintiffs. *See supra* at 13-15.

19

Nothing in these claims "turn[s] on contractual language." *Am. Bar Ass'n v. DOJ*, No. 25-cv-1263, 2025 WL 1388891, at *5 (D.D.C. May 14, 2025), and review of contractual language is not required to assess the claims. *See Harris Cnty.*, 2025 WL 1707665, at *5 ("Had the funds been earmarked to fund, say, public awareness campaigns by HHS itself rather than grants to state and local governments, the separation-of-powers analysis would be the same."); *see also* Compl. ¶¶ 74-103.[3] Plaintiff AFSCME (like many of Plaintiff ALA's members) does not have grants with IMLS at all. It has no contractual rights to invoke. *See Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government[.]" (quoting *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990))).

The D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so 'would deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley*, 38 F.4th at 1107 (quoting *Megapulse*, 672 F.2d at 967-68). The Supreme Court recently agreed. *Am. Pub. Health Ass'n*, 2025 WL 2415669, at *2 (Barrett, J., concurring) ("That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear."). Otherwise, the government could transform any constitutional or statutory claim into a contract claim "simply by

---

[3] It does not matter that some of Plaintiffs' injuries result from the grant terminations—indeed, many do not, including injuries relating to the loss of IMLS research and technical support. SOMF ¶¶ 23-26, 162-163, 165-166, 211-213, 228-232. "While that fact may go to plaintiffs' injury for standing purposes, it does not define the source or nature of their constitutional claim." *Harris County*, 2025 WL 1707665, at *5. "[A]n important difference exists between (i) a plaintiff's statutory [or constitutional] cause of action . . . and (ii) a plaintiff's suffering concrete harm[.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021).

contracting not to engage" in constitutional or statutory violations. *Megapulse*, 672 F.2d at 971. Here, because Plaintiffs' claims "depend[] on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual." *Widakuswara I*, 2025 WL 1288817, at *12 (Pillard, J., dissenting); *see Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.D.C. May 28, 2025) (*Widakuswara* II) (adopting Judge Pillard's reasoning).

**2.** Next, Plaintiffs do not seek "money damages." *Bowen*, 487 U.S. at 893. Instead, Plaintiffs seek declaratory relief and vacatur of the unlawful agency action, Compl. at 28, and injunctive relief directing Defendants to cease their operations to shut down IMLS, including by not conducting the agency's statutorily mandated functions. Compl. at 29.

"[U]ndo[ing]" agency action is not the same as "money damages." *Bowen*, 487 U.S. at 910. Instead, the equitable remedy of "[v]acatur is the normal remedy" under the APA. *N.J. Conservation Found. v. FERC*, 111 F. 4th 42, 63 (D.C. Cir. 2024) (quoting *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020)). Similarly, declaratory and injunctive relief are "certainly not . . . money damages." *Bowen*, 487 U.S. at 893. In any event, Plaintiffs' request that the Court vacate the decision to shut down IMLS is not the same as requesting vacatur of grant terminations. *See Am. Pub. Health Ass'n*, 2025 WL 2415669, at *1; *id.* at *2 (Barrett, J., concurring). Rather, the requested vacatur would restore IMLS operations and capacity to the pre-shut-down status quo, meaning that IMLS could perform *all* of its functions, including research, oversight, institutional support, cooperative agreements, and interagency cooperation.

True, the relief that Plaintiffs seek may result in payments "going forward" to grant recipients (although not necessarily to Plaintiffs themselves). But "[t]he fact that a judicial remedy

may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. The relief Plaintiffs seek is not compensation for backwards-looking losses suffered due to breach, so these funds would not be "money damages." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002); *Md. Dep't of Hum. Res. v. HHS*, 763 F. 2d 1441, 1446 (D.D.C. 1985). Plaintiffs request for this forward-looking relief, including the ability to compete for new grants, is different from requesting reinstatement of terminated grants. *See Am. Pub. Health Ass'n*, 2025 WL 2415669, at \*5 n.2 (Gorsuch, J., concurring). Plaintiffs' suit at most involves a request for the return of "strings-attached" disbursements, subject to the terms and conditions of the relevant grant agreements, as opposed to a "free and clear transfer of money." *Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1318-19 (Fed. Cir. 2017). This is thus a suit for equitable relief, not a lump sum of money damages. *Id.*; *see Widakuswara I*, 2025 WL 1288817, at \*13 (Pillard, J., dissenting).

**3.** The D.C. Circuit has "categorically reject[ed] the suggestion" that the Tucker Act can deprive this Court of jurisdiction where the CFC itself does not have jurisdiction.[4] *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.D.C. 2006). Here, the CFC lacks jurisdiction over Plaintiffs' claims. The CFC's jurisdiction over claims arising under the Constitution or a statute is limited, applying only for those constitutional and statutory claims that seek money damages under money-mandating provisions, such as the Takings Clause. *United States v. Mitchell*, 463 U.S. 206, 216 (1983). "[T]he doctrine of separation of powers" does not confer jurisdiction because it "do[es] not mandate payment of money by the government." *LeBlanc v. United States*, 50 F.3d 1025, 1028

---

[4] That makes sense: The APA authorizes review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and foreclosing judicial review entirely is inconsistent with the "strong presumption favoring judicial review," *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015).

(Fed. Cir. 1995); *see Telemaque v. United States*, 82 Fed. Cl. 624, 626 (2008). Plaintiffs' statutory claims are not "money-mandating," *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 322-23 (2020), because the underlying statutes do not "entitle" any specific entity to an award, *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006), and "[t]he APA is not a money-mandating statute," *Harlem Globetrotters Int'l, Inc. v. United States*, 168 Fed. Cl. 31, 42 (2023). Moreover, the CFC lacks jurisdiction over Plaintiffs AFSCME and its members, who have no contracts with the government. The same is true for many of ALA's members, who include librarians, patrons, and other individuals and institutions who do not receive IMLS grants. Because Plaintiffs "could not bring this type of . . . action in Claims Court in the first place, that Court would not have exclusive jurisdiction of them." *Crowley*, 38 F.4th at 1109.

