## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN LIBRARY ASSOCIATION, *et al.*,

     Plaintiffs,

  v.

KEITH SONDELING, in his capacity as Acting Director of the Institute of Museum and Library Services, *et al.*,

     Defendants.

Case No. 25-cv-01050-RJL

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION TO DISMISS, OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION .......................................................................................................................... 1

BACKGROUND ............................................................................................................................ 2

LEGAL STANDARD .................................................................................................................... 3

ARGUMENT ................................................................................................................................. 4

I.    All Claims Should Be Dismissed Because The Court Lacks Subject-Matter Jurisdiction. ......................................................................................................................... 4

    A.  The Court Of Federal Claims Has Exclusive Jurisdiction Over Plaintiffs' Claims. ................................................................................................................... 4

    B.  Administrative Bodies Identified in the Civil Service Reform Act of 1978 are the Exclusive Channels for Any Challenge to the Propriety of Federal Employee Removals. ........................................................................................... 10

II.   Dismissal Is Warranted Because Plaintiffs Do Not Have Standing to Receive the Broad Relief They Seek. ................................................................................................... 14

    A.  Plaintiffs Lack Standing to Categorically Enjoin Defendants' Re-structuring Decisions. ............................................................................................................. 14

    B.  Plaintiffs Do Not Have Organizational Standing to Assert Claims on their Members' Behalf ................................................................................................. 16

    C.  Plaintiffs Lack Associational Standing. ............................................................. 20

III.  Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete, Final Agency Action. ......................................................................................... 21

IV.   Defendants' Staffing and Funding Determinations are Themselves Committed to Agency Discretion. ........................................................................................................... 25

V.    Defendants Are Entitled To Summary Judgment On Plaintiffs' Constitutional and *Ultra Vires* Claims. ......................................................................................................... 29

    A.  Plaintiffs' Claims are Foreclosed by *Dalton*. ................................................... 29

    B.  The Take Care Clause Claim Also Fails Because There Has Been No Such Violation. ............................................................................................................. 30

    C.  *Ultra Vires* Review Is Not Available. ............................................................... 32

VI.   Plaintiffs Have Failed to Establish Irreparable Harm. ..................................................... 32

VII.  The Balance of the Equities and the Public Interest Tip in Defendants' Favor. ... 34

VIII. Vacatur is Not Appropriate Under the APA. .................................................................. 35

CONCLUSION ............................................................................................................................. 37

# TABLE OF AUTHORITIES

**Cases**

*Advoc. Christ Med. Ctr. v. Azar*,
No. 17-cv-1519 (TSC), 2022 WL 2064830 (D.D.C. June 8, 2022)..............................................4

*Air Transp. Ass'n of Am. v. Reno*,
80 F.3d 477 (D.C. Cir. 1996) ..................................................................................................20

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019)................................................................................................11

*Am. Nat'l Ins. Co. v. FDIC*,
642 F.3d 1137 (D.C. Cir. 2011)................................................................................................3

*Appalachian Energy Grp. v. EPA*,
33 F.3d 319 (4th Cir. 1994)....................................................................................................24

*Appalachian Voices v. United States Envtl. Prot. Agency*,
No. CV 25-1982 (RJL), 2025 WL 2494905 (D.D.C. Aug. 29, 2025).....................................10

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ...................................................................................................3

*Baker v. Carr*,
369 U.S. 186 (1962) ..........................................................................................................12, 31

*Bd. of Governors, FRS v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) .................................................................................................................32

*Bennett v. Spear*,
520 U.S. 154 (1997) ...............................................................................................................23

*Biden v. Texas*,
597 U.S. 785 (2022) ...............................................................................................................24

*California v. Texas*,
593 U.S. 659 (2021) .........................................................................................................15, 36

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)..........................................................................................32, 33

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) .........................................................................................................24, 31

*City of New York v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019)..................................................................................................24

*Clapper v. Amnesty Int'l,*
568 U.S. 398 (2013) ................................................................................................ 14

*Climate United Fund v. Citibank, N.A.,*
No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) ................................. 8, 10

*Clinton v. Jones,*
520 U.S. 681 (1997) ................................................................................................ 31

*Cobell v. Kempthorne,*
455 F.3d 301 (D.C. Cir. 2006) ............................................................................... 22

*Collins v. Yellen,*
594 U.S. 220 (2021) ................................................................................................ 19

*Comm'n v. Texas,*
605 U.S. 665 (2025) ................................................................................................ 32

*Conservation Force v. Salazar,*
919 F. Supp. 2d 85 (D.D.C. 2013) .......................................................................... 25

*Corp. for Pub. Broad. v. Fed. Emergency Mgmt. Agency,*
792 F. Supp. 3d 67 (D.D.C. 2025) .......................................................................... 34

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
38 F.4th 1099 (D.C. Cir. 2022) ................................................................................. 5

*Ctr. for Sustainable Econ. v. Jewell,*
779 F.3d 588 (D.C. Cir. 2015) ................................................................................ 21

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006) ................................................................................................ 16

*Dalton v. Specter,*
511 U.S. 462 (1994) .......................................................................................... 29, 31

*Dep't of Ed. v. California,*
604 U.S. 650 (2025) ......................................................................................... *passim*

*DeVillier v. Texas,*
601 U.S. 285 (2024) ................................................................................................ 29

*Disner v. United States,*
888 F. Supp. 2d 83 (D.D.C. 2012) ............................................................................ 3

*Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity,*
18 F.4th 38 (1st Cir. 2021) ...................................................................................... 35

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) ................................................................................................. 35

*Drake v. FAA*,
291 F.3d 59 (D.C. Cir. 2002) ................................................................................... 26

*Egbert v. Boule*,
596 U.S. 482 (2022) ................................................................................................. 13

*Elgin v. Dep't of the Treasury*,
567 U.S. 1 (2012) ......................................................................................... 11, 12, 22

*EPA v. Brown*,
431 U.S. 99 (1977) ................................................................................................... 24

*Equal Rights Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ............................................................................... 17

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ................................................................................................. 25

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) .......................................................................................... *passim*

*Free Enter. Fund v. Pub Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ................................................................................................. 31

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980) ................................................................................................. 24

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) ....................................................................................... 16, 19

*Global Health Council v. Trump*,
No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ............................... 29, 30

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U. S. 204 (2002) ................................................................................................. 7

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ........................................................................................... 12, 13

*Hammer v. United States*,
989 F.3d 1 (D.C. Cir. 2021) ....................................................................................... 5

*Harkrader v. Wadley*,
172 U.S. 148 (1898) ................................................................................................. 13

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ................................................................................................. 17

*Heckler v. Chaney*,
470 U.S. 821 (1985) ............................................................................................ 26, 27

*Hi-Tech Pharmacal Co., Inc. v. U.S. Food & Drug Admin.*,
587 F. Supp. 2d 1 (D.D.C. 2008) ............................................................................. 32

*In re Sawyer*,
124 U.S. 200 (1888) ................................................................................................. 12

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) .................................................................................. 24

*Kansas Health Care Ass'n Inc. v. Kansas Dep't of Social & Rehab. Serv.*,
958 F.2d 1018 (10th Cir. 1992) ................................................................................ 21

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) ................................................................................................. 18

*Lampon-Paz v. OPM*,
732 F. App'x 158 (3d Cir. 2018) .............................................................................. 11

*Lawyers Ass'n v. Reno*,
199 F.3d 1352 (D.C. Cir. 2000) ................................................................................ 19

*Lewis v. Casey*,
518 U.S. 343 (1996) ................................................................................................. 19

*Lincoln v. Vigil*,
508 U.S. 191 (1993) ................................................................................ 25, 26, 27, 28

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................................................ *passim*

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ............................................................................................ 21, 22

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ................................................................................................. 36

*Mahorner v. Bush*,
224 F. Supp. 2d 48 (D.D.C. 2002) ............................................................................ 19

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ................................................................................... 31

vi

*Maryland v. King*,
567 U.S. 1301 (2012)................................................................................35

*McMahon v. New York*,
145 S. Ct. 2643 (2025)..............................................................................13

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982)......................................................................5

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002)....................................................................28

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866)......................................................................31

*Missouri v. Jenkins*,
515 U.S. 70 (1995)....................................................................................16

*Morrison v. Olson*,
487 U.S. 654 (1988)..................................................................................31

*Murthy v. Missouri*,
603 U.S. 43 (2024)....................................................................................14

*Nat'l Insts. of Health v. Am. Pub. Health Assoc.*,
No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025).....................1, 7, 8, 10

*Nat'l Taxpayers Union, Inc. v. United States*,
68 F.3d 1428 (D.C. Cir. 1995)....................................................................17

*Nat'l Treasury Emps. Union v. Vought*,
No. 25-5091, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025)...........*passim*

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
753 F. Supp. 2d 103 (D.D.C. 2010)............................................................26

*Niles v. U.S. Capitol Police Bd.*,
233 F. Supp. 3d 140 (D.D.C. 2017)..............................................................3

*Nken v. Holder*,
556 U.S. 418 (2009)..................................................................................34

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)....................................................................................21

*O'Hair v. White*,
675 F.2d 680 (5th Cir. 1982)......................................................................21