Additionally, the CFC is "not empower[ed]" to order the equitable relief that Plaintiffs seek. *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 202 (Fed. Cir. 1997). The Supreme Court "ha[s] stated categorically that 'the Court of Claims has no power to grant equitable relief.'" *Bowen*, 487 U.S. at 905 (quoting *Richardson v. Morris*, 409 U.S. 464, 465 (1973) (per curiam)); *see Crowley* 38 F.4th at 1112-13; *Widakuswara I*, 2025 WL 1288817, at *13 (Pillard, J., dissenting).

**4.** The Supreme Court's recent decision in *American Public Health Association*, 2025 WL 2415669, reinforces the conclusion that this court has jurisdiction. There, plaintiffs challenged a range of actions taken by the National Institutes of Health, including guidance documents about grant award criteria and the grant terminations themselves, all of which were vacated by the district court as arbitrary and capricious pursuant to the APA.[5] *Id.*; *see Am. Pub. Health Ass'n v. NIH*, No. 1:25-cv-10787, 2025 WL 1747128, at *1-2 (D. Mass. June 23, 2025).

---

[5] The Court in *American Public Health* did not address constitutional claims regarding grant terminations, nor did it address claims brought by those injured as the result of grant terminations but who did not receive the grant funds themselves.

Justice Barrett's controlling concurrence set forth a clear distinction: The plaintiffs' challenge to individual grant terminations likely belonged in the CFC, but their challenge to the guidance documents belonged in federal district court. *Am. Pub. Health Ass'n*, 2025 WL 2415669, at *1; *see id.* at *2 (Barrett, J., concurring). "That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." *Id.* at *2 (Barrett, J., concurring) (quoting 28 U.S.C. § 1491(a)(1)). Other recent emergency decisions by the Supreme Court draw the same distinction. *Compare Dep't of Educ.*, 145 S. Ct. at 968 (staying injunction that "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue[d]"), *with Dep't of State v. AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753, 753 (2025) (declining to stay restraining order that "enjoin[ed] the Government from enforcing directives pausing disbursements of foreign development assistance funds").

Thus, while an APA challenge to individual grant terminations likely belongs in the CFC, this Court has jurisdiction to grant the relief Plaintiffs seek here: vacatur of the policies and directives that impact IMLS's operations, including the agency's ability to issue future grants, even though those policies and directives relate to grants and grant administration. As discussed, Plaintiffs do not challenge individual grant terminations at this juncture. Like the challenges to guidance documents in *American Public Health Association* and the challenges to broad directives at issue in *AIDS Vaccine Advocacy Coalition*, Plaintiffs claims here fit squarely within the category that the Supreme Court recognized belong in federal district court. Moreover, because neither

*American Public Health Association* nor *California* involved constitutional or ultra vires claims, those cases have no bearing on the constitutional and ultra vires claims Plaintiffs raise here.[6]

### C. The Court has jurisdiction over the Plaintiffs' constitutional and ultra vires claims for which sovereign immunity never attached.

Plaintiffs' constitutional and ultra vires claims do not rely on the APA's waiver of sovereign immunity, so the Tucker Act cannot deprive this Court of jurisdiction.

Although the United States normally "may not be sued without its consent," courts have long recognized an exception for suits "against officers of the sovereign allegedly acting beyond statutory authority or unconstitutionally." *Pollack v. Hogan*, 703 F.3d 117, 119 (D.C. Cir. 2012) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)). Such acts are "beyond the officer's powers" and thus "not the conduct of the sovereign." *Id.* Accordingly, "there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996). This longstanding '*Larson*' exception applies to Plaintiffs' constitutional and ultra vires claims. *Local 2677, Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60, 68 (D.D.C. 1973); *ABA*, 2025 WL 1388891, at *4. Because sovereign immunity never attached to these claims, no waiver of sovereign immunity is necessary as to them.

### D. The Civil Service Reform Act does not divest this Court of jurisdiction.

Nor are Plaintiffs' claims "of the type" that Congress intended to be channeled under the CSRA. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994). The CSRA does not deprive this Court of jurisdiction unless two conditions are met. First, "'the 'statutory scheme'" must

---

[6] At any rate, none of these emergency decisions displaced any of the Supreme Court's prior precedents. *California* and Justice Barrett's controlling concurrence in *American Public Health Association* both favorably cited *Bowen. See California*, 145 S. Ct. at 968; *Am. Pub. Health Ass'n*, 2025 WL 2415669, at *2 (Barrett, J., concurring). And, given the emergency posture in which they were decided, these "interim orders are not conclusive as to the merits." *Trump v. Boyle*, No. 25A11, 2025 WL 2056889 (July 23, 2025); *see Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring).

"display[] a 'fairly discernible' intent to limit jurisdiction," and, second, "the claims at issue" must be "of the type Congress intended to be reviewed within th[e] statutory structure." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 207, 212). Congress presumptively "does not intend to limit jurisdiction [1] if 'a finding of preclusion could foreclose all meaningful judicial review'; [2] if the suit is 'wholly collateral to a statute's review provisions'; and [3] if the claims are 'outside the agency's expertise.'" *Id.* (quoting *Thunder Basin*, 510 U.S. at 212-13).

The CSRA does not reach the claims brought by Plaintiffs in this case. The CSRA "established a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Crucially, the scheme is about *employees'* claims and remedies. *See id.* Plaintiffs are not IMLS employees and their claims are not, at their root, challenges to personnel actions. The mere fact that "the termination of federal employee remains embedded within [a] dispute . . . is not enough to bring a claim within the scope of" the CSRA's channeling scheme. *Am Fed'n of Gov't Emps. v. OPM*, No. 25-cv-1780, 2025 WL 660053, at *7 (N.D. Cal. Feb. 28, 2025); *see Widakuswara* I, 2025 WL 1288817, at *8 (Pillard, J., dissenting); *Rural Dev. Innovations Ltd. v. Marocco*, No. 25-cv-1631, 2025 WL 1807818, at *4 (D.D.C. July 1, 2025).