*OPM v. American Fed'n of Gov't Emps.*,
145 S. Ct. 1914 (2025) ................................................................................. 15

*Printz v. United States*,
521 U.S. 898 (1997) ...................................................................................... 31

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
45 F.4th 353 (D.C. Cir. 2022) ...................................................................... 24

*Railway Clerks v. Assoc. for Benefit of Non-contract Employees*,
380 U.S. 650 (1965) ...................................................................................... 32

*Raines v. Byrd*,
521 U.S. 811 (1997) ................................................................................. 16, 19

*Renne v. Geary*,
501 U.S. 312 (1991) ...................................................................................... 19

*Rhode Island v. Mass.*,
37 U.S. 657 (1838) ........................................................................................ 35

*Safari Club Int'l v. Jewell*,
47 F. Supp. 3d 29 (D.D.C. 2014) ................................................................. 33

*Sampson v. Murray*,
415 U.S. 61 (1974) ........................................................................................ 12

*Saul v. United States*,
928 F.2d 829 (9th Cir. 1991) ........................................................................ 11

*Scolaro v. D.C. Bd. of Elections & Ethics*,
104 F. Supp. 2d 18 (D.D.C. 2000) ................................................................. 3

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ...................................................................................... 26

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ........................................................................................ 6

*Select Specialty Hosp.-Akron, LLC v. Sebelius*,
820 F. Supp. 2d 13 (D.D.C. 2011) ................................................................. 4

*Slattery v. United States*,
635 F.3d 1298 (Fed. Cir. 2011) ...................................................................... 5

*Spectrum, Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985) ....................................................................... 5

*Speelman v. United States,*
461 F. Supp. 2d 71 (D.D.C. 2006).........................................................................3

*Spokeo v. Robins,*
578 U.S. 330 (2016)...........................................................................................16

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009)...........................................................................................16

*Sustainability Inst. v. Trump,*
No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025)......................................7

*Tanner-Brown v. Haaland,*
105 F.4th 437 (D.C. Cir. 2024)......................................................................20, 21

*Thomas v. Principi,*
394 F.3d 970 (D.C. Cir. 2005)..............................................................................3

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021)...........................................................................................14

*Travelers United, Inc. v. Hyatt Hotels Corp.,*
No. 23-cv-2776, 2025 WL 27162 (D.D.C. Jan. 3, 2025)...................................20, 23

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025)...........................................................................................36

*Turlock Irrigation Dist. v. Fed. Energy Reg. Comm'n,*
786 F.3d 18 (D.C. Cir. 2015)..............................................................................17

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
517 U.S. 544 (1996)...........................................................................................20

*United States v. Fausto,*
484 U.S. 439 (1988)...........................................................................................11

*United States v. Texas,*
599 U.S. 670 (2023).......................................................................................35, 36

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,*
454 U.S. 464 (1982)...........................................................................................16

*Veit v. Heckler,*
746 F.2d 508 (9th Cir. 1984)..............................................................................11

*Vera Institute of Justice v. U.S. Department of Justice,*
No. 25-CV-1643 (APM), 2025 WL 1865160 (D.D.C. July 7, 2025).......................10

ix

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) ................................................................................................26, 27

*Walton v. House of Representatives*,
265 U.S. 487 (1924) .........................................................................................................13

*Warth v. Seldin*,
422 U.S. 490 (1975) .........................................................................................................20

*Weingarten v. Devos*,
468 F. Supp. 3d 322 (D.D.C. 2020).............................................................................21

*White v. Berry*,
171 U.S. 366 (1898) .........................................................................................................13

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ...............................................................................32, 33

**Statutes**

5 U.S.C. § 701 ..................................................................................................................26

5 U.S.C. § 702 ..................................................................................................................12

5 U.S.C. § 704 ..................................................................................................................24

5 U.S.C. § 706 ...........................................................................................................13, 15

20 U.S.C. § 9102 ...............................................................................................................2

20 U.S.C. § 9105 .............................................................................................................27

20 U.S.C. § 9108 ....................................................................................................6, 9, 34

20 U.S.C. § 9162 .............................................................................................................28

28 U.S.C. § 1491 ..................................................................................................4, 7, 13

Civil Service Reform Act of 1978,
Pub. L. No. 95-454 .........................................................................................................10

Further Consolidated Appropriations Act,
Pub. L. No. 118-47 .........................................................................................................28

Full-Year Continuing Appropriations and Extensions Act, 2025,
Pub. L. No. 119-4 ...........................................................................................................28

**Rules**

Federal Rule of Civil Procedure 12.............................................................................................3

Federal Rule of Civil Procedure 56.............................................................................................4

**Other Authorities**

Exec. Order No. 14238 ...................................................................................*passim*

## INTRODUCTION

The jurisdictional issues in this case are no longer "close question[s]." *See* Order Den. Mot. for Prel. Inj. ("PI Order"), ECF No. 48 at 9.  Recent Supreme Court and D.C. Circuit decisions affirm that this Court was correct in concluding that "plaintiffs' claims for relief, standing arguments, and irreparable harm allegations are all keyed to defendants' termination of grants" and that those claims belong in the Court of Federal Claims.  *See id.* at 18-19.

Since this Court initially rejected Plaintiffs' preliminary injunction motion, the Supreme Court again stayed an order that would have vacated government grant terminations.  *See National Institutes of Health v. American Public Health Association* ("*NIH*"), No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025).  In so holding, the Supreme Court reiterated its prior holding in *Department of Education v. California* that "[t]he Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the [grants at issue] or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants."  *Id.* (citing *Dep't of Ed. v. California*, 604 U.S. 650 (2025) (per curiam)).  And in *National Treasury Employees Union v. Vought*, the D.C. Circuit, applying Supreme Court precedent, concluded that—even as to challenges to personnel actions that occur as part of "broad disputes about agency shutdowns"—such challenges cannot be heard by a district court in light of Congressional channeling of such claims to specialized review schemes.  No. 25-5091, 2025 WL 2371608, at *6 (D.C. Cir. Aug. 15, 2025).

As to grant terminations, the Supreme Court's reasoning in *California* and *NIH* controls because those claims are committed to the Court of Federal Claims by the Tucker Act.  As to personnel decisions, the Civil Service Reform Act requires channeling of claims related to federal employment to the administrative bodies created by that statute.  Together, these two jurisdictional bars entirely preclude Plaintiffs' case.

For these reasons, and the additional reasons explained herein, this Court should deny Plaintiffs' Motion, grant Defendants' cross-motion, and enter judgment for Defendants.

# BACKGROUND

## I.    Statutory Background

Congress established IMLS in 1996.  20 U.S.C. § 9102.  IMLS is headed by a director, whose "primary responsibility" is the "development and implementation of policy to ensure the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United States."  *Id*. § 9103(a), (c); *see also id*. § 9108(a) ("The Director shall regularly support and conduct, as appropriate, policy research, data collection, analysis and modeling, evaluation, and dissemination of information to extend and improve the Nation's museum, library, and information services.").  To that end, the director is entitled to "appoint and determine the compensation of such employees as the Director determines to be necessary to carry out the duties of the Institute."  *Id*. § 9105(a).  The director is also "authorized to enter into grants, contracts, cooperative agreements, and other arrangements with Federal agencies, public and private organizations, and other entities with expertise the Director determines appropriate" to carry out policy objectives and fulfill statutory responsibilities.  *Id*. § 9108(c).

## II.    Factual Background

Plaintiffs filed a Complaint for Declaratory and Injunctive Relief.  *See* Compl., ECF No. 1.  The Complaint asserts six counts: (1) Count I—violation of separation of powers against all Defendants, *id*. at 23-24; (2) Count II—violation of the Take Care clause against all Defendants, *id*. at 24; (3) Count III— arbitrary and capricious agency actions in violation of the APA against Defendants Sonderling, IMLS, Gleason, U.S. DOGE Service, U.S. DOGE Service Temporary Organization, Vought, and OMB, *id*. at 25-27; (4) Count IV—violation of the APA in failing to disburse appropriated funds against Defendants Sonderling and IMLS, *id*. at 27; (5) Count V— equitable *ultra vires* against all Defendants, *id*. at 27-28; and (6) Count VI—violation of the First Amendment against all Defendants, *id*. at 28-29.

Plaintiffs subsequently filed a Motion for Preliminary Injunction. ECF No. 13.  Plaintiffs

requested a preliminary injunction "enjoining Defendants from taking further steps to dissolve IMLS" and ordering "Defendants to take all necessary steps to return IMLS and its employees, grantees, and contractors to their status prior to March 31, 2025." ECF No. 13-1 at 45-46. On June 6, 2025, the Court denied Plaintiffs' Motion for Preliminary Injunction. *See* PI Order. The Court found that because "the relief sought is largely contractual," the Tucker Act "may indeed require that plaintiffs bring their case in the Court of Federal Claims." *Id*. at 23.

## LEGAL STANDARD

### I.   Motion to Dismiss Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests whether the court has subject-matter jurisdiction over an action. As this Court has previously explained, "[f]ederal courts are courts of limited jurisdiction." *Niles v. U.S. Capitol Police Bd.*, 233 F. Supp. 3d 140, 142 (D.D.C. 2017). It is well-settled that the party invoking federal jurisdiction bears the burden of proving its existence. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). In evaluating a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a court must assume the truth of all factual allegations and must review "the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). Nevertheless, "the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the [c]ourt accept plaintiff's legal conclusions." *Disner v. United States*, 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (quoting *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006)). Finally, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000).