Channeling "could foreclose all meaningful judicial review," *Thunder Basin*, 510 U.S. at 212-13, a result that Congress "rarely allows," *Axon Enter. v. FTC*, 598 U.S. 175, 186 (2023). Plaintiffs—who are neither IMLS employees nor suing on their behalf—cannot access CSRA procedures. *See NTEU v. Vought*, No. 25-5091, 2025 WL 2371608, at *6 (D.C. Cir. Aug. 15, 2025) (noting that non-employee plaintiffs did "not seek [review] for employment-related injuries"). "[I]t would be surprising" for Congress to have limited courts' jurisdiction where, as here, a challenge

concerns "the structure or very existence of an agency" and "charge[s] that an agency is wielding authority unconstitutionally in all or a broad swath of its work." *Axon*, 598 U.S. at 189. That is especially true here where Plaintiffs have nowhere else to go to raise these claims. *See supra* at 22-23.

Moreover, Plaintiffs' suit is "wholly collateral" to the CSRA's review provisions. *Thunder Basin*, 510 U.S. at 212 (quoting *Heckler v. Ringer*, 466 U.S. 602, 618 (1984)). The CSRA concerns employee grievances, but Plaintiffs claim that the agency is abdicating its statutory functions. And, Plaintiffs' claims are "outside the agenc[ies'] expertise." *Thunder Basin*, 510 U.S. at 212, Plaintiffs' claims "raise 'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy.'" *Axon*, 598 U.S. at 194 (quoting *Thunder Basin*, 561 U.S. at 491). The Merit Services Protection Board and the Federal Labor Relations Authority "know[] a good deal about" labor and employment policy, "but nothing special about the separation of powers." *Axon*, 598 U.S. at 194.

## II.    **Plaintiffs' Claims are Reviewable.**

### A.  **Plaintiffs' APA claims are reviewable because Plaintiffs challenge discrete, final agency action.**

Plaintiffs challenge multiple discrete and final agency actions: the March 31, 2025, email placing all IMLS staff on administrative leave, prohibiting them from returning from the building, and cutting off their email access; the mass firing of all Board members; the directive to IMLS's grant reimbursement payment processor to freeze all grant reimbursements indefinitely; Sonderling's action memoranda directing the mass termination of grants; the award of nearly all of the National Leadership Grants award to the America250 project; and the single decision to fully dismantle the agency.

**1.** To start, each challenged action is discrete and not a "generic challenge" to a programmatic wash of unidentifiable policies guiding "the continuing (and thus constantly changing) operations" of the agency like those in *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990). Plaintiffs identify "a completed universe of particular [agency] orders and regulations" that violate the APA. *Id*. Although some of these actions, including the directives targeting staff, grants, and payments "appl[y] . . . across the board," they are nevertheless specific actions that "can of course be challenged under the APA." *Id.* at 890 n.2. Further, each of the challenged actions meet the definition of "order": "the whole or a part of a final disposition . . . of an agency in a matter other than a rulemaking." 5 U.S.C. § 551(6). All orders necessarily "involve circumscribed, discrete agency actions, as [the term's] definition[] make[s] clear." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). The discreteness element is therefore satisfied.

This case is unlike *NTEU*, where the D.C. Circuit found that "an asserted decision, inferred from various [specific actions], to shut down the [CFPB]" did not itself qualify as agency action and "[t]he plaintiffs point[ed] to no . . . statement, formal or informal, written or oral" directing the shutdown, *Id.* at *10-12. Here, Plaintiffs have pointed to multiple orders, discussed above.

**2.** Each of these actions is also final because each "mark[ed] the 'consummation' of the agency's decisionmaking process" and "legal consequences will flow from [them]." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). After Defendant Trump called for the "eliminat[ion]" of the "unnecessary" agency, EO §§ 1, 2(a), Agency Defendants decided to eliminate all purportedly non-statutorily required functions. The resulting directive to place all staff on administrative leave mandated that all staff stop all agency activities, and the action clearly was final—staff were unable to work and subsequently terminated from employment, told to leave their keys and government IDs before departing the premises, and cut off from email and telephone

access. SOMF ¶ 81; Thomas Decl. ¶ 2. Because Defendants "bound agency staff by forbidding them to continue the program[s] in any way from that moment on," their decisions constituted "final agency action." *Biden v. Texas*, 597 U.S. 785, 808-09 (2022). The same is true of the final firing of all Board members. Similarly, the directive from DOGE to the IMLS's grant reimbursement payment processor to freeze all payments and Sonderling's follow-on memoranda on the termination of grants were final, discrete orders—they marked the consummation of Defendants' decisionmaking process relating to the reimbursements of grants. *See, e.g., Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 124 (D.D.C. Feb. 25, 2025) (pause on funding constituted final agency action).

Defendants' actions were not "informal, or only the ruling of a subordinate official, or tentative." *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967). Instead, the directives at issue came from Sonderling, the agency head, or his designees, SOMF ¶¶ 111, 113, 115, 117-120, 125, 150-153, and there is no "reason to question [Sonderling's] authority to speak for" the agency. *Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 636 (2019) (citation omitted). Nor were these directives "nonbinding statement[s] of something the agency intends to do in the future." *NTEU*, 2025 WL 2371608, at *17. Agency Defendants demonstrated the finality with which they treated the decisions through their agency-wide response, effectuated through mass layoffs, mass grant terminations, and wholesale cessation of agency services. *See* SOMF ¶¶ 82, 85, 87, 89, 98-101, 103, 105, 117, 119, 127, 185-188, 202; *see also Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) ("The way in which the agency subsequently treat[ed] the challenged action" likewise evinces finality.).