## II.    Summary Judgment Standard

In an APA case, the Federal Rule of Civil Procedure 56(a) summary judgment standard, requiring the court to determine if there is a genuine dispute of material fact, does not apply. Rather, the district court sits as an appellate tribunal, reviewing the administrative record. "[S]ummary judgment 'serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.'" *See Advoc. Christ Med. Ctr. v. Azar*, No. 17-cv-1519 (TSC), 2022 WL 2064830, at *5 (D.D.C. June 8, 2022) (quoting *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011)), *aff'd*, 80 F.4th 346 (D.C. Cir. 2023).

## ARGUMENT

## I.    All Claims Should Be Dismissed Because The Court Lacks Subject-Matter Jurisdiction.

### A.  The Court Of Federal Claims Has Exclusive Jurisdiction Over Plaintiffs' Claims.

Grant terminations are "woven into each of the claims for relief" in Plaintiffs' Complaint. *See* Order Denying Prelim. Injunc., ECF No 48, at 16. "Grant terminations are also the heart and soul of plaintiffs' standing and irreparable harm arguments." *Id*. at 17 (noting that "plaintiffs' irreparable harm arguments are grounded in the impact of grant terminations"). Because "plaintiffs' claims for relief, standing arguments, and irreparable harm allegations are all keyed to defendants' termination of grants," which are "essentially contracts with the Government," all claims are "contract claims under the Tucker Act." *Id*. at 18-19. This Court was correct in June, and its reasoning continues to be dispositive. In response, Plaintiffs argue that the fact that they "cite grant terminations as one component of the harm resulting from Defendants' actions does not transform this case into a contract dispute." Pls.' Mot. for Summ. Judg. ("Pls' Mot."), ECF No. 58-1, at 24. But grant terminations are not merely "one component" of the claimed harms, *id.*, they are the cornerstone of each of Plaintiffs' claims.

The Tucker Act, 28 U.S.C. § 1491(a), provides for exclusive judicial review of breach

4

claims for express or implied contracts over $10,000 in the Court of Federal Claims "unless such jurisdiction was explicitly withheld or withdrawn by statute." *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*); *see Hammer v. United States,* 989 F.3d 1, 2 (D.C. Cir. 2021) ("this Court has interpreted [the Tucker Act] to confer exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims").

Courts consider two factors in assessing whether an action raises a contract claim governed by the Tucker Act: "the source of the rights upon which [Plaintiffs] base [their] claims" and "the type of relief sought.'" *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). In assessing "the source of the rights" upon which the plaintiffs bases their claims, courts consider whether the "plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights 'exist prior to and apart from rights created under the contract,' and whether the plaintiff 'seeks to enforce any duty imposed upon' the government 'by the relevant contracts to which' the government 'is a party.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (cleaned up). If a claim is premised on an agreement with the Government, depends upon the Government having breached that agreement, and seeks to compel the Government to pay sums due under the agreement—it is a contract claim subject to the Tucker Act claim, not an APA claim. *See Megapulse*, 672 F.2d at 967-71.

Here, Plaintiffs' claims are contract claims for which the Court of Federal Claims has exclusive jurisdiction. The grant instruments are plainly "the source of the rights upon which" Plaintiffs base their claims. *Megapulse*, 672 F.2d at 968. Indeed, the asserted right to millions of dollars in taxpayer funds arises solely from the grants and "in no sense . . . exist[s] independently of those grants. *Spectrum, Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). Because no statute or regulation confers upon Plaintiffs any right to payment or services, Plaintiffs would have no claim absent the Government's alleged breach of the grant agreements. Simply put, without grants, Plaintiffs do not have claims.

Moreover, the only means by which Plaintiffs can achieve their requested relief is

through the restoration of grants. For purposes of the Tucker Act, Plaintiffs' grant agreements are contracts because they set out obligations that must be fulfilled in exchange for consideration from the government. Indeed, Congress has made clear that any funds disbursed to grantees like Plaintiffs are paid via grant agreements, *i.e.*, contracts, between the subject agencies and the grantees, rather than through direct disbursement of funds. *See* 20 U.S.C. § 9108(c) ("The Director [of the IMLS] is authorized to enter into grants, contracts, cooperative agreements, and other arrangements with Federal agencies, public and private organizations, and other entities with expertise the Director determines appropriate . . . ."). Plaintiffs attempt to sidestep the Tucker Act's jurisdictional mandate by depicting their claims as requests for equitable relief stemming from statutory mandates. *See* Pls' Mot. at 19. But this misstates the law: Congress did not directly appropriate funds to the grantees; it authorized IMLS to issue grants. Those grants are contracts, and suits challenging their termination—and Plaintiffs' demand that the government keep paying funds out from these terminated grants—belong in the Court of Federal Claims. The Government acknowledges that the subject grants are funded via appropriations, but that is true for virtually all government contracts—after all, generally federal funds cannot be paid absent appropriations. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020) (noting that most agencies rely on the annual appropriations process for funding). Nothing in the statutory framework mandates payment by methods other than grant agreements. Indeed, Plaintiffs' request to enjoin IMLS's downsizing attempt—over which jurisdiction is independently precluded, *see infra* parts I.B. and IV—is premised on the notion that IMLS will be unable to distribute grant funds to Plaintiffs. *See, e.g.*, Pls' SOMF ¶¶ 86-87 ("Only 12 IMLS staff were retained and not placed on administrative leave . . . Those staff were not sufficient to perform IMLS's legal obligations. For example, there were not enough program officers to staff termination review committees while adhering to the grant terms and federal regulatory requirements regarding impartiality, and no remaining staff had experience with the grant process of reviewing, correcting, and approving requests." (citations omitted)).

The Supreme Court has been clear that such challenges to grant terminations belong in

the Court of Federal Claims.  In *California*, the Court considered a temporary restraining order "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue."  604 U.S. at 968.  The Supreme Court held that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA."  *Id.*  This is so because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered."  *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002)).  "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'"  *Id.* (quoting 28 U.S.C. § 1491(a)(1)); *see Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) ("Yet like the grants in *California*, the grants here were awarded by federal executive agencies to specific grantees from a generalized fund. While the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds.").

In *NIH*, the Supreme Court reiterated its prior holding in *California* that "[t]he Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants."  2025 WL 2415669, at *1 (citing *California*, 604 U.S. at 968).  Justice Barrett's concurrence provides that "the District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims (CFC)."  *Id.* at *2.  Justice Gorsuch's concurrence explains why *California*, despite being a decision regarding interim relief, should still carry precedential weight with respect to its reasoning.  *Id.* at *4.  Justice Gorsuch notes that "even probabilistic holdings—such as *California*'s top-line conclusion that 'the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA,' must 'inform how a [lower] court' proceeds 'in like cases.'"  *Id.* (internal citations

omitted).  Moreover, Justice Gorsuch dispensed with the court of appeals' argument that *California* was distinguishable because the district court had only invoked the APA "to vacate the government's decision to terminate respondents' grants," stating that "[a]n order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants."  *Id*. Justice Gorsuch also disagreed with the court of appeals' assertion that the claims before it did not rely on the grant awards' terms and conditions, noting that "[i]n both cases, respondents' injury and alleged right to payment stem from the government's refusal to pay promised grants according to the terms and conditions that accompany them."  *Id*.

Here, Plaintiffs' claims are grounded in the alleged need for undisrupted funding pursuant to grant agreements with IMLS.  *See* Pls' Mot. at 14-15; Pls' SOMF ¶ 214 ("With IMLS's programs interrupted or cancelled, Plaintiffs and many of their members have had to cancel or pause programs, lay off staff, and plan for future program cuts and layoffs."); *id*. ¶ 216 ("Plaintiff ALA's grants remain cancelled . . . ."); *see also* Compl. at 22-28 (relying on grant terminations as the basis for each count).  The heart of this action, then, is a request to prevent the termination of those agreements or the enforcement of monetary obligations of the government pursuant to those agreements, as the D.C. Circuit, following *NIH*, has held.  *See Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881, at *7 (D.C. Cir. Sept. 2, 2025) ("[T]he grantees seek to set aside their grant terminations, which means they seek specific performance.  This is a typical contract remedy that indicates a claim is founded upon a contract for purposes of the Tucker Act." (cleaned up)); *NIH*, 2025 WL 2415669, at *4 (concurring in the Supreme Court's order to stay district court's judgments vacating grant terminations because "[a]n order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants.") (Gorsuch, J., concurring); *id*. at *5 ("[P]laintiffs' claims challenging NIH grant terminations likely belong in the Court of Federal Claims, not in federal district court . . . .[t]he reason is straightforward:  The core of plaintiffs' suit alleges that the Government unlawfully terminated

their grants.") (Kavanaugh, J., concurring).