The decisions "ha[d] a direct and immediate . . . effect on the day-to-day business of the parties challenging the action." *Ciba-Geigy Corp. v. Alza Corp.*, 801 F.2d 430, 436 (Fed. Cir. 1986)

(citations and quotation marks omitted). ALA-member libraries that rely on IMLS expertise were immediately without IMLS guidance and information resources, SOMF ¶ 213; ALA and AFSCME were without statutorily required data that support various aspects of their work, SOMF ¶¶ 98-104, 211-212, 228-232; grantees, including ALA members and those who employed AFSCME members, lost funding, have received no response to requests for review, and are unable to apply for future opportunities, SOMF ¶¶ 131-145, 151, 160-161, 186, 220, 222, 226; and, as a result, libraries and librarians have been forced to shutter crucial programming and services, SOMF ¶¶ 216-226. This case therefore does not present the same finality concerns at issue in *NTEU*, 2025 WL 2371608. There, the challenged decision did not "by itself effect[] the termination of any employees or the cancellation of any contracts." *NTEU*, 2025 WL 2341608, at *13. That's not the case here, where the challenged actions directly authorized employee terminations, grant cancellations, and more. Defendants definitively conveyed the agencies' positions and thus forfeited "the benefit of postponed judicial review." *Ciba-Geigy Corp.*, 801 F.2d at 436.

### B. Plaintiffs' causes of action are reviewable notwithstanding *Global Health Council v. Trump*.

A recent decision from the D.C. Circuit, *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 13, 2025), *as amended* Aug. 28, 2025, does not undercut Plaintiffs' APA, constitutional, or ultra vires causes of action. In its amended opinion, the D.C. Circuit offered three narrow holdings. First, *Global Health* denied the availability of constitutional claims "because the alleged constitutional violation is predicated on the underlying alleged statutory violation" of violating the Impoundment Control Act (ICA). *Id.* at *7 n.11. Second, *Global Health* held that Plaintiffs lacked an APA cause of action to argue that Defendants violated the ICA because of the ICA's complex notification scheme by which the President informs Congress when he wants to defer or impound funds, and Congress has an opportunity to act. *Id.* at *9-11. Third,

*Global Health* found that Plaintiffs' ultra vires claims were barred because the plaintiffs failed to point to any specific prohibition that the defendants had violated to the requisite degree. *Id.* at *12. None of these three holdings impacts Plaintiffs' claims in this case.

**1.** *Global Health's* APA holding is limited to the ICA. *Global Health* expressly declined to weigh in on whether plaintiffs can enforce appropriations acts and other substantive statutes under the APA, *id.* at *11 n.17, and allowed the APA claims based on those statutes to proceed in district court. *Id*. at *11 n.17; *see Glob. Health Council v. Trump*, Nos. 25-5097, 25-5098, 2025 U.S. App. LEXIS 22294, at *18 (D.C. Cir. Aug. 28, 2025) (en banc) (*Glob. Health II*) (statement of Garcia, J.). On remand, the district court recognized that the APA confers—and the ICA does not displace—a cause of action premised on the mandates of appropriations acts. *AIDS Vaccine Advoc. Coal. v. Trump*, No. 25-cv-400, 2025 WL 2537200, at *23-34 (D.D.C. Sept. 3, 2025). Thus, *Global Health* did not disturb the longstanding rule that plaintiffs challenging agency action can bring other contrary-to-statute claims under the APA. *See* 5 U.S.C. § 706(2)(A)-(C). Plaintiffs here rely on the MLSA and Appropriations Statutes, which are entirely unrelated to the unique and limited exception established for the ICA.

**2.** Plaintiffs' ultra vires claims also are reviewable (if the Court finds that Plaintiffs' other claims are unavailable). "Review for ultra vires acts rests on the longstanding principle that if an agency action is 'unauthorized by the statute under which [the agency] assumes to act,' the agency has 'violate[d] the law' and 'the courts generally have jurisdiction to grant relief.'" *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)). Ultra vires review is available when an agency has acted entirely "in excess of its delegated powers and contrary to a specific prohibition" in a statute. *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025) (quotation omitted).

The obligations imposed on IMLS by the MLSA are "specific." *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776. The Board "shall" be composed of certain members, and the agency "shall" conduct research, award certain grants, collaborate and consult with other agencies, and more. 20 U.S.C. §§ 9103(f)-(g), 9105a, 9108, 9141, 9161, 9162. This case is unlike *Glob. Health*, 2025 WL 2480618, at *12, where the plaintiffs' only claim stemmed from the ICA and they did not point to any "specific prohibition." If no other avenues for relief are available to Plaintiffs, the court should adjudicate Plaintiffs' ultra vires claims; otherwise, Plaintiffs would have no "alternative path to judicial review." *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665, 682 (2025). The court in *Global Health* sought to avoid such a result. *See Glob. Health*, 2025 WL 2480618, at *11 n.17; *Glob. Health II*, 2025 U.S. App. LEXIS 22294, at *18 (statement of Garcia, J.).

**3.** *Global Health* also does not preclude Plaintiffs' constitutional cause of action. There, the plaintiffs' constitutional cause of action arose from their claims that the Executive Branch violated the ICA and the Anti-Deficiency Act by ordering a funding freeze. *Glob. Health*, 2025 WL 2480618, at *3, *6-9. Crucially, the panel distinguished the holding from *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), which permits freestanding constitutional claim where the only basis of asserted executive authority is constitutional. *Glob. Health*, 2025 WL 2480618, at *7. According to the majority opinion, the *Global Health* defendants claimed statutory, not constitutional, authority for their actions. *Id.*; *see also Glob. Health II*, 2025 U.S. App. LEXIS 22294, at *11 (opinion of Katsas, J.) (noting that if the Government had asserted a freestanding Article II power, the court "could freely have considered it under *Youngstown*"). *Global Health* did not displace the idea that freestanding constitutional causes of action exist generally, it simply held that the specifics of that case precluded a constitutional cause of action there.