The remaining alleged impact of the IMLS's restructuring can be traced to contracting or other funding decisions—as Plaintiffs themselves acknowledge.  *See*, *e.g.*, Pls' SOMF ¶ 103 ("IMLS also cancelled its contracts with its primary subcontractors AIR and Mathematica who supported IMLS's data collections and literacy research."); *id*. ¶ 104 ("As of August 13, 2025, IMLS appears to have contacted AIR, the contractor that has historically conducted the Public Library Survey, ostensibly to reengage AIR for the purposes of publishing the FY 2023 PLS data.").  In denying Plaintiffs' request for a preliminary injunction, the Court correctly observed that while "IMLS 'shall regularly support and conduct, as appropriate, policy research, data collection, analysis and modeling, evaluation, and dissemination of information to extend and improve the Nation's museum, library, and information services," the IMLS director is "authorized to enter into 'grants, contracts, cooperative agreements, and other arrangements' to achieve those objectives."  PI Order at 3 (citing 20 U.S.C. § 9108(a), (c)).  Indeed, IMLS utilizes contractors to compile all library and museum data.  *See* Defs' SOMF ¶ 2.  And the timing of IMLS's publication of that data is entirely dependent on the provisions of those contracts.  *See id*. ¶ 3.  Putting aside the fact that Plaintiffs are not parties to IMLS's data collection contracts and thus have no standing to enforce the terms of those contracts, IMLS and its contractors remain on track to publish the relevant data.  *See id*. ¶¶ 4-9.  Plaintiffs have no basis—in contract or in statute—to demand that IMLS publish data on their desired timeline.[1]

And for purposes of the Tucker Act, the court correctly determined that "remedying the data collection failures is at least partially derivative of remedying the grant terminations" because "to order IMLS to continue collecting data, the Court would have to require IMLS to reinstate its data collection contracts—a form of relief which raises Tucker Act questions."  *Id*. at 22.  Indeed, Plaintiffs' data-based claims are controlled by contracts between IMLS and its data

---

[1] To be clear, Plaintiffs do not assert an unreasonable delay claim under the APA with respect to IMLS's data publication.  Plaintiffs merely speculate that IMLS's re-structuring would render it incapable of complying with its data publication responsibilities.  *See* Pls' Mot. at 13-14.  Not so. *See* Defs' SOMF ¶¶ 4-10.

collection vendors and can only be redressed through enforcement of those third-party contracts. Because—as the Supreme Court recently emphasized—Congress vested the Court of Federal Claims with exclusive jurisdiction over such claims, this Court lacks jurisdiction over contract claims regarding IMLS's data collection. *See NIH*, 2025 WL 2415669, at *1 (citing *California*, 604 U.S. at 968 (per curiam)); *Appalachian Voices v. United States Envtl. Prot. Agency*, No. CV 25-1982 (RJL), 2025 WL 2494905, at *8 (D.D.C. Aug. 29, 2025) ("[T]he Tucker Act bars an APA action in federal district court that is based on contractual claims.").

In short, Plaintiffs' claims rest on the need for assurances that the government will continue to comply with existing grant agreements. In other words, Plaintiffs want the Government to keep paying up. *See Climate United Fund*, 2025 WL 2502881, at *7 (holding the district court lacked jurisdiction over grantees' APA claims where, "[d]espite the grantees' characterizations, the remedy they seek is specific performance of their contracts, and they have identified no right to relief that is 'truly independent' of the grant agreements."). As such, jurisdiction for Plaintiffs' claims lies exclusively in the Court of Federal Claims. *See Vera Institute of Justice v. U.S. Department of Justice*, No. 25-CV-1643 (APM), 2025 WL 1865160, at *18 (D.D.C. July 7, 2025), *appeal filed*, No. 25-5248 (D.C. Cir. July 10, 2025) (concluding that APA claims regarding *en masse* grant terminations were precluded by the Tucker Act).

**B. Administrative Bodies Identified in the Civil Service Reform Act of 1978 are the Exclusive Channels for Any Challenge to the Propriety of Federal Employee Removals.**

In addition to seeking specific performance on grant agreements, Plaintiffs' allegations challenge the Defendants Agencies' employment actions. *See* Compl. ¶ 42 ("This significant reduction in staff will dramatically slow the processing of reimbursements due to libraries for awards already granted—assuming the grants are not terminated—as well as processing of applications for important grant award submissions by states and libraries."); Pls' Mot. at 7 ("The twelve staff members that remained at IMLS were not enough to carry out the agency's statutory duties."). Federal law, however, does not permit Plaintiffs to employ an APA action to challenge the removal of federal employees—much less the removal of third-party employees.

Rather, in the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978), Congress established a comprehensive framework for evaluating employment actions against federal employees and presenting an integrated scheme of both administrative and judicial review of challenged personnel practices. In so doing, Congress balanced "the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988).

Specifically, in passing the CSRA, Congress made the Office of Special Counsel, the Merit Systems Protection Board ("MSPB"), and the Federal Labor Relations Authority ("FLRA") the exclusive means for federal employees, applicants, labor unions and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions, *see United States v. Fausto*, 484 U.S. 439, 455 (1988), even when those disputes involve constitutional claims, *see Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10-15 (2012) (citation omitted); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*").

The Supreme Court has long recognized that Congress established the CSRA as a comprehensive scheme covering all matters involving federal employment. *See Fausto*, 484 U.S. at 455. Indeed, the Supreme Court has held that, even if a federal employee was raising constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction[.]" *Elgin*, 567 U.S. at 12. The CSRA thus "precludes courts from providing supplemental remedies." *Lampon-Paz v. OPM*, 732 F. App'x 158, 161 (3d Cir. 2018); *Saul v. United States*, 928 F.2d 829, 835-42 (9th Cir. 1991) ("Congress is better equipped than we to strike an appropriate balance between employees' interests in remedying constitutional violations and the interests of the government and the public in maintaining the efficiency, morale and discipline of the federal workforce."); *Veit v. Heckler*, 746 F.2d 508, 510-11 (9th Cir. 1984). A request for "reinstatement [of] members already terminated and to prevent [an agency] from terminating other members in the future . . . is precisely the relief afforded through the CSRA." *Nat'l Treasury Employees Union*, 2025 WL 2371608, at *5.

11

The D.C. Circuit recently held that, even as to challenges to personnel actions that occur as part of "broad disputes about agency shutdowns," *i.e.*, not formulated as specific challenges to individual terminations by those individuals, such challenges cannot be heard by a district court in light of Congressional channeling of such claims to a specialized review scheme. *Id.* at *6. In so holding, the D.C. Circuit explained it was relying on precedent in which "the Supreme Court held that the CSRA review scheme is exclusive even where the harmed employee contends that a governing 'federal statute is unconstitutional.'" *Id.* (quoting *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012)). Thus, the Supreme Court precedent on which the D.C. Circuit relied confirms that even claims related to an alleged effort to shut down an agency must be channeled under the CSRA review scheme.

The same reasoning applies in this case; because federal law requires channeling of all claims related to federal employment via the administrative bodies that Congress created in the CSRA, this Court lacks jurisdiction to consider Plaintiffs' claims to the extent they challenge federal personnel decisions. Indeed, such a holding is consistent with the Supreme Court's emphasis in *California* that the APA does not allow litigants to forestall properly applicable channeling regimes that Congress established. *See California*, 604 U.S. at 968.

Even if jurisdiction over such employment-related actions generally was not precluded, reinstatement is not an available remedy under the APA because it exceeds court's historical authority in equity. The APA authorizes a court to grant injunctive relief subject to traditional equitable limitations. *See* 5 U.S.C. § 702(1). Absent express statutory authority, a federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement was not a traditionally available remedy at equity. *See Sampson v. Murray*, 415 U.S. 61, 83 (1974). To the contrary, courts of equity lacked "the power . . . to restrain by injunction the removal of a [public] officer." *In re Sawyer*, 124 U.S. 200, 212 (1888); *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal

12

equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction"); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers."); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898) ("[T]o sustain a bill in equity to restrain . . . the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the [g]overnment."); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another." (citation omitted)).

The creation of new remedies is "a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022), and courts of equity lack "the power to create remedies previously unknown to equity jurisprudence," *Grupo Mexicano*, 527 U.S. at 332. Plaintiffs are not entitled to bring claims under the CSRA, nor did they follow CSRA-required procedures. More broadly, no statute authorizes courts to reinstate public employees in order to improve government services to third parties. This Court thus lacks the power to grant the reinstatement remedy here.

Ultimately, any claim that Defendants have failed to take a discrete, mandatory agency action (such as the provision of concrete services) to which Plaintiffs believe they are legally entitled must be brought under the APA's provision authorizing suits to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Or, should the Defendants fail to disburse funds that Plaintiffs believe the Defendants are obligated to pay, Plaintiffs could pursue remedies in the Court of Federal Claims under the Tucker Act, 28 U.S.C. 1491. Plaintiffs may not evade the limits on such actions by seeking mass reinstatement of the employees who may provide such services instead; *see McMahon v. New York*, 145 S. Ct. 2643 (2025) (granting stay of an order requiring re-instatement of 1,400 federal employees while the appellate court considers the government's channeling arguments).