Here, Defendants have not asserted any statutory defense to Plaintiffs' claim that they have unlawfully usurped Congress's authority by dismantling IMLS. And Plaintiffs bring a different type of constitutional claim than was brought in *Global Health*: They allege that Defendants seized Congress's authority by dismantling the agency, whereas the only constitutional claim in *Global Health* centered on the failure to expend appropriated funds. Thus, this particular constitutional claim is more akin to *Youngstown* than to *Global Health*, leaving Plaintiffs with a freestanding constitutional cause of action.

III. **Defendants' Decision to Dismantle IMLS Is Unlawful.**

    **A. Defendants' actions are not in accordance with law and in excess of statutory authority.**

  **1.** Dismantling IMLS is "not in accordance with" the MLSA, appropriation acts, Paperwork Reduction Act, and the Constitution. 5 U.S.C. § 706(2)(A).

**MLSA.** As this Court has observed, "[t]he wholesale termination of grants and services and the mass layoffs appear to violate the clear statutory mandates outlined in the MLSA." TRO Order (ECF 36) at 3. Congress created an independent agency to support the successful development of American libraries and museums. Arts, Humanities, and Cultural Affairs Act, Pub. L. No. 94-462, Title II, § 203(a), 90 Stat. 1971, 1975 (1976). Since then, Congress has continued to strengthen and update the statutory framework for IMLS, consistently recognizing the importance of access to information in the twenty-first century. Casting Congress's mandates aside, Defendants have made every effort to shut IMLS down.

Indeed, Defendants have violated almost every one of their statutory obligations. The MLSA requires that IMLS be constituted in specific ways. IMLS's Board "shall be composed of" twenty-three statutorily specified members, 20 U.S.C. § 9105a(b), but Defendants fired the entire Board and have refused to reconstitute it, SOMF ¶¶ 89, 182. IMLS's Office of Museum Service

"shall be headed by a Deputy Director," 20 U.S.C. § 9104, but that position was left empty until IMLS had to file a status report in *Rhode Island*. SOMF ¶¶ 92-93, 181. And IMLS's Director is prohibited from delegating any of his functions to individuals who are not IMLS officers or employees, 20 U.S.C. § 9103(d), but Sonderling has put DOGE and Department of Labor employees in charge of handing down IMLS directives, SOMF ¶¶ 78-79, 103-104, 126, 178-179.

The MLSA also tasks the agency with statutorily mandated activities that Defendants have failed to conduct. IMLS "shall" conduct research, 20 U.S.C. § 9108(a), but its research has overwhelmingly stopped, SOMF ¶¶ 96, 99-101. IMLS "shall award grants to Indian tribes and to [Native Hawaiian organizations]" and "shall establish and carry out a program to enhance the quality of library services nationwide," 20 U.S.C. §§ 9131, 9161, 9162, but those grants and programs were cut off, SOMF ¶¶ 42-43, 189. IMLS "shall" award National Leadership Grants "on a competitive basis," and "shall make every effort to ensure" that those grants fund programs reflecting a range of library types and geographic areas and administered by library and museum professionals. 20 U.S.C. § 9162(b)(2), (c)(1)-(2). But IMLS instead bypassed the competitive process and awarded nearly the entire pot of money to the America250 project, which does not meet the substantive statutory requirements. SOMF ¶¶ 146-145. IMLS had no discretion to forgo these mandatory duties, *Kingdomware Tech., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("'shall' usually connotes a requirement"), but it abandoned them anyway.

**Appropriations Act.** Agency Defendants' conduct also violates the 2025 Appropriations Act. *See* 2025 Appropriations Act; 2024 Appropriations Act at 697. Congress appropriated $294,800,000 to IMLS "[f]or carrying out the Museum and Library Services Act of 1996 and the National Museum of African American History and Culture Act." *Id*. at 697; 2025 Appropriations Act at 9. But IMLS refused to spend this money. SOMF ¶¶ 147, 152. Instead, IMLS returned, and

OMB withheld, a significant portion, SOMF ¶¶ 147, 152, before OMB belatedly decided to apportion the full amount to IMLS. SOMF ¶ 203. In any event, in the face of the agency's destruction, with slashed staff and terminated grants, IMLS lacks the personnel and infrastructure to issue the grants Congress intended. It is thus still the case that "defendants' conduct contravenes Congress's appropriation of almost $300 million to IMLS," TRO Order (ECF 36) at 4.

**Paperwork Reduction Act (PRA).** By abandoning the research obligations mandated by IMLS, Agency Defendants also violate the PRA. Under the PRA, 44 U.S.C. § 3507(h)(3), an agency may not make substantive or material modifications to data collection that has been approved by the Director of OMB without prior approval. *Id.* IMLS data collection projects, including the Public Libraries Survey, are "collections of information" under the PRA. *See* OIRA, OMB Control No: 3137-0074, https://perma.cc/A5WX-625R (approving Public Libraries Survey through November 30, 2027). Staff required to fulfill IMLS's data collection requirements under 20 U.S.C. § 9108 were fired, and the agency stopped fulfilling these duties, in violation of the Act.

**2.** The dismantling of IMLS is also "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). IMLS and other "[a]dministrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "An agency," in other words, "'literally has no power to act' . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). Defendants cannot entirely unravel an agency that Congress has created, on which Congress has imposed mandatory duties, and for which Congress has appropriated funding.