II.    **Dismissal Is Warranted Because Plaintiffs Do Not Have Standing to Receive the Broad Relief They Seek.**

Plaintiffs—a non-profit organization and a labor organization—challenge not only a number of existing and potential grant, employment, and programmatic terminations, but also structural and policy changes at IMLS.  *See generally* Compl., ECF No. 1; Mot. for Summ. Judg., ECF No. 58.  However, Plaintiffs lack standing to remedy any alleged injury stemming from IMLS's re-structuring that is not otherwise linked to a concrete and particularized injury to a named party.

A.    **Plaintiffs Lack Standing to Categorically Enjoin Defendants' Re-structuring Decisions.**

As a threshold matter, Plaintiffs lack the "irreducible constitutional minimum of standing" required to maintain a suit for the sweeping relief that they seek.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To meet that constitutional requirement, Plaintiffs must establish that they "[have] suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024).  The Supreme Court has emphasized that "standing is not dispensed in gross." *Id.* at 61 (quotation omitted) (holding that the circuit court in that case had erred by treating the plaintiffs and defendants, respectively, "as a unified whole").  Thus, "plaintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).  The Court highlighted that "[h]eeding these conditions is critically important" in a "sprawling suit" with multiple plaintiffs, defendants, and claims, where plaintiffs had alleged different impacts stemming from varying conduct by different defendants. *Id.*  The same requirement for careful analysis applies here.

Only "actual or imminent" injuries count for Article III purposes.  *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024).  Allegations that are "too speculative" or merely assert "possible future injury" do not suffice.  *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (emphasis and quotation omitted).  Plaintiffs do not have standing to lodge a generalized,

speculative dispute over whether an agency will perform its statutory duties or will have sufficient resources to do so.  Where Plaintiffs alleged that they have suffered actual loss—*i.e.*, termination of grants and programs that has already occurred—they do not claim (nor could they plausibly do so) that those terminations were the result of insufficient staffing.  Indeed, Plaintiffs' own evidence shows at most that grants and programs were terminated by the agency's voluntary programmatic choice, not inability based on staffing.  *See* Pls. SOMF at 19-21 (describing IMLS's termination of grants "in alignment with the agency's updated priorities and the President's Executive Order 14238").  Plaintiffs' speculation that reductions in force may lead to delays or terminations of grants or services in the future is insufficient to establish any injury in fact.  *See Alliance for Hippocratic Med.*, 602 U.S. at 383.  To be sure, the proportion of staff terminated at IMLS tends to support a prediction that the agency's scale and scope, including in programs offered, will be reduced in the future.  But that is the very intent of Executive Order 14238.  Plaintiffs challenge IMLS's general re-structuring decisions and claim that those decisions potentially affect agency operations generally but Plaintiffs have not identified any specific staffing decisions that have resulted in concrete and particularized injury to IMLS programs or services upon which Plaintiffs rely.  *See* Pls' Mot. at 43 (requesting generally that the Court vacate IMLS's decision to "place staff on administrative leave").  These claims, however, do not satisfy Article III because Plaintiffs cannot establish that specific staffing levels are necessary to redress any concrete injury stemming from the loss of discrete IMLS programs or services.  The appropriate and lawful method to challenge an actual (not hypothetical) failure to provide a program that a plaintiff believes an agency is legally obligated to provide is through a claim under 5 U.S.C. § 706(1), if and when the program is no longer available and any injury to that plaintiff has actually occurred.  *See California v. Texas*, 593 U.S. 659, 678 (2021) (rejecting a "highly attenuated chain of possibilities"); *OPM v. American Fed'n of Gov't Emps.*, 145 S. Ct. 1914, 1914 (2025) (citing *Clapper* and concluding that "allegations of the nine non-profit-organization plaintiffs" were "presently insufficient to support the organizations' standing").

And Plaintiffs' broad claims regarding the purported "dismantling" of IMLS, Pls' Mot. at 10, involve no "legally and judicially cognizable" harm that is "traditionally thought to be capable of resolution through the judicial process," *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Such suits have no "ground[ing] in historical practice" or "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo v. Robins*, 578 U.S. 330, 341 (2016). This "generalized interest . . . is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Id*.; *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 482-83 (1982). Finally, because Plaintiffs assert an injury caused by IMLS's alleged blanket abdication of its legal responsibilities, the judiciary may not redress that injury, as doing so require "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of . . . administration, contrary to the more modest role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006); *see also Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring).

For the reasons explained further herein, the Court should deny relief in full. To the extent the Court is inclined to grant any relief, however, Article III—and the related requirement that the remedy sought "be limited to the inadequacy that produced the injury in fact that the plaintiff has established," *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018)—necessitates that any relief be drawn narrowly to address only demonstrated injuries to Plaintiffs in this case.

### B. Plaintiffs Do Not Have Organizational Standing to Assert Claims on their Members' Behalf.

Plaintiffs cannot show that they have organizational standing to sue on their own behalf. Plaintiffs are not agency employees who themselves are "the object of the government action or inaction" they "challenge," meaning that although "standing is not precluded . . . it is ordinarily 'substantially more difficult' to establish." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). And organizations, like Plaintiffs, must prove an injury-in-fact that is fairly traceable to the

16

challenged actions.  That showing requires "more than simply a setback to the organization's abstract social interests."  *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  Each organization must establish that the challenged conduct "'perceptibly impaired' the organization's ability to provide services."  *Turlock Irrigation Dist. v. Fed. Energy Reg. Comm'n*, 786 F.3d 18, 24 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)) (emphasis added).

The limited scope of organizational standing under *Havens* was clarified in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).  The *Alliance* plaintiffs—four medical associations and several individual doctors—challenged FDA actions regarding the regulation of mifepristone, a pregnancy-termination drug, making it easier for doctors to prescribe and for pregnant women to obtain the drug.  *Id*. at 376.  Plaintiffs did not prescribe or use mifepristone, and FDA did not impose any requirements on plaintiffs.  The *Alliance* Court observed that organizations may "sue on their own behalf for injuries they have sustained," *id*. at 393 (citing *Havens*, 455 U.S. at 379 n.19) (emphasis added), but made clear that an organization cannot establish injury by asserting the right of others: "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might only have a general legal, moral, ideological, or policy objection to a particular government action," *id*. at 381.

The *Alliance* Court explicitly rejected the organizations' assertion that "standing exists when an organization diverts its resources in response to a defendant's actions," and clarified that "*Havens* does not support such an expansive theory of standing."  *Alliance*, 602 U.S. at 395.  The Court noted that the organization plaintiff in *Havens*, HOME, "not only was an issue advocacy organization, but also operated a housing counseling service."  *Id*.  The false information provided by the realty defendant about apartment availability "perceptibly impaired" HOME's counseling and referral services, meaning that the realty's "actions directly affected and interfered with" the organization's "core business activities" distinct from its advocacy

activities—"not dissimilar," the Court added, "to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id*. In contrast, FDA's relaxation of the regulation of mifepristone in *Alliance* did not present any similar impediment to the medical associations' business. *Id*. A plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Id*. at 394. Indeed, if diversion of resources could confer standing on an organization, that "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies," which take the Article III courts far outside their properly limited role. *Id*. at 395.

Like the plaintiffs in *Alliance*, Plaintiffs here are unable to identify direct harms to them. Plaintiff AFSCME is neither an IMLS employee nor a direct recipient of IMLS grants. *See* Compl. ¶¶ 72-73. AFSCME claims that "AFSCME members will lose their jobs as a result of Defendants' funding cuts." *Id*. ¶ 72. These claims do not represent an injury on the Plaintiff's "own behalf," *Alliance*, 602 U.S. at 393, but rather appear to assert an injury on its member's behalf. Such an assertion would flout the prudential rule against third-party standing. In general, only the party afforded a given constitutional right "has the appropriate incentive to challenge (or not challenge) governmental action" in a way that genuinely furthers the right-holder's interests, "and to do so with the necessary zeal and appropriate presentation," the third-party standing doctrine requires a plaintiff with its own Article III injury-in-fact to "make two additional showings" before asserting the right of a nonparty: that it has "a 'close' relationship with the person who possesses the right," and that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004). Here, even assuming, *arguendo*, AFSCME has a sufficiently "close" relationship with library employees and grant recipients, AFSCME identifies no "hindrance" to those individuals proceeding with their own cases, meaning that "no obvious barrier exists that would prevent" any such recipient

"from asserting" its "own rights." *Renne v. Geary*, 501 U.S. 312, 320 (1991); *see, e.g., Am. Immigr. Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1362 (D.C. Cir. 2000).

Moreover, the "standing inquiry [must be] especially rigorous when," as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). In that regard, no plaintiff can show Article III standing based on anything less than "concrete" injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs' broad fears about employment outcomes or loss of bargaining power lack the requisite concreteness. *See, e.g.*, Compl. ¶¶ 70-71. And Plaintiffs' forecasts of harms to their status and bargaining power "amount[] to nothing more than speculation about future events that may or may not occur[.]" *See Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002) ("The plaintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict with Iraq, amounts to nothing more than speculation about future events that may or may not occur."), *aff'd*, 2003 WL 349713 (D.C. Cir. 2003).