### B. Defendants' actions are arbitrary and capricious.

Defendants' decision to dismantle IMLS was neither "reasonable" nor "reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation omitted). It was therefore arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

*First*, Defendants failed to "articulate a satisfactory explanation" for the decision to dismantle IMLS or any of the follow-on agency actions that includes "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). Under the APA, an agency may not "depart from a prior policy sub silentio" and "must show that there are good reasons for the new policy." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

Until March of this year, IMLS was proud of the work it was doing, and wanted to do more of it. Just last year, IMLS justified its budget request by emphasizing that "social mobility within communities can be tied to the proximity of cultural institutions and particularly libraries." IMLS, *Fiscal Year 2025: Congressional Justification* 3 (Mar. 2024), https://perma.cc/C36H-YQ7H. IMLS also leveraged its research function to "strive to establish and advance credible, relevant, and actional information to better meet the needs of our nation's museums and libraries and their communities, especially those in underserved locales." *Id.* And IMLS articulated that "IMLS's Native Communities grant programs have been effective in their allowed flexibility of the use of funds" by providing "small, hard-to-reach Indigenous communities access to much-needed funding." IMLS, *Evaluation of IMLS's Native Communities Grant Programs* 6 (2024) https://perma.cc/63AY-A33L. And, just days before Defendants brought IMLS operations to a halt, the agency informed grantees that they could expect to receive their grants as usual. SOMF ¶ 174.

Defendants ended all of that work. But they have not acknowledged or explained their changed positions, much less the consequences of their actions. There is no explanation for the decision to fire the entire Board, SOMF ¶¶ 15, 89, 187, to freeze reimbursements, SOMF ¶¶ 105-106, not to perform requested reviews of terminated grants, SOMF ¶¶ 195-196, to place on administrative leave and fire the staff necessary to perform the reviews, SOMF ¶¶ 81-82, 86-87,

or to cut off all research functions, stop all communications with grant recipients, and halt all interagency collaborations. SOMF ¶¶ 98, 101, 103, 162-166, 186, 188. Nor is there any explanation of how these decisions accord with earlier statements about the value of IMLS programs.

For other cuts, the Defendants offered minimal and incoherent explanations. Sonderling's action memoranda contained only barebones explanations for the mass grant terminations: to comply with the Executive Order and to align with administration priorities. SOMF ¶¶ 109-110, 113-115, 119. The termination letters echo these stated reasons. SOMF ¶¶ 111-118. But it is hardly a reasoned explanation to summarily state that these grants, all of which have gone through a rigorous application and evaluation process, are all suddenly out of step with the agency's goals or the needs of the American people. Similarly, citation to the EO makes no sense considering that the EO purported to apply only to non-statutorily mandated agency functions, but was invoked to authorize the termination of statutorily mandated awards. SOMF ¶¶ 115, 117, 125.

The same incoherence applies to the mass placement of employees on administrative leave and attempted RIFs, supposedly "taken to facilitate the work and operations of the agency." SOMF ¶¶ 82, 84, 87. It is unclear how refusing to allow staff to work and attempting to fire them would facilitate the agency's operations. This simply is not a reasonable connection between this stated goal and the actions taken to achieve it. *See State Farm*, 463 U.S. at 43.

*Second*, Agency Defendants failed to consider the catastrophic consequences of shuttering IMLS. *See id*. IMLS research services support library workers and provide libraries with the information they need to address issues like child literacy. SOMF ¶¶ 21, 23, 33, 101-102, 232. IMLS services, grants, and cooperative agreements provide for training, professional development, and other support for effective libraries and museums. SOMF ¶¶ 213, 216, 220, 222, 224. Without that support, communities across the country lose access to programs like interlibrary loans,

37

summer reading programs, rural broadband access, materials for blind and disabled library patrons, and more. SOMF ¶¶ 132-139, 216-226, 232. The public also has suffered as libraries across the country have been forced to slash hours, or even close. SOMF ¶¶ 135, 139. The administrative record evinces no consideration for these consequences.

Further, Agency Defendants failed to consider that their actions will also impact other agencies. For example, IMLS operates a large part the Save America's Treasures program that the National Park Service is statutorily mandated to implement. SOMF ¶ 69; *see* 54 U.S.C. § 308902. IMLS did not consider how eliminating this program would impact the Park Service or the people it serves. Similarly, other statutorily required programs depend on IMLS research. The Federal Communications Commission uses IMLS's Public Libraries Survey to determine library eligibility for their E-Rate program, which provides Universal Service Fund funding to subsidize broadband internet access to libraries and K-12 schools pursuant to congressional mandate. *See id.*; 47 U.S.C. § 254(h)(2)(A); 47 C.F.R. §§ 54.501(b), 54.502(d); FCC, *E-Rate: Universal Service Program for Schools and Libraries*, https://perma.cc/F6NF-FC5G. The administrative record has no evidence that these impacts were considered at all.

*Third*, Agency Defendants failed "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). But those reliance interests are significant. Librarians who relied on IMLS for guidance, training, and professional development have lost those vital services. SOMF ¶¶ 64-67; *see also* Inouye Decl. ¶ 5; Inouye Supp. Decl. ¶ 6; Neal Decl. ¶ 5; *cf.* Hofschire Decl. ¶¶ 16-17. Librarians, researchers, and Plaintiffs relied on IMLS data collection—especially the Public Libraries Survey, as well as the research on improvement of childhood literacy—but are now left without this crucial data that

is nearly impossible to replicate. SOMF ¶¶ 229-231; Fournier Supp. Decl. ¶¶ 9-12, 15-16; Billinger Supp. Decl. ¶¶ 5, 7-8. Counting on the continued existence of IMLS grant programs, libraries and museums who planned to continue or expand programming and services now must diminish or eliminate them in the face of this budget shift. SOMF ¶¶ 133-134, 136-139. Some rely on IMLS so significantly that they might shutter in the near future with this funding source gone. Haupt Decl. ¶¶ 11, 13-14, 16-18. Others already have. SOMF ¶ 135; Feller Decl. ¶ 10.

*Fourth*, Agency Defendants failed to consider reasonable alternatives. While Agency Defendants might have targeted their changes to IMLS had they engaged in reasoned decisionmaking, they instead chose a wholesale, indiscriminate ending of agency functions, leaving no practical ability for the agency to carry out its statutorily mandated duties.

### C.  Defendants' actions are unconstitutional and ultra vires.

**1.** Defendants' actions also violate the constitutional separation of powers.[7] The separation of powers is "foundational": The Constitution gives "certain powers" to "certain bodies." *Seila L. LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see Trump v. United States*, 603 U.S. 593, 637-638 (2024). The separation of powers "requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996).