What is at issue is, at most, AFSCME's "pocketbook injury" (lost dues) from individual employee-specific agency decisions. *Collins v. Yellen*, 594 U.S. 220, 243 (2021). Although AFSCME has sought broad relief from agency decisions regarding employment, in Article III courts, "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see Gill v. Whitford*, 585 U.S. 48, 72, 138 S. Ct. 1916, 201 L. Ed. 2d 313 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). AFSCME attempts to carve out standing by asserting reliance on data compiled and distributed by IMLS. *See* Compl. ¶ 70; Pls' Mot. at 14. However, AFSCME does not demonstrate that it will be wholly incapable of substituting the IMLS data with other sources should it become unavailable. Although AFSCME claims that PLS data is its "primary source," Pls' Mot. at 14, it is unclear why AFSCME could not use the most-recently available historical data from the same surveys for purposes of its work negotiating collective bargaining

agreements. *See Alliance*, 602 U.S. at 393 ("The doctors have not shown that FDA's actions likely will cause them any injury in fact. The asserted causal link is simply too speculative or too attenuated to support Article III standing.").

Beyond the direct harm alleged by Plaintiff ALA regarding grant terminations which is only redressable in the Court of Federal Claims, it does not have organizational standing to lodge broad claims on behalf of its 47,000 member "librarians, libraries, and members of the reading public." Pls' Mot. at 44. ALA claims that its members-libraries will be harmed if their IMLS grants are terminated, but these indirect claims are not sufficient to establish organizational or third-party standing, particularly where many of those users or states have asserted their own claims on behalf of public libraries. *See Rhode Island v. Trump*, No. 25-cv-00128 (D. R.I.).

### C. Plaintiffs Lack Associational Standing.

To establish associational standing, a plaintiff must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (quotation omitted).

At issue here is the third, or "member-participation," prong. *Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-cv-2776, 2025 WL 27162, at *12 (D.D.C. Jan. 3, 2025). That prong is unsatisfied when "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Air Transp. Ass'n of Am. v. Reno*, 80 F.3d 477, 483 (D.C. Cir. 1996) (quoting *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975)). The member-participation prong thus concentrates on "whether the claim asserted and relief requested require individualized determinations," an inquiry that "is prudential and reflects a 'judicially self-imposed limit on the exercise of federal jurisdiction' rather than a 'constitutional mandate,' focusing instead on 'matters of administrative convenience and efficiency.'" *Tanner-Brown*, 105 F.4th at 447 (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996) (cleaned up)). Here, the

Plaintiff's claims, albeit purportedly for injunctive and declaratory relief, require "consideration of the individual circumstances of any aggrieved member of the organization," *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015), namely, individualized findings concerning specific contracting and employment decisions.

The extent of the harm to Plaintiffs' members thus hinges on individualized proof. Plaintiffs' mere styling of the relief sought as equitable does not obviate the need to analyze whether the claim asserted require member participation because of the necessity for "individualized determinations." In *Tanner-Brown*, for example, the D.C. Circuit concluded the member-participation prong was not satisfied because the association sought the equitable remedy of accounting, which could not issue "without making individualized findings." 105 F.4th at 447; *see Weingarten v. Devos*, 468 F. Supp. 3d 322, 335-36 (D.D.C. 2020) (member-participation prong unsatisfied for due process claim where union relied on member-specific evidence to prove asserted deficiencies despite purported character of relief sought); *see also O'Hair v. White*, 675 F.2d 680, 692 (5th Cir. 1982); *Kansas Health Care Ass'n Inc. v. Kansas Dep't of Social & Rehab. Serv.*, 958 F.2d 1018, 1021-22 (10th Cir. 1992). Here, too, relief would need to be specific as to individual grant terminations or employment actions.

## III. Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete, Final Agency Action.

Plaintiffs' APA claims independently fail and summary judgment should be entered for Defendants because Plaintiffs are not challenging a discrete agency action, but rather a collection of grant terminations, personnel actions, and programmatic activities. Under the APA, plaintiffs "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004). Consistent with these principles, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan*, 497 U.S. at 891. "Because 'an on-going program or policy is

not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Id*.

Plaintiffs improperly seek wholesale judicial review of IMLS's re-structuring decisions. *See* Pls' Mot. at 15-16. For example, Plaintiffs challenge Defendants' alleged "decision to dismantle IMLS," claiming that Defendants improperly sought to "to shutter the agency." *Id*. at 15, 43. Notably, Plaintiffs do not challenge specific grant terminations; specific payments they claim to be entitled to; or specific provision of library or museum services—they challenge IMLS's entire course of conduct moving forward. The APA does not permit such challenges.

In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892-93 (footnote omitted). Just as in *Lujan*, Plaintiffs' APA counts seek to bring a collective, programmatic, challenge to the possibility that IMLS will fail to disburse grant funds as they become due and the prospect that it may be unable to comply with generalized purported statutory obligations given its staffing decisions. But these are grab-bag challenges to general agency operations, not discrete challenges to concrete agency actions.

In *National Treasury Employees Union*, the D.C. Circuit noted that "plaintiffs [sought] to challenge what they describe as a single, overarching decision to shut down the CFPB." 2025 WL 2371608, at *11. Plaintiffs in that case inferred the "putative shutdown decision" "from various discrete actions taken by agency leadership to downsize [and agency], including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing

employees, and terminating the lease for its headquarters." *Id.* at *7.  The D.C. Circuit explained that such a challenge "is not viable," *id.*, and does not constitute final agency action reviewable under the APA.

As in *National Treasury Employees Union*, Plaintiffs here "point to no regulation, order, document, email, or other statement, written or oral, purporting to shut down the [Defendant Agencies]." *Id.* at *11.  The Executive Order itself makes no such command.  *See* Exec. Order No. 14238, 90 Fed. Reg. 13043, §2(a) (2025) ("[T]he non-statutory components and functions of [IMLS] shall be eliminated to the maximum extent *consistent with applicable law*, and [IMLS] shall reduce the performance of [its] statutory functions and associated personnel to the minimum presence and function *required by law*" (emphases added)).  Indeed, Plaintiffs' claims do not stem from the programmatic efforts of the agency writ large, but from specific activities stemming from programmatic plans—from a grant termination (were such terminations reviewable under the APA, which they are not), or the specific cancellation of services to which the Plaintiffs allegedly had a legal entitlement.  But they do not bring those specific challenges— and, as the D.C. Circuit made clear, they cannot subsume concrete final agency action within the banner of a programmatic challenge more generally.

Plaintiffs do not identify or challenge the Executive Order as final agency action.  But even if they did, IMLS's compliance with the Executive Order generally would not itself constitute final agency action reviewable under the APA.  To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). Plaintiffs' argument that IMLS's "single decision to fully dismantle the agency"—surmised from various decisions taken by agency leadership to downsize—is final agency actions under *Bennett*, Pls' Mot. at 27, misses the mark.

Under *Bennett*'s first prong, IMLS's downsizing efforts through its implementation of the Executive Order marks the initiation, not the consummation, of the agency's decision-making

process. IMLS's actions reflect decisions by agency leadership to realign their policy goals and actions consistent with the current administration's directives. Those decisions would be "preliminary" in nature and "not directly reviewable[.]" *See* 5 U.S.C. § 704. "[They] may be a step, which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the interim decisions themselves the "consummation of the administrative process" reevaluating the agency's priorities. *Id*. at 113; *see EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel."); *Appalachian Energy Grp. v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994) (no final agency action where agency "has not taken any action at this point triggering [the court's] power to review its position").

Nor do the IMLS's attempts to implement the Executive Order satisfy the second *Bennett* prong. Prong two's language requires "a 'pragmatic' inquiry that requires courts to examine the 'concrete consequences' of an agency action." *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (citation omitted). The court must consider the "concrete impact the [agency action] had on [the Plaintiffs]." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate . . . effect on the day-to-day business' of the complaining parties" (citation omitted)); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties"). The holding in *Biden v. Texas*, 597 U.S. 785 (2022), does not save Plaintiffs' APA claims. *See* Pls' Mot. at 29. In that case, the Supreme Court concluded that memoranda terminating an immigration program constituted final agency action because they "bound [agency] staff by forbidding them to continue the program in any way from that moment on." *Id*. at 808-09. Here, however, Plaintiffs' programmatic challenge to the Defendant Agencies' decisions to review their statutory obligations and undertake restructuring

consistent with the EO and applicable law fails to identify any discrete and final agency of the type considered by the Court in *Biden* and reviewable under the APA. *See National Treasury Employees Union*, 2025 WL 2371608 at *12 ("[T]he shutdown decision posited here, like the Termination Decision posited in *Biden v. Texas*, is an abstract decision wholly apart from any specific agency action, as defined in the APA." (quotation omitted)). Simply put, Plaintiffs' sweeping claims here are not workable as APA challenges.

## IV.   Defendants' Staffing and Funding Determinations are Themselves Committed to Agency Discretion.

Plaintiffs repeatedly complain about IMLS's staffing decisions, which they say may hinder the provision of what Plaintiffs claim are IMLS's legally mandated obligations. But this conflates two distinct inquiries: (1) agency internal staffing determinations, on one hand, and (2) specific provision of specific services to external parties, on the other. The former is committed to agency discretion, and Plaintiffs cannot use their fears about the adequacy of the latter to justify challenges to the former, particularly in the absence of concrete actions to terminate statutorily required obligations.