Defendants have seized the power of Congress by unraveling a duly passed statutory program on nothing more than the President's say so. Only Congress can make laws, *see* U.S. Const. art. I, § 1, and only Congress can establish, reorganize, restructure, or abolish agencies. *See Myers v. United States*, 272 U.S. 52, 129 (1926); *see also Limitations on Presidential Power to Create a New Exec. Branch Entity to Receive & Administer Funds Under Foreign Aid Legis.*, 9

---

[7] As discussed above (*supra* at 33, 39-43), Defendants constitutional claims are reviewable under both the APA and a freestanding constitutional cause of action.

Op. O.L.C. 76, 78 (1985). The President is limited to "recommending [] laws he thinks wise and [] vetoing [] laws he thinks bad." *Youngstown,* 343 U.S. at 587. "Needless to say, the President is without authority to set aside congressional legislation by executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999). Although Congress has occasionally granted the President limited authority to reorganize agencies, it has consistently declined presidential requests for open-ended reorganization authority for the last forty years. *See* Henry B. Hogue, Cong. Rsch. Serv., R42852, Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress, 15-16, 20-21, 32 (Dec. 11, 2012). And because Congress has legislated in this area and declined to grant the power that the current Administration is asserting, the President's power is at its "lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). A president cannot unilaterally "eliminate" a congressionally created agency, whether through executive order or otherwise.

When Congress established IMLS, it gave clear, mandatory instructions requiring it to operate in specific ways. *See* Part III.A, *supra*. Defendants ignored those instructions, "impairing" Congress "in the performance of its constitutional duties." *Loving*, 517 U.S. at 757. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see INS v. Chadha*, 462 U.S. 919, 954 (1983). Holding otherwise "would be clothing the President with a power to control the legislation of congress." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838). By directing that IMLS be "eliminated," firing virtually all IMLS staff, terminating grants, and firing the Board, Defendants have exceeded their constitutional authority and violated the separation of powers.

**2.** Defendants also violated the separation of powers by improperly intruding on Congress's appropriations power. Congress has "exclusive power over the federal purse." *U.S. Dep't of Navy*

*v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (citation omitted); *see City & Cnty. of S.F. v. Trump*, 897 F. 3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7). Here, Congress exercised that power by repeatedly appropriating funds for IMLS to carry out its mandatory duties. *See* 2025 Appropriations Act, 2024 Appropriations Act.

Defendants' efforts to leave that money unspent through staff and grant terminations and to return unspent funds to OMB improperly intrudes on a power reserved for Congress. Even though a president may "ha[ve] policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program," he "does not have unilateral authority to refuse to spend the funds" but must instead "propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty.*, 725 F.3d 255, 261 (D.D.C. 2013) (citation omitted). Rather than propose a rescission, Defendants have simply refused to spend their funds and unilaterally returned a significant portion to OMB. SOMF ¶¶ 147, 152. Defendants have cancelled nearly all National Leadership Grants for Libraries, refused to consider pending applications for such grants, and waived application requirements in order to allocate almost all of the National Leadership Grant funds to a single entity, America250, a cherry-picked recipient. SOMF ¶¶ 150-159; *see* Fourth Albright Decl. ¶¶ 10-11. Not only are these actions contrary to the statutory requirement that these grant funds be issued on a competitive basis, *see supra* at 4, 12-13, but they also violate Congress's mandated purpose for these grants, which "shall . . . enhance the quality of library services nationwide and . . . provide coordination between libraries and museums." 20 U.S.C. § 9162(a), (b)(1).

**3.** Defendants' dismantling of IMLS also violates the Take Care Clause. The President is constitutionally required to "take care that the Laws be faithfully executed." U.S. Const. art. II § 3; *see also Morrison v. Olson*, 487 U.S. 654, 690 (1988) (quoting U.S. Const. art. II, § 3). "Under

our system of government, Congress makes laws and the President . . . faithfully execute[s] them." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) (cleaned up). "Just as the Constitution prevents Congress from intruding on the President's power to execute the laws, the President— and his subordinates—do not wield 'authority to set aside congressional legislation by executive order.'" *New York v. Trump*, 767 F. Supp. 3d. 44 (S.D.N.Y. 2025) (quoting *In re United Mine Workers of Am.*, 190 F.3d at 551). This obligation "to see that the laws are faithfully executed refutes the idea that [the President] is to be a lawmaker." *Youngstown*, 343 U.S. at 587. Thus, "the President may not . . . decline to follow a statutory mandate . . . simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d at 259. The Executive violates the Take Care Clause when it overrides statutes enacted by Congress. *In re United Mine Workers*, 190 F.3d at 551.

As explained above, the unilateral dissolution of IMLS by the President and his agents violates the Take Care Clause. This claim is cognizable under both the APA and a freestanding constitutional cause of action, as *Global Health* did not address any Take Care Clause argument. *See supra* at 32-33. "Withholding congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on this constitutional mandate" to "take Care that the Laws be faithfully executed." *Widakuswara v. Lake*, No. 25-cv-2390, 2025 WL 945869, at *7 (S.D.N.Y. Mar. 28, 2025) (quoting U.S. Const. art. II, § 3).

**4.** The D.C. Circuit's recent opinion in *Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025), does not undermine Plaintiffs' constitutional claims. To start, *Climate United Fund* did not address the Appropriations Clause. *See id.* at *12 n.13. Crucially, in *Climate United Fund*, the D.C. Circuit found, as an evidentiary matter, that there

was "no evidence that the agency sought to dismantle the programs without congressional approval." *Id.* at *11. In contrast here, as shown (at 7-9) Defendants did seek to shutter the agency.