As a result, Plaintiffs cannot succeed on the merits of their arbitrary and capricious claim regarding staffing changes, which involve actions committed to agency discretion by law. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]" *Id.* The standard of review is "highly deferential" in determining whether an action is arbitrary and capricious, *Conservation Force v. Salazar*, 919 F. Supp. 2d 85, 89 (D.D.C. 2013), and agency action regarding reallocation of resources and reorganizing of enforcement priorities after a change in presidential administrations, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln v. Vigil*, 508 U.S. 191, 193 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most

effective or desirable way."). Plaintiffs bear the burden of making such a showing. *See generally New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 113 (D.D.C. 2010) ("[T]he burden of establishing that the agency action is arbitrary or capricious rests with the party challenging agency action.").

Courts lack the power to "dictat[e] to the agency the methods [and] procedures" the agency must use to complete its statutory obligations. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524-25 (1978) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Indeed, internal staffing decisions are traditionally left to an agency's discretion. *See id.* at 524 (explaining that the Supreme "Court has for more than four decades emphasized that" even outward facing "procedures [are] basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments"). To override these principles and enjoin agency leadership from exercising procedural control over its own staff so as to ensure that staff is carrying out statutory obligations or otherwise exercising agency leadership's policies would be an extraordinary violation of the separation of powers. Such activities are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administration action at issue and the language and the structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that Defendants' managerial decisions are committed to agency discretion.

First, these decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92 (quoting 5 U.S.C. § 701). Individual staffing decisions reflect efforts to determine whether ongoing agency actions "best fit the agency's overall policies" under new leadership and "whether agency resources are best spent on" current projects or whether they would be better spent differently. *Heckler v. Chaney*, 470 U.S. 821 (1985). "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."

*Id.* at 831-32.

Second, Plaintiffs can point to no particular statute limiting the agency's inherent discretion to make independent staffing decisions. Again, agencies generally have broad discretion to fashion internal procedures for formulating policies and implementing a statute. *See Vt. Yankee*, 435 U.S. at 543. IMLS's statute expressly grants such discretion. *See* 20 U.S.C. § 9105(a) ("The [IMLS] Director may . . . appoint and determine the compensation of such employees as the Director determines to be necessary to carry out the duties of the Institute.").

Ultimately, if Plaintiffs are dissatisfied with a specific final agency action, they may challenge that action in an appropriate venue. And they cannot preemptively challenge staffing determinations antecedent to those actions on the fear that the agency may not be able to comply with any statutory mandates. Said differently, a person may be able to challenge a final agency action that injures them; they cannot challenge the staffing determinations that decided which line employee made that determination. But it is the latter challenge Plaintiffs bring, because they cannot bring the former.

Additionally, an agency's decision to discontinue a previously funded program and reallocate those funds to other uses is committed to agency discretion by law. *Lincoln*, 508 U.S. at 185-88. The Supreme Court has explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In making this allocation, the agency must engage in "a complicated balancing of a number of factors" within "its expertise," including "whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* at 193 (quotation omitted). Although the Supreme Court in *Lincoln* addressed lump-sum appropriations, its logic extends to other funding programs that permit the agency to decide "how the moneys" for a

particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002).

Many of the grant programs at issue here fall under that rubric. Each agency is funded at present by a lump-sum appropriation. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, tit. I, § 1102(a)(2), (8), 139 Stat. 9, 10-11; *see* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 697 (appropriating "[f]or carrying out the Museum and Library Services Act of 1996 and the National Museum of African American History and Culture Act, $294,800,000"). And the specific grant programs Plaintiffs cite vest each agency's leadership with discretion to determine the appropriate number and size of grants awarded, to the extent they obligate the agencies to make grants at all. *See e.g.*, 20 U.S.C. § 9162(b)(1) ("National leadership grants") ("The Director *may* carry out the activities described in subsection (a) by entering into arrangements, including grants, contracts, cooperative agreements, and other forms of assistance, with libraries, library consortia and associations, institutions of higher education, museums, and other entities that the Director determines appropriate.") (emphasis added); *id*. § 9165(b) ("Laura Bush 21st Century Librarian Program") ("[T]he [IMLS] Director *may* enter into arrangements, including grants, contracts, cooperative agreements, and other forms of assistance, with libraries, library consortia and associations, institutions of higher education (as defined in section 1001 of this title), and other entities that the Director determines appropriate") (emphasis added).

IMLS has the ability to consider the optimal distribution of funding to achieve statutory goals "in what [each agency] sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. The APA does not allow for judicial review of those discretionary judgments that implicate agency expertise about allocating limited resources and advancing policy priorities. *See id*. at 193 (noting that funding decisions involve "a complicated balancing of a number of factors" (quotation omitted)). Accordingly, summary judgment should be entered for Defendants on all APA claims.

28

V.    **Defendants Are Entitled To Summary Judgment On Plaintiffs' Constitutional and**
     ***Ultra Vires* Claims.**

    **A.    Plaintiffs' Claims are Foreclosed by *Dalton*.**

As a threshold matter, the constitutional and *ultra vires* claims are merely Plaintiffs'
statutory and APA claims re-packaged because they argue that Defendants' actions do not
comport with the applicable statutes. *See, e.g.*, Compl. ¶ 78 ("Congress has the exclusive power
under the Spending Clause and the Appropriations Clause to establish and fund federal programs
and to direct payment of federal funds to the states for purposes defined by Congress."); *id*. ¶ 87
("President Trump's actions to dismantle IMLS violate the Take Care Clause because they are
directly contrary to the duly enacted statutes establishing IMLS . . . .").

"Constitutional rights do not typically come with a built-in cause of action to allow for
private enforcement in courts. Instead, constitutional rights are generally invoked defensively in
cases arising under other sources of law, or asserted offensively pursuant to an independent
cause of action designed for that purpose." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024).  As the
Supreme Court has confirmed, "claims simply alleging that the President has exceeded his
statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994).
In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in
excess of his statutory authority, he also violates the constitutional separation of powers
doctrine." *Id*. at 471.  Not "every action by the President, or by another executive official, in
excess of his statutory authority is ipso facto in violation of the Constitution." *Id*. at 472.  In
reaching this conclusion, the Supreme Court carefully "distinguished between claims of
constitutional violations and claims that an official has acted in excess of his statutory authority."
*Id*. (collecting cases).  The Constitution is implicated only if executive officers rely on it as "[t]he
only basis of authority" or if the officers rely on an unconstitutional statute.  *Id*. at 473 & n.5.

Recently, in *Global Health Council v. Trump*, the D.C. Circuit considered various APA
and constitutional challenges to an executive order calling for an agency funding freeze and a
reevaluation of the agency's funding programs.  No. 25-5097, 2025 WL 2480618, at *1 (D.C.

Cir. Aug. 28, 2025). The grantees claimed "that the Executive [] unlawfully impounded—that is, improperly delayed or withheld—certain sums appropriated" through the implementation of an executive order—specifically, through the "suspen[sion] or terminat[ion] thousands of grant awards" and the "major [agency] restructuring and downsizing efforts." *Id.* at *2-3. In determining "whether the underlying claim [was] properly characterized as statutory or constitutional," the court applied the *Dalton* framework. *Id.* at *6. The court concluded that the grantees "may not bring a freestanding constitutional claim if the underlying alleged violation and claimed authority are statutory" and that the "the grantees may not reframe this fundamentally statutory dispute as an ultra vires claim either." *Id.* at *1.

Here, too, Plaintiffs' claims focus entirely on their contentions that IMLS has not acted consistent with its statutory obligations. Compl. ¶ 78 ("Congress has the exclusive power under the Spending Clause and the Appropriations Clause to establish and fund federal programs and to direct payment of federal funds to the states for purposes defined by Congress."); *id.* ¶ 87 ("President Trump's actions to dismantle IMLS violate the Take Care Clause because they are directly contrary to the duly enacted statutes establishing IMLS as an independent agency."); *see also* Pls' Mot. at 43 ("Defendants' actions are *ultra vires*. The statutory obligations imposed on IMLS by the MLSA are specific . . . Defendants' actions contravene these mandates, as does Defendants' action to dismantle IMLS." (cleaned up)). In turn, Plaintiffs point to three statutes they claim Defendants have "usurp[ed]," *id.* ¶ 82—IMLS's organic statute, the relevant Appropriation Acts, and the Paperwork Reduction Act, *see* Pls' Mot. at 34-35. The constitutional and *ultra vires* claims thus amount to little more than an attempt to re-state a statutory claim in constitutional parlance, and they should therefore be rejected.

## B. The Take Care Clause Claim Also Fails Because There Has Been No Such Violation.

The Constitution vests the President with broad, discretionary authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The Supreme Court has recognized that the President's duty when exercising his power to see that the laws are faithfully executed is

"purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165-66 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character.").

To hold otherwise would upset the separation of powers and allow judicial superintendence over executive power that the Clause commits to the President alone. *Baker*, 369 U.S. at 217 (Courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department."); *see also Dalton*, 511 U.S. at 474-75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review the President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. (4 Wall.) at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub Co. Acct. Oversight Bd.*, 561 U.S. 477, 492-93 (2010) ("It is his responsibility to take care that the laws be faithfully executed."); *id*. at 495-97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689-90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712-13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate *the President's* duty to faithfully execute the laws. To the extent Plaintiffs and Intervenors seek to challenge the

legality of Defendants' conduct, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles.