**5.** Finally, Defendants' actions are ultra vires. The statutory obligations imposed on IMLS by the MLSA are "specific." *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776. The Board "shall" be composed of certain members, and the agency "shall" conduct research, "shall" award certain grants, "shall" award certain other grants on a competitive process, "shall" collaborate and consult with other agencies, and more. 20 U.S.C. §§ 9103(f)-(g), 9105a, 9108 9141, 9161, 9162. Defendants' actions contravene these mandates, as does Defendants' action to dismantle IMLS.

## IV.    This Court Should Vacate Defendants' Unlawful Actions in Full.

### A.    The APA authorizes courts to set aside agency actions in their entirety.

The APA authorizes courts to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). Thus, "[w]hen an agency's action is unlawful, 'vacatur is the normal remedy.'" *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)); *see Corner Post, Inc. v. Bd. of Govs. of the Fed. Rsrv. Sys.*, 603 U.S. 799, 830-31 (2024) (Kavanaugh, J., concurring). This Court should therefore vacate each of Defendants' unlawful decisions, including the directives to stop work and place staff on administrative leave, the firing of Board members, the directive to freeze payments, the authorization of grant terminations, the directive to ignore statutory restrictions on grantmaking, and the decision to dismantle the agency.

The Supreme Court's decision in *Trump v. CASA*, Nos. 24A884, 24A885, 24A886, 2025 WL 1773631 (June 27, 2025), did not change matters. *CASA* held that the Judiciary Act of 1789 did not vest courts with general equitable powers to grant universal relief. *Id.* at *6. Crucially, the decision in *CASA* rested on courts' statutory authority under the Judiciary Act and did not address

"the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at *8 n.10; *see id.* at *19 (Kavanaugh, J., concurring) ("[I]n cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminary 'set aside' a new agency rule." (quoting 5 U.S.C. § 706(2))). Thus, in the wake of *CASA*, courts have continued to recognize that vacatur is both appropriate and authorized by the APA. *See, e.g.*, *Drs. for Am. v. OPM*, No. 25-cv-322, 2025 WL 1836009, at *22 n.17 (D.D.C. July 3, 2025); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306, 2025 WL 1825431, at *51 (D.D.C. July 2, 2025). This Court should do the same.

### B. In the alternative, a broad injunction is necessary to afford Plaintiffs and their members complete relief.

Alternatively, a broad injunction is appropriate here because it is necessary to provide complete relief to Plaintiffs. *CASA* recognized the propriety of a broad injunction in such circumstances. 2025 WL 1773631, at *11-12. For one, because IMLS cannot be put back together with respect to only some individuals, a narrow injunction will not provide complete relief to Plaintiffs. And, if only certain functions of IMLS are reinstated, Plaintiffs and their members will continue to be harmed given their reliance on most if not all of IMLS's services. *See, e.g.*, SOMF ¶¶ 21-26, 67, 131, 162-163, 211-232; The only way to make Plaintiffs whole is to reinstitute these services, which requires bringing back staff and restoring agency functions.

Plaintiffs' widespread membership also requires a broad injunction. ALA has more than 47,000 members across the country, including librarians, library patrons, and libraries. SOMF ¶ 2. It would not be feasible to narrow relief to only those libraries where ALA members worked or patronized. Similarly, AFSCME represents more than 50,000 library and museum workers at hundreds of cultural institutions across the country. SOMF ¶ 6. IMLS funding terminations will cause many of its members to lose their jobs, and significantly worsen the working conditions of

other members and make their employment more precarious nationwide. And although the *Rhode Island* injunction has provided partial relief to some of ALA's and AFSCME's members located in the plaintiff states, that relief is not guaranteed to last, and the injunction is currently on appeal. *See* Docketing Notice, *Rhode Island v. Trump*, No. 25-1477 (1st Cir. May 21, 2025).

Significantly, Plaintiffs' members include library patrons who rely on IMLS's various services. SOMF ¶ 2; *see, e.g.*, Jacobson Decl. ¶¶ 3-5; Bradley Decl. ¶ 5; Haupt Decl. ¶ 18. Library patrons are similarly situated to unregulated parties who may obtain universal relief under the APA. *See Corner Post*, 603 U.S. at 826 (Kavanaugh, J., concurring) ("[T]he unregulated plaintiff can obtain meaningful relief" only if an agency action is set aside in its entirety, "thereby remedying the adverse downstream effects of the [agency action] on the unregulated plaintiff."). Additionally, given the interconnectedness of and resource sharing between libraries in this country, Plaintiffs are indirectly harmed by grant terminations that impact other libraries who are not represented by Plaintiffs. One key example is the interlibrary loan system, which relies heavily on IMLS coordination and funding. SOMF ¶¶ 42, 133, 134, 220, 221. Not only does IMLS directly fund these platforms, but because these are resource sharing platforms, libraries are impacted by cuts to other libraries, not just to themselves. *See* SOMF ¶ 221. The loss of IMLS more broadly also has a negative impact on workplace conditions industry-wide, weakening AFSCME's negotiating strength across the union. SOMF ¶¶ 211-215, 231.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment.

Dated: September 5, 2025                    Respectfully submitted,

*/s/ Pooja A. Boisture*
Pooja A. Boisture*
Orlando Economos (DC Bar No. 90013791)
Kayla M. Kaufman (DC Bar No. 90029091)
Robin F. Thurston (DC Bar No. 1531399)
Skye Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
pboisture@democracyforward.org
oeconomos@democracyforward.org
kkaufman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org


*/s/ Chris Gair*
Chris Gair (Ill. Bar No. 6190781)*
Vilia Dedinas (Ill. Bar No. 6191614)*
John Gallo (Ill. Bar No. 6193988)*
Ingrid Yin (Ill. Bar No. 6339857)*
Gair Gallo Eberhard LLP
1 E. Wacker Drive, Suite 2600
Chicago, Illinois 60601
(312) 600-4900
cgair@gairgallo.com
vdedinas@gairgallo.com
jgallo@gairgallo.com
iyin@gairgallo.com

*Counsel for Plaintiffs*

* Admitted *pro hac vice*