### C. *Ultra Vires* Review Is Not Available.

The Supreme Court has "strictly limited" the scope of ultra vires review, reasoning that "ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). Thus, the Supreme Court has held that *ultra vires* claims must fit within "painstakingly delineated procedural boundaries"; such review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*'" in a statute. *Id.* (quoting *Railway Clerks v. Assoc. for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965)) (emphasis the Court's).

Plaintiffs' claim in this case falls beyond these boundaries. Indeed, *ultra vires* review is unavailable if, "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Here, as discussed above, the Tucker Act and the CSRA provide a mechanism for review of Plaintiffs' claims. And, even if the Court were to disagree and hold that Plaintiff's APA claims could proceed, this, too, would supply an adequate opportunity for the review of Plaintiffs' claims. Given these "alternative path[s] to judicial review," *Nuclear Regul. Comm'n*, 605 U.S. at 681, an *ultra vires* claim is not available.

### VI. Plaintiffs Have Failed to Establish Irreparable Harm.

Plaintiffs fail to establish that they will suffer irreparable harm absent injunctive relief. To demonstrate irreparable harm, Plaintiffs must meet a "high standard" and show that they face injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co., Inc. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1 (D.D.C. 2008), and "beyond remediation," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Merely economic harms are not beyond remediation. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Here, none of the alleged injuries Plaintiffs plead can support the entry of

the requested injunction preventing IMLS from taking any steps to restructure, that is to implement the EO, because all claimed harms are economic or speculative.

First, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough" to establish irreparable harm. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wis. Gas Co.*, 758 F.2d at 674). Rather, it is black-letter law that economic harm is generally not irreparable because compensation after the lawsuit generally ensures full relief. *Wis. Gas Co.*, 758 F.2d at 674 (describing that principle as "well-settled"). The only exceptions are "where the loss threatens the very existence of the movant's business," *id.*, or "where the claimed economic loss is unrecoverable," *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).

Here, Plaintiffs' contract allegations illustrate why economic harm generally is not cognizable as irreparable harm for purposes of equitable relief. Money is generally fungible, and, unless the very existence of an enterprise is threatened, litigant suffering financial loss may be made whole through money damages. Plaintiffs effectively concede the point in arguing alleged irreparable harm from IMLS's funding cuts. *See* Pls' SOMF ¶ 214 ("With IMLS's programs interrupted or cancelled, Plaintiffs and many of their members have had to cancel or pause programs, lay off staff, and plan for future program cuts and layoffs.").

In *California*, the Supreme Court considering an analogous suit found it "compelling" that grantees—that had been granted a temporary restraining order enjoining the Government from terminating various education-related grants—"[had] the financial wherewithal to keep their programs running." 604 U.S. at 969. Against that backdrop, the Supreme Court held it was appropriate to stay the temporary restraining order, reasoning that "if [the grantees] ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum.' *Id.* Just so in this case. While any grantee could have chosen to bring its own action in an appropriate forum, *i.e.*, the Court of Federal Claims, to litigate whether payment on that grant must be made, there is no authority under which Plaintiffs can bootstrap onto any alleged harm an order that all future payments to it must be made by IMLS, regardless of the President's or

33

agency's judgment, let alone to numerous other grantees.  Yet that is the expansive relief that Plaintiffs demand.

Second, Plaintiffs' allegations regarding IMLS's data and research services do not support injunctive relief.  Although IMLS "shall regularly support and conduct, as appropriate, policy research, data collection, analysis and modeling, evaluation, and dissemination of information to extend and improve the Nation's museum, library, and information services," there is no statutory requirement that IMLS disseminate such data on any particular timeline. *See* 20 U.S.C. § 9108(a).  Plaintiffs thus have no legal entitlement to IMLS data on their proposed terms. *See* Pls' SOMF ¶ 100 ("PLS data is typically published in May or June; in the ordinary course, the Fiscal Year 2023 data would have been released in May or June of 2025 and was prepared for release by April 2025; but IMLS halted the publication of the data.").  Any purported harm stemming from Plaintiffs' expectations that they would receive data by a certain date is not sufficient to support injunctive relief. *See Corp. for Pub. Broad. v. Fed. Emergency Mgmt. Agency*, 792 F. Supp. 3d 67, 80 (D.D.C. 2025) ("[I]nstability and unpredictability are not . . . sufficient to find irreparable harm" (citation and quotation omitted)).  Indeed, IMLS remains on track to publish the annual Public Library Survey and the biannual State Library Administrative Agency survey upon which Plaintiffs' claims are based. *See* Pls' SOMF ¶¶ 22-26; *see also* Defs' SOMF ¶¶ 4-10.

Accordingly, Plaintiffs have failed to establish irreparable harm that could support the entry of any injunction.

## VII.    The Balance of the Equities and the Public Interest Tip in Defendants' Favor.

An injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See  Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party").  In this setting, granting the injunction that Plaintiffs seeks would disrupt IMLS's efforts to comply with the EO, and act as responsible stewards of public funds.  Such an order here would effectively disable IMLS, as well as the President himself, from implementing the administration's priorities consistent with legal

authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted); *see also See Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*, 18 F.4th 38, 47 (1st Cir. 2021).

Additionally, where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funding, such funds may not be retrievable afterwards. *See California*, 604 U.S. at 969 (noting "the Government's representation that it is unlikely to recover the grant funds once they are disbursed" as among the reasons supporting a stay of a temporary restraining order enjoining the Government from terminating various education-related grants).

## VIII.    Vacatur is Not Appropriate Under the APA.

Plaintiffs' request—a "broad" injunction that restores IMLS to its March 2025 status, Pls' Mot. at 44—constitutes an over-broad equitable remedy that exceeds any harm to Plaintiffs. "Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff. If the court's remedial order affects nonparties, it does so only incidentally." *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs."). "This tracks the founding-era understanding that courts 'render a judgment or decree upon the right of the litigant[s].'" *Texas*, 599 U.S. at 693 (Gorsuch, J., concurring) (quoting *Rhode Island v. Mass.*, 37 U.S. 657 (1838)). This notion "ensures that federal courts respect the limits of their Article III authority to decide cases and controversies and avoid trenching on the power of the elected branches to shape legal rights and duties more broadly." *Id.* at 693-94.

As an initial matter, the APA does not permit vacatur of agency action, much less of an executive order. *See Texas*, 599 U.S at 695 (Gorsuch, J., concurring) (The APA "does not say

anything about 'vacating' agency action ('wholesale' or otherwise)."). The history and structure of the APA do not support that the "set aside" language in Section 706(2) is synonymous to "vacate," but rather that "set aside" should be understood to mean that a court should "disregard" the action taken by the agency in determining the outcome of a case. *Id.* ("Routinely, a court will disregard offensive provisions like these and proceed to decide the parties' dispute without respect to them."). At the time of the APA's adoption, "conventional wisdom regarded agency rules as 'quasi-legislative' in nature." *Id.* at 696. Indeed, federal courts have "never enjoyed the power to 'vacate' legislation," but instead possessed "'little more than the negative power to disregard an unconstitutional enactment.'" *Id.* (citation omitted). Interpreting the APA to allow quasi-legislative rules to be vacated (rather than disregarded) would thus be inconsistent with the history of the APA.

Even if Section 706 could be read to authorize vacatur of agency action, "a district court should think twice—and perhaps twice again—before granting such sweeping relief." *Id.* at 702 (citations and internal quotation marks omitted). As the Supreme Court recently explained in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), there is no basis in equity for a universal injunction that goes beyond remedying the harms incurred by the plaintiffs who have brought the lawsuit. The Court has long recognized that "equitable relief must be limited to the inadequacy that produced [the] injury in fact" and "[a]ny remedy a judge authorizes must not be more burdensome [to the defendant] than necessary to redress the complaining parties." *Texas*, 599 U.S. at 702 (Gorsuch, J., concurring) (cleaned up). To grant universal relief under the auspices of vacatur "strains our separation of powers. It exaggerates the role of the Judiciary in our constitutional order, allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide." *Id.* at 703. Accordingly, any equitable remedy applied in the nature of vacatur should apply only to the named parties. *See California v. Texas*, 141 S.Ct. 2104, 2115 (2021) (remedies "ordinarily operate with respect to specific parties" rather than "on legal rules in the abstract") (citations and internal quotation marks omitted); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (observing that the "general rule" is that

36

equitable relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.") (citations omitted).

## **CONCLUSION**

For all the reasons discussed herein, the Court should deny Plaintiffs' Motion, grant Defendants' Cross-Motion, and enter final judgment in Defendants' favor.

Dated:  November 25, 2025

<div style="margin-left:40%;">

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ *Abigail Stout*
ABIGAIL STOUT
(DC Bar No. 90009415)
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

/s/ *Heidy L. Gonzalez*
HEIDY L. GONZALEZ (FL Bar No. 1025003)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Telephone: (202) 598-7409
Email: heidy.gonzalez@usdoj.gov

*Attorneys for Defendants*

</div>

